UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MELISSA GENERAL,                                    CIV. No. 07- CV- 6159T

        Plaintiff,

        vs.                                        AFFIDAVIT

CENTER FOR DISABILITY RIGHTS,

        Defendant.

STATE OF NEW YORK)
COUNTY OF MONROE) ss:

Mary Willoughby, being duly sworn deposes and states:

    1.      I have been the Director of Human Resources for the Center of Disability Rights, Inc ("CDR") since August of 2004.

    2.      CDR is a non-profit organization whose activities include advocating, servicing, training, housing, and counseling businesses, residents, agencies and individuals with disabilities.

    3.      CDR is contracted by the Monroe County Department of Social Services to act as a vendor and participate in the Consumer Directed Personal Assistance Service Program ("CDPAS").  Please find attached hereto as **Exhibit A**, is a true and correct copy of the Memorandum of Understanding between CDR and the Monroe County of Social Services.

    4.      CDPAS is a Medicaid funded home care services program that allows qualified chronically ill or physically disabled individuals greater flexibility in obtaining services.  The benefit of the program is that eligible chronically ill or disabled individuals

are able to oversee their own care while living at home. The program guidelines are outlined in Social Security Law Section 365-f and 18 NYCCR Section 505.14, 505.21 and 505.23. Please find attached hereto as **Exhibit B**, a true and correct copy of the above statute and regulations.

5.      The position of the Human Resource Director at the Center of Disability Rights ("CDR") involves dealing with the direct staff of CDR as well as the CDPAS aides who are jointly employed by CDR and the disabled consumers in whose homes the aides work.

6.      The chronically ill or disabled individual participating in CDPAS is known as a consumer and is responsible for, among other things, recruiting, interviewing, hiring, determining tasks to be completed, training, supervising, scheduling, ensuring the attendant work the hours that he or she is scheduled and dismissing their attendant. The consumer is responsible for approving and submitting time sheets for their attendants for CDR to process.

7.      In the event a consumer is unable to oversee their own care, the consumer must select a designated representative or self-directed other ("SDO") to act on their behalf.

8.      As a vendor, CDR is responsible for processing payroll, monitoring the completion of employment records, and acting as employer of record with regard to tax, insurance and workers compensation.

9.      CDR does not assist in the hiring, supervising or termination of an attendant. These decisions are in the sole discretion of the consumer or the SDO.

10.     CDR does not interview, select or remove an SDO. The consumer has the sole discretion to select and remove his or her SDO.

11.     If a consumer and attendant terminate their working relationship, and there are no allegations of abuse, CDR will place the attendant on its attendant list. Other consumers and/or SDO's often use the list to interview candidates in the event that he or she needs additional help or needs to replace a departing attendant.

12      The attendants' pay is funded through Medicaid.

13.     Attendants receive an hourly rate based on the amount of hours that they work or a consumer. If an attendant is not employed by a consumer at any given time, that attendant is not eligible to be paid.

14.     In the course of this litigation, I obtained records of the hours Ms. General work in the CDPAS program through CDR. Please find attached hereto as **Exhibit C**, true and correct records of the hours Melissa General worked as an attendant in the CDPAS program. The work records indicate that Ms. General began working as an attendant for consumer Marie J. Webster on May 1, 2001 and continued to work as an attendant for various consumers through September 1, 2006.

15.     The records of Ms. General's hours indicate that she worked for Virginia Keuntz from June 17, 2003 through September 26, 2004. See Exhibit C.

16.     On or about September 27, 2004, Mr. Taylor visited CDR to complain about Ms. General. CDPAS Director Melanie Menough interviewed Mr. Taylor. Please find attached as **Exhibit D**, a true and correct copy of Ms. Menough' notes from that interview.

17.     The next day, on or about September 28, 2004, I received an email from Melissa General indicating, among other things, that she was being harassed by SDO Oliver Raymond Taylor.  Please find attached hereto as **Exhibit E**, a true and correct copy of Melissa' General's email.

18.     I initiated an investigation of the allegations made by both parties.

19.     I reviewed Ms. General's personnel file and did not find any past allegations or complaints made against Mr. Taylor or any other SDO's or consumers.

20.     Nonetheless, given the allegations, I recommended, and Ms. General agreed, that she no longer work for Ms. Keuntz.

21.     CDR is not authorized to remove an SDO.  Nonetheless, CDR contacted Virginia Keuntz and encouraged her to get someone else to act as her SDO.

22.     Ms. Keuntz did not remove Mr. Taylor until January 12, 2005.

23.     Ms. General's name was maintained on the availability list.

24.     On October 6, 2004, consumer Shelly Perrin agreed to hire Ms. General as her attendant.  Please find attached hereto as **Exhibit F**, a true and correct copy of the CDPAS work authorization form, indicating that Ms. General was to begin working for Ms. Perrin.

25.     I understood that Ms. Perrin was not able to offer Ms. General the same amount of hours as Ms. Keuntz.  Therefore, although CDR does not typically make proactive efforts to schedule interviews, I instructed several employees to find available work for Ms. General.  On several occasions, Ms. General either failed to appear or failed to return our calls.  Please find attached hereto as **Exhibit G**, true and correct copies of

emails sent from my staff demonstrating efforts to find Ms. General supplemental employment.

26.     On or about February 16, 2005, Ms. General contracted with consumer Christy Wilson to work as her attendant while she continued to work for Ms. Perrin. Please find attached hereto as **Exhibit H**, a true and correct copy of a CDPAS work authorization form indicating Ms. General was to begin working for Ms. Wilson.

27.     The additional hours provided by Ms. Wilson allowed Ms. General to work thirty-six (36) hours per week.

28.     Ms. General continued to work for CDR as an attendant for several consumers until September of 2006, when she stopped working for Marjorie Walsh. Please find attached hereto as **Exhibit I**, a true and correct copy of a letter submitted to CDR authored By Marjorie Walsh.

29.     On or about September 26, 2006, CDR notified Ms. General by way of letter that it could not include her name on the attendant availability list due to an outstanding disciplinary issue and her failure to provide an updated health assessment. Please find attached hereto as **Exhibit J**, a true and correct copy of the letter.

30.     Ms. General never contacted CDR to clarify the disciplinary issue or provide the updated information.

Dated: May 11, 2010
Rochester, New York

Mary Willoughby

Sworn to before me this
11th day of September 2009 May 2010

Notary Public

DIANNE L FERRIS
Notary Public, State of New York
County of Monroe
No. 01FE6048861
Commission Expires Oct. 02, 2010

EXHIBIT A

MCDSS Contract Log #109-04

# MEMORANDUM OF UNDERSTANDING

For provision of the

Consumer Directed Personal Assistance Program (CDPAP)

by and between

MONROE COUNTY DIVISION OF SOCIAL SERVICES

And

CENTER FOR DISABILITY RIGHTS, INC.



RECEIVED

JUL 1 6 2004

In accordance with Sections 365-f and 367-p (c) of the Social Services Law, the parties seek to enable Medicaid recipients (the "Consumer") to utilize the Consumer Directed Personal Assistance Program (CDPAP). The CDPAP Provider Agency, **Center for Disability Rights (CDR)** with offices at **412 State Street, Rochester, NY 14608** will provide services for the **Monroe County Division of Social Services** with offices at **111 Westfall Road, Rochester, NY 14620**.

CDR will assume the role of fiscal intermediary and act as the paymaster of record for the Consumer Directed Personal Assistant (the "CDPA"). The CDR will provide local assistance, quality assurance and facilitate peer support, including the establishment of an advisory committee for the purpose of program review and support. CDR will work closely with the Monroe County Division of Social Services in all phases of the delivery of CDPAP to be provided under this MOU.

Although the consumer is not a party to this MOU, the consumer will be required to execute a separate MOU confirming his/her responsibilities as enumerated below.

The parties hereby agree as follows:

## Responsibilities of the Consumer

The consumer and/or the consumer's guardian shall undertake the following:

1. Recruit, interview, hire, train, supervise, schedule and terminate the CDPA.

2. Provide equal employment opportunities as specified in the Consumer's MOU with CDR and the Employment/Wage MOU which is signed by both the Consumer and the CDPA.

3. Inform CDR of any changes in status including, but not limited to, address, telephone number, CDPA's names, addresses, hours worked and hospitalization. Inform the social services district of any change in status, including address and telephone number changes and hospitalizations.

4. Process the required paperwork for CDR including time sheets, annual worker health assessments, and required employment documents.

5. Arrange and schedule paperwork for CDR including time sheets, annual worker health assessments, and required employment documents.

6. Distribute paychecks to each CDPA.

7. Insure that each CDPA works the hours indicated on the time sheet.

8. Meet with a Community Health Nurse (CHN) and a representative of the Monroe County Division of Social Services once every six months for the required nursing review.

9.    Enter into a written MOU with CDR, which acknowledges these responsibilities.

**Responsibilities of CDR**

Upon the completion of the rate approval process by the New York State Department of Health, CDR shall undertake the following:

1.    Process the payroll for each DCPA, including withholdings for Federal, State and local income tax and Social Security (FICA).

2.    Monitor the completion of the required annual worker health assessment and all required employment documents.

3.    Act as the employer of record for insurance, unemployment and worker compensation benefits.

4.    Coordinate annual leave, health insurance, and other benefit programs for each CDPA.

5.    Monitor the completion of the required nursing assessment forms and the Consumer MOU outlining responsibilities assumed thereby.

6.    Maintain a personnel record for each DCPA which shall include, at a minimum, copies of the enrollment forms, the annual worker health assessments, and the information needed for payroll processing and benefit administration.

7.    Maintain consumer record, which includes copies of the Monroe County Division of Social Services approval/referral, the Monroe County Department of Social Services Division's service authorizations, the MOU signed by the Consumer outlining the responsibilities assumed thereby, the periodic nursing assessments, and other documentation of the CDR's efforts to monitor the Consumer's ability to meet its obligations.

8.    Assist the Consumer with recruitment and service coverage referrals, and provide informational support for training, supervision, advocacy and personal management.

9.    Monitor the Consumer's ability to meet contractual obligations.

10.   Provide local support to the consumer by coordinating payroll distribution, the distribution of forms, and the collection of information.

11.   Maintain the original personnel record for each CDPA which shall include, at a minimum, the original enrollment forms, the annual CDPA health assessments, and the information needed for payroll processing and benefit administration.

12.   Maintain the original Consumer record, which shall include the original MCDSS approval/referral, the MCDSS service authorizations, the MOU signed by the Consumer

outlining the responsibilities the Consumer has assumed, the periodic nursing assessments, and other documentation of the CDR's effort to monitor the Consumer's ability to meet its obligations.

13. Coordinate access to health facilities capable of providing the required annual worker health assessment and other health related program requirements.

14. Establish an advisory committee which will consist of disabled consumers, advocates and/or other interested parties. The committee will oversee quality assurance of this MOU and provide MCDSS and CDR with assistance and support, which may include peer counseling, referral and program monitoring.

15. Provide the MCDSS with monthly statistical reports in the manner and form determined by the Division to be necessary and appropriate, to permit the proper documentation of the growth of the CDPAP and the level of savings achieved as a result of this MOU.

16. Monitor the consumer's continuing suitability for the CDPAP.

17. Cooperate and participate in any administrative hearings regarding the termination or modification of the care plan for the consumer.

## Responsibilities of Monroe County Division of Social Services

The Monroe County Division of Social Services shall undertake the following:

1. Determine that the Consumer is a resident of the authorizing county and is Medicaid eligible.

2. Determine that the Consumer is eligible for long term care and services provided by a certified home health agency, the long term home health care program, the AIDS home care program or personal care services.

3. Determine, pursuant to an assessment of the person's appropriateness for the program conducted with an appropriate long term home health care program, certified home health agency, or an AIDS home care program or pursuant to the personal care program, that the Consumer is in need of home care services or private duty nursing.

4. Determine that the Consumer is able and willing or has a legal guardian able and willing to make informed choices, or has designated a relative or other adult who is able and willing to assist in making informed choices, as to the type and quality of services, including but not limited to nursing care, personal care, transportation and respite services.

5. Determine Consumer's eligibility for the program through its approved annual plan procedure including the initial assessment and periodic reassessments. The MCDSS will authorize the level and amount of services required and will authorize the reimbursement

for CDPAP services to the CDR as prescribed by the New York State Department of Health.

6. Transfer the Consumer to other programs with more traditional agency control should the Consumer be deemed inappropriate to continue participation in the CDPAP.

7. Provide all eligible individuals receiving home care with notice of the availability of the program and an opportunity to apply for participation in the program.

8. Provide Consumers with the appropriate fair hearing notice and the opportunity for a fair hearing with aid-continuing, if appropriate, at such times as the Division requires.

**Right to Terminate MOU**

1. Upon sixty (60) days notice, any party may terminate this MOU without further liability.

2. This MOU will terminate upon notification from the New York State Department of Health that State and/or Federal funds are unavailable for these services or for any other reason specified by the Division.

3. In the event either party wishes to terminate this MOU, written notice by either party shall be delivered via registered mail to the individuals whose signatures appear on the attached signature page at the address noted.

4. The period of this MOU is **1/1/04 through 12/31/04.**

The parties agree that the following attachments are part of this MOU:

## ATTACHMENT A:  Debarment Certification

Rev. 01/04

IN WITNESS THEREOF, the parties have hereunto signed this MOU on the day and year appearing opposite their respective signatures.

Date_____

~~JOSEPH M. MARTINO, ACTING DIRECTOR~~
~~MONROE COUNTY DIVISION OF SOCIAL SERVICES~~

Date _5-20-04_

CENTER FOR DISABILITY RIGHTS
EMPLOYER ID #22-3141275

| DIVISION OF SOCIAL SERVICES | |
|---|---|
| Contract Admin: | _Malone_ 5-24-04 |
| Program: | _Brenda Crandall_ |
| Finance: | _7/8/04_ |
| Contract Procurement: | _7-9-04_ |
| Legal: | _7/9/04_ |

STATE OF NEW YORK)         SS
COUNTY OF MONROE)

On this ____ day of _____, 20___, before me personally came **JOSEPH M. MARTINO**, to me known, who being by me duly sworn, did depose and say that he resides in Rochester, N.Y., that he is the **ACTING DIRECTOR** of the **MONROE COUNTY DIVISION OF SOCIAL SERVICES**, the Agency described in and which executed the above instrument; that as Director of said Agency he signed his name thereto.

_Susan Stahl_ (SS)
                          NOTARY PUBLIC

STATE OF NEW YORK)         SS
COUNTY OF MONROE)

On this _20_ day of _MAY_, 20_04_ before me personally came _BRUCE E. DARLING_, to me known, who duly sworn, did depose and say that (s)he resides in _HILTON, NY_; that (s)he is the _EXECUTIVE DIRECTOR_ of _CTR. FOR DISABILITY RIGHTS_ the corporation described in and which executed the foregoing instrument, that (s)he signed his/her name thereto by order of the Board of Directors.

**SUSAN STAHL**
NOTARY PUBLIC, STATE OF NEW YORK
No. 01ST6097414
QUALIFIED IN MONROE COUNTY
MY COMMISSION EXPIRES AUG. 18, 2007

_Susan Stahl_
                          NOTARY PUBLIC

Date_____

_____
Patricia A. Stevens, Director
Monroe County Division of Social Services

STATE OF NEW YORK)      SS
COUNTY OF MONROE)

On this _____ day of _____, 20____ before me personally came **PATRICIA A. STEVENS**, to me known, who being by me duly sworn, did depose and say that she resides in Rochester, N.Y., that she is the **DIRECTOR** of the **MONROE COUNTY DIVISION OF SOCIAL SERVICES**, the Agency described in and which executed the above instrument; that as Director of said Agency she signed her name thereto.

_____
NOTARY PUBLIC

_7/13/04_
Date

_Mell Walzak_
Melvin Walczak, Assistant Director
Monroe County Division of Social Services

STATE OF NEW YORK)  SS
COUNTY OF MONROE)

On this _13_ day of _July_, 200_4_, before me personally came **MELVIN WALCZAK** (who is signing in the absence of **PATRICIA A. STEVENS, DIRECTOR**) to me known, who being by me duly sworn, did depose and say that he resides in Rochester, N.Y., that he is the **ASSISTANT DIRECTOR** of the **MONROE COUNTY DIVISION OF SOCIAL SERVICES**, the Agency described in and which executed the above instrument; that as Assistant Director, signing in the absence of the Acting Director of said Agency, he signed his name thereto.

_Carol J. Sayre_
NOTARY PUBLIC

CAROL J. SAYRE, NOTARY PUBLIC
State of New York - County of Monroe
Registration No. 01SA5026281
My Commission Expires _4/18/06_

## ATTACHMENT A
## DEBARMENT CERTIFICATION

The undersigned certifies, to the best of his/her knowledge and belief, that the Contractor and its principals:

1.  Are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded by any Federal department or agency;

2.  Have not within a three-year period preceding this transaction/ application/proposal/ contract/agreement been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State or local) transaction or contract under a public transaction; violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

3.  Are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State or local)  with commission of any of the offenses enumerated in paragraph 2 of this certification; and

4.  Have not within a three-year period preceding this transaction/ application/proposal/ contract/agreement had one or more public transactions (Federal, State or local) terminated for cause or default.

Date: _5-20-04_

Center for Disability Rights, Inc.
Print Name of Contractor

_Signature_

_BRUCE E. DARLING_
Print Name

_EXECUTIVE DIRECTOR_
Print Title/Office

EXHIBIT B

§ 365-f. Consumer directed personal assistance program. 1. Purpose and intent. The consumer directed personal assistance program is intended to permit chronically ill and/or physically disabled individuals receiving home care services under the medical assistance program greater flexibility and freedom of choice in obtaining such services. The department shall regularly monitor district participation in the program by reviewing the implementation plans submitted pursuant to this section. The department shall provide guidance to the districts to improve compliance with implementation plans and promote consistency among counties regarding approved service levels based on the assessments required by this section. In addition, the department shall provide technical assistance and such other assistance as may be necessary to assist such districts in assuring access to the program for eligible individuals.

2. Eligibility. All eligible individuals receiving home care shall be provided notice of the availability of the program, and no less frequently than annually thereafter, and shall have the opportunity to apply for participation in the program. Each social services district shall file an implementation plan with the commissioner of the department of health, which shall be updated annually. Such updates shall be submitted no later than November thirtieth of each year. Beginning on June thirtieth, two thousand nine, the plans and updates submitted by districts shall require the approval of the department. Implementation plans shall include district enrollment targets, describe methods for the provision of notice and assistance to interested individuals eligible for enrollment in the program, and shall contain such other information as shall be required by the department. An "eligible individual", for purposes of this section is a person who:

(a) is eligible for long term care and services provided by a certified home health agency, long term home health care program or AIDS home care program authorized pursuant to article thirty-six of the public health law, or is eligible for personal care services provided pursuant to this article;

(b) is eligible for medical assistance;

(c) has been determined by the social services district, pursuant to an assessment of the person's appropriateness for the program, conducted with an appropriate long term home health care program, a certified home health agency, or an AIDS home care program or pursuant to the personal care program, as being in need of home care services or private duty nursing and is able and willing or has a legal guardian able and willing to make informed choices, or has designated a relative or other adult who is able and willing to assist in making informed choices, as to the type and quality of services, including but not limited to such services as nursing care, personal care, transportation and respite services; and

(d) meets such other criteria, as may be established by the commissioner, which are necessary to effectively implement the objectives of this section.

3. Division of responsibilities. Eligible individuals who elect to participate in the program assume the responsibility for services under such program as mutually agreed to by the eligible individual and provider and as documented in the eligible individual's record. Such individuals shall be assisted as appropriate with service coverage, supervision, advocacy and management. Providers shall not be liable for fulfillment of responsibilities agreed to be undertaken by the eligible individual. This subdivision, however, shall not diminish the participating provider's liability for failure to exercise reasonable care in properly carrying out its responsibilities under this program, which shall include monitoring such individual's continuing ability to

fulfill those responsibilities documented in his or her records. Failure of the individual to carry out his or her agreed to responsibilities may be considered in determining such individual's continued appropriateness for the program.

4.   Participating  providers. All agencies or individuals who meet the qualifications to provide home health, personal care or nursing services and who elect to provide such  services  to  persons  receiving  medical assistance  may  participate  in  the program. Any agency or individuals providing services under a patient managed home care program  authorized under  the  former  section  thirty-six hundred twenty-two of the public health law or the former sections three  hundred  sixty-five-f  of  this chapter may continue to provide such services under this section.

5. Waivers, regulation and effectiveness.

(a)   The   commissioner may, subject to the approval of the director of the budget, file for such federal waivers as  may  be  needed  for  the implementation of the program.

(b)   Notwithstanding  any  other provision of law, the commissioner is authorized to waive any provision of section three hundred sixty-seven-b of  this  title  related  to  payment  and  may  promulgate  regulations necessary to carry out the objectives of the program, and which describe the responsibilities of the eligible individuals in arranging and paying for  services  and  the protections assured such individuals if they are unable or no longer desire to continue in the program.

6. This section shall be effective if, to the extent that, and as long as,  federal  financial  participation  is  available  for  expenditures incurred under this section.



**NY Department of State-Division of Administrative Rules**

Home    Search    Help    ©

# Welcome to the online source for the New York Codes, Rules and Regulations

## 18 NY ADC 505.14

18 NYCRR 505.14

18 N.Y. Comp. Codes R. & Regs. 505.14

OFFICIAL COMPILATION OF CODES, RULES AND REGULATIONS OF THE STATE OF NEW YORK
TITLE 18. DEPARTMENT OF SOCIAL SERVICES
CHAPTER II. REGULATIONS OF THE DEPARTMENT OF SOCIAL SERVICES
SUBCHAPTER E. MEDICAL CARE
ARTICLE 3. POLICIES AND STANDARDS GOVERNING PROVISION OF MEDICAL AND DENTAL CARE
PART 505. MEDICAL CARE

Current through March 31, 2010.

\* Section 505.14.\* Personal care services.

(a) Definitions and scope of services.

(1) Personal care services means some or total assistance with personal hygiene, dressing and feeding; and nutritional and environmental support functions. Such services must be essential to the maintenance of the patient's health and safety in his or her own home, as determined by the social services district in accordance with the regulations of the Department of Health; ordered by the attending physician; based on an assessment of the patient's needs and of the appropriateness and cost-effectiveness of services specified in subparagraph (b)(3)(iv) of this section; provided by a qualified person in accordance with a plan of care; and supervised by a registered professional nurse.

(2) Some or total assistance shall be defined as follows:

(i) Some assistance shall mean that a specific function or task is performed and completed by the patient with help from another individual.

(ii) Total assistance shall mean that a specific function or task is performed and completed for the patient.

(3) Continuous 24-hour personal care services shall mean the provision of uninterrupted care, by more than one person, for a patient who, because of his/her medical condition and disabilities, requires total assistance with toileting and/or walking and/or transferring and/or feeding at unscheduled times during the day and night.

(4) Personal care services, as defined in this section, can be provided only if the services are medically necessary and the social services district reasonably expects that the patient's health and safety in the home can be maintained by the provision of such services, as determined in accordance with the regulations of the Department of Health.

(i) The patient's medical condition shall be stable, which shall be defined as follows:

(a) the condition is not expected to exhibit sudden deterioration or improvement; and

(b) the condition does not require frequent medical or nursing judgment to determine changes in the patient's plan of care; and

(1) the condition is such that a physically disabled individual is in need of routine supportive assistance and does not need skilled professional care in the home; or

(2) the condition is such that a physically disabled or frail elderly individual does not need professional care but does require assistance in the home to prevent a health or safety crisis from developing.

(ii) The patient shall be self-directing, which shall mean that he/she is capable of making choices

about his/her activities of daily living, understanding the impact of the choice and assuming responsibility for the results of the choice. Patients who are nonself-directing, and who require continuous supervision and direction for making choices about activities of daily living shall not receive personal care services, except under the following conditions:

(a) supervision or direction is provided on an interim or part-time basis as part of a plan of care in which the responsibility for making choices about activities of daily living is assumed by a self-directing individual living within the same household; or

(b) supervision or direction is provided on an interim or part-time basis as part of a plan of care in which the responsibility for making choices about activities of daily living is assumed by a self-directing individual not living within the same household; or

(c) supervision or direction is provided on an interim or part-time basis as part of a plan of care in which the responsibility for making choices about activities of daily living is assumed by an outside agency or other formal organization. The local social services department may be the outside agency.

(5) Acting as an extension of a self-directing patient means that the individual providing personal care services carries out the functions and tasks identified in the patient's plan of care in accordance with specific instructions by the patient.

(6) Personal care services shall include the following two levels of care, and be provided in accordance with the following standards:

(i) Level I shall be limited to the performance of nutritional and environmental support functions.

(a) Nutritional and environmental support functions shall include some or total assistance with the following:

(1) making and changing beds;
(2) dusting and vacuuming the rooms which the patient uses;
(3) light cleaning of the kitchen, bedroom and bathroom;
(4) dishwashing;
(5) listing needed supplies;
(6) shopping for the patient if no other arrangements are possible;
(7) patient's laundering, including necessary ironing and mending;
(8) payment of bills and other essential errands; and
(9) preparing meals, including simple modified diets.

(b) The initial authorization for Level I services shall not exceed eight hours per week. An exception to this requirement may be made under the following conditions:

(1) The patient requires some or total assistance with meal preparation, including simple modified diets, as a result of the following conditions:

(i) informal caregivers such as family and friends are unavailable, unable or unwilling to provide such assistance or are unacceptable to the patient; and

(ii) community resources to provide meals are unavailable or inaccessible, or inappropriate because of the patient's dietary needs.

(2) In such a situation, the local social services department may authorize up to four additional hours of service per week.

(ii) Level II shall include the performance of nutritional and environmental support functions specified in clause (i)(a) of this paragraph and personal care functions.

(a) Personal care functions shall include some or total assistance with the following:

(1) bathing of the patient in the bed, the tub or in the shower;
(2) dressing;
(3) grooming, including care of hair, shaving and ordinary care of nails, teeth and mouth;
(4) toileting; this may include assisting the patient on and off the bedpan, commode or toilet;
(5) walking, beyond that provided by durable medical equipment, within the home and outside the home;
(6) transferring from bed to chair or wheelchair;
(7) preparing of meals in accordance with modified diets, including low sugar, low fat, low salt and low residue diets;
(8) feeding;
(9) administration of medication by the patient, including prompting the patient as to time, identifying the medication for the patient, bringing the medication and any necessary supplies or equipment to the patient, opening the container for the patient, positioning the patient for medication and administration, disposing of used supplies and materials and storing the medication properly;
(10) providing routine skin care;
(11) using medical supplies and equipment such as walkers and wheelchairs; and
(12) changing of simple dressings.

(b) When continuous 24-hour care is indicated, additional requirements for the provision of services, as specified in clause (b)(4)(i)(c) of this section, must be met.

(7) Shared aide means a method of providing personal care services under which a social services district authorizes one or more nutritional and environmental support functions or personal care functions for each personal care services recipient who resides with other personal care services recipients in a designated geographic area, such as in the same apartment building, and a personal care services provider completes the authorized functions by making short visits to each such recipient.

(b) Criteria and authorization for provision of services.

(1) When the local social services department receives a request for services, that department shall determine the applicant's eligibility for medical assistance.

(2) The initial authorization for personal care services must be based on the following:

(i) a physician's order that meets the requirements of subparagraph (3)(i) of this subdivision;

(ii) a social assessment that meets the requirements of subparagraph (3)(ii) of this subdivision;

(iii) a nursing assessment that meets the requirements of subparagraph (3)(iii) of this subdivision;

(iv) an assessment of the patient's appropriateness for hospice services and assessments of the appropriateness and cost-effectiveness of the services specified in subparagraph (3)(iv) of this subdivision; and

(v) such other factors as may be required by paragraph (4) of this subdivision.

(3) The initial authorization process shall include the following procedures:

(i) A physician's order must be completed on the form required by the department.

(a) The physician's order form must be completed by a physician licensed in accordance with article 131 of the Education Law, a physician's assistant or a specialist's assistant registered in accordance with article 131-B of the Education Law, or a nurse practitioner certified in accordance with article 139 of the Education Law.

(1) Such medical professional must complete the physician's order form within 30 calendar days after he or she conducts a medical examination of the patient, and the physician's order form must be forwarded to a social services district or another entity in accordance with clause (c) of this subparagraph.

(2) Such medical professional must complete the physician's order form by accurately describing the patient's medical condition and regimens, including any medication regimens, and the patient's need for assistance with personal care services tasks and by providing only such other information as the physician' s order form requires.

(3) Such medical professional must not recommend the number of hours of personal care services that the patient should be authorized to receive.

(b) A physician must sign the physician's order form and certify that the patient can be cared for at home and that the information provided in the physician' s order form accurately describes the patient's medical condition and regimens, including any medication regimens, and the patient's need for assistance with personal care services tasks, at the time of the medical examination.

(c) Within 30 calendar days after the medical examination of the patient, the physician, other medical professional, the patient or the patient's representative must forward a completed and signed copy of the physician's order form to the social services district for completion of the social assessment; however, when the social services district has delegated, pursuant to subdivision (g) of this section, the responsibility for completing the social assessment to another agency, the physician, other medical professional, the patient or the patient's representative must forward a completed and signed copy of the physician's order form to such other agency rather than to the social services district.

(d) When the social services district, or the district's designee pursuant to subdivision (g) of this section, is responsible for completing the social assessment but is not also responsible for completing the nursing assessment, the district or its designee must forward a completed and signed copy of the physician's order form to the person or agency responsible for completing the nursing assessment.

(e) The physician's order is subject to the provisions of Parts 515, 516, 517 and 518 of this Title. These Parts permit the department to impose monetary penalties on, or sanction and recover overpayments from, providers or prescribers of medical care, services, or supplies when medical care, services, or supplies that are unnecessary, improper or exceed patients' documented medical needs are provided or ordered.

(ii) The social assessment shall be completed by professional staff of the local social services department on forms approved by the State Department of Social Services.

(a) The social assessment shall include a discussion with the patient to determine perception of

his/her circumstances and preferences.

(b) The social assessment shall include an evaluation of the potential contribution of informal caregivers, such as family and friends, to the patient's care, and shall consider all of the following:

   (1) number and kind of informal caregivers available to the patient;

   (2) ability and motivation of informal caregivers to assist in care;

   (3) extent of informal caregivers' potential involvement;

   (4) availability of informal caregivers for future assistance; and

   (5) acceptability to the patient of the informal caregivers' involvement in his/her care.

(c) The social assessment shall be completed on a timely basis and shall be current.

(iii) The nursing assessment shall be completed by a nurse from the certified home health agency, or a nurse employed by the local social services department, or a nurse employed by a voluntary or proprietary agency under contract with the local social services department.

(a) A nurse employed by the local social services department or by a voluntary or proprietary agency under contract with the local social services department shall have the following minimum qualifications:

   (1) a license and current registration to practice as a registered professional nurse in New York State; and

   (2) at least two years of satisfactory recent experience in home health care.

(b) The nursing assessment shall be completed within five working days of the request and shall include the following:

   (1) a review and interpretation of the physician's order;

   (2) the primary diagnosis code from the ICD-9-CM;

   (3) an evaluation of the functions and tasks required by the patient;

   (4) the degree of assistance required for each function and task in accordance with the standards for levels of services outlined in subdivision (a) of this section;

   (5) development of a plan of care in collaboration with the patient or his/her representative; and

   (6) recommendations for authorization of services.

(iv) Assessment of other services.

(a) Before authorizing or reauthorizing personal care services, a social service district must assess each patient to determine the following:

   (1) whether personal care services can be provided according to the patient's plan of care, whether such services are medically necessary and whether the social services district reasonably expects that such services can maintain the patient's health and safety in his or her home, as determined in accordance with the regulations of the Department of Health;

   (2) whether the patient can be served appropriately and more cost-effectively by personal care services provided under a consumer directed personal assistance program authorized in accordance with section 365-f of the Social Services Law;

   (3) whether the functional needs, living arrangements and working arrangements of a patient who receives personal care services solely for monitoring the patient's medical condition and well-being can be monitored appropriately and more cost- effectively by personal emergency response services provided in accordance with section 505.33 of this Part;

   (4) whether the functional needs, living arrangements and working arrangements of the patient can be maintained appropriately and more cost-effectively by personal care services provided by shared aides in accordance with subdivision (k) of this section;

   (5) whether a patient who requires, as a part of a routine plan of care, part-time or intermittent nursing or other therapeutic services or nursing services provided to a medically stable patient, can be served appropriately and more cost-effectively through the provision of home health services in accordance with section 505.23 of this Part;

   (6) whether the patient can be served appropriately and more cost-effectively by other long-term care services, including, but not limited to, services provided under the long-term home health care program (LTHHCP), the assisted living program or the enriched housing program;

   (7) whether the patient can be served appropriately and more cost-effectively by using specialized medical equipment covered by the MA program including, but not limited to, insulin pens; and

   (8) whether personal care services can be provided appropriately and more cost-effectively by the personal care services provider in cooperation with an adult day health program.

(b) If a social services district determines that a patient can be served appropriately and more cost-effectively through the provision of services described in subclauses (a)(2) through (8) of this subparagraph, and the social services district determines that such services are available in the district, the social services district must first consider the use of such services in developing the patient's plan of care. The patient must use such services rather than personal care services to

achieve the maximum reduction in his or her need for home health services or other long-term care services.

(c) A social services district may determine that the assessments required by subclauses (a)(1) through (8) of this subparagraph may be included in the social assessment or the nursing assessment.

(d) A social services district must have an agreement with each hospice that is available in the district. The agreement must specify the procedures for notifying patients who the social services district reasonably expects would be appropriate for hospice services of the availability of hospice services and for referring patients to hospice services. A social services district must not refer a patient to hospice services if the patient's physician has determined that hospice services are medically contra-indicated for the patient or the patient does not choose to receive hospice services.

(v) An authorization for services shall be prepared by staff of the local social services department.

(4) The initial authorization process shall include additional requirements for authorization of services in certain case situations:

(i) An independent medical review of the case shall be completed by the local professional director, a physician designated by the local professional director or a physician under contract with the local social services department to review personal care services cases when:

(a) there is disagreement between the physician's order and the social, nursing and other required assessments; or

(b) there is question about the level and amount of services to be provided; or

(c) the case involves the provision of continuous 24-hour personal care services as defined in paragraph (a)(3) of this section. Documentation for such cases shall be subject to the following requirements:

(1) The social assessment shall demonstrate that all alternative arrangements for meeting the patient's medical needs have been explored and/or are infeasible including, but not limited to, the provision of personal care services in combination with other formal services or in combination with contributions of informal caregivers.

(2) The nursing assessment shall document that the functions required by the patient, the degree of assistance required for each function and the time of this assistance require the provision of continuous 24-hour care.

(ii) The local professional director, or designee, must review the physician's order and the social, nursing and other required assessments in accordance with the standards for levels of services set forth in subdivision (a) of this section, and is responsible for the final determination of the level and amount of care to be provided. The final determination must be made within five working days of the request.

(5) The authorization for personal care services shall be completed prior to the initiation of services.

(i) The local social services department shall authorize only the hours of services actually required by the patient. When the individual providing personal care services is living in the home of the patient, the local social services department shall determine whether or not, based upon the social and nursing assessments, the patient can be safely left alone without care for a period of one or more hours per day.

(ii) The duration of the authorization period shall be based on the patient's needs as reflected in the required assessments. In determining the duration of the authorization period, the following shall be considered:

(a) the patient's prognosis and/or potential for recovery; and

(b) the expected length of any informal caregivers' participation in caregiving; and

(c) the projected length of time alternative services will be available to meet a part of the patient's needs.

(iii) No authorization for personal care services shall exceed six months. The local social services department may request approval for an exception to allow for authorization periods up to 12 months. The request must be accompanied by the following:

(a) a description of the patients who will be considered for an expanded authorization period; and

(b) a description of the local social services department's process to assure that the delivery of services is responsive to changes in the patient's condition and allows immediate access to services by the patient, patient's physician, assessing nurse and provider agency if the need for services changes during the expanded authorization period.

(iv) When the patient needs Level I or Level II services immediately to protect his or her health or safety and the nursing assessment cannot be completed in five business days, the social services district may authorize the services based on the physician's order and the social assessment, provided that:

(a) the nursing assessment is obtained with 30 calendar days; and

(b) the recommendations of the nursing assessment are reviewed and changes are made in the authorization as required.

(a) The social services district must deny or discontinue personal care services when such services are not medically necessary or are no longer medically necessary or when the social services district reasonably expects that such services cannot maintain or continue to maintain the client's health and safety in his or her home.

(b) The social services district must notify the client in writing of its decision to authorize, reauthorize, increase, decrease, discontinue or deny personal care services on forms required by the department. The client is entitled to a fair hearing and to have such services continued unchanged until the fair hearing decision is issued (aid-continuing) in accordance with the requirements outlined in Part 358 of this Title.

(c) The social services district's determination to reduce, discontinue or deny a client's prior authorization must be stated in the client notice. Appropriate reasons and notice language to be used when reducing, discontinuing or denying personal care services include, but are not limited to:

(1) the client's medical, mental, economic or social circumstances have changed and the district determines that the personal care services provided under the last authorization or reauthorization are no longer appropriate or can be provided in fewer hours than they were previously;

(2) a mistake occurred in the previous personal care services authorization;

(3) the client refused to cooperate with the required assessment of services;

(4) a technological development renders certain services unnecessary or less time consuming;

(5) the client can be more appropriately and cost-effectively served through other Medicaid programs and services;

(6) the client's health and safety cannot be assured with the provision of personal care services;

(7) the client's medical condition is not stable;

(8) the client is not self-directing and has no one to assume those responsibilities;

(9) the services the client needs exceed the personal care aid's scope of practice; and

(10) the client resides in a facility or participates in another program or receives other services which are responsible for the provision of needed personal care services.

(d) The social services district may not authorize or reauthorize personal care services based upon a task-based assessment when the applicant or recipient of personal care services has been determined by the social services district or the State to be in need of 24-hour personal care, including continuous (split-shift or multi-shift) care, 24-hour sleep-in care or the equivalent provided by formal or informal caregivers. The determination of the need for such 24-hour personal care, including continuous (split-shift or multi-shift) care, shall be made without regard to the availability of formal or informal caregivers to assist in the provision of such care.

(vi) When services are authorized, the local social services department shall provide the agency or person providing services, the patient receiving the services, and the agency or individual supervising the services, with written information about the services authorized, including the functions and tasks required and the frequency and duration of the services.

(vii) All services provided shall be in accordance with the authorization. No change in functions or tasks, degree of assistance required for each function or tasks, or hours of services delivered shall be made without notification to, or approval of, the local social services department.

(viii) The local social services department shall notify the patient in writing when a change in the amount of services authorized is being considered. Notification shall be provided in accordance with the requirements specified in subparagraph (b)(5)(v) of this section.

(ix) Reauthorization for personal care services shall follow the procedures outlined in paragraphs (2) through (4) of this subdivision, with the following exceptions:

(a) Reauthorization of Level I services shall not require a nursing assessment if the physician's order indicates that the patient's medical condition is unchanged.

(b) Reauthorization of Level II services shall include an evaluation of the services provided during the previous authorization period. The evaluation shall include a review of the nursing supervisory reports to assure that the patient' s needs have been adequately met during the initial authorization period.

(x) When an unexpected change in the patient's social circumstances, mental status or medical condition occurs which would affect the type, amount or frequency of personal care services being provided during the authorization period, the social services district is responsible for making necessary changes in the authorization on a timely basis in accordance with the following procedures:

(a) When the change in the patient's services needs results solely from a change in his/her social circumstances including, but not limited to, loss or withdrawal of support provided by informal caregivers, the local social services department shall review the social assessment, document the patient's social circumstances and make changes in the authorization as indicated. A new physician's order and nursing assessment shall not be required.

(b) When the change in the patient's services needs results from a change in his/her mental status including, but not limited to, loss of his/her ability to make judgments, the local social services department shall review the social assessment, document the changes in the patient's mental status and take appropriate action as indicated.

(c) When the change in the patient's services needs results from a change in his/her medical condition, the local social services department shall obtain a new physician's order and a new nursing assessment and shall complete a new social assessment. If the patient's medical condition continues to require the provision of personal care services, and the nursing assessment can not be obtained within five working days of the request from the local social services department, the local department may make changes in the authorization in accordance with the procedures specified in subparagraph (b)(5)(iv) of this section.

(6) Nothing in this subdivision shall preclude the provision of personal care services in combination with other services when a combination of services can appropriately and adequately meet the patient's needs.

(c) Contracting for the provision of personal care services.

(1) Each social services district must have contracts or other written agreements with all agencies or persons providing personal care services or any support functions for the delivery of personal care services. As used in this subdivision, support functions for the delivery of personal care services include, but are not necessarily limited to, nursing assessments, nursing supervision and case management, when provided according to subdivisions (b), (f) and (g) of this section, respectively.

(2) The social services district must use the model contract for personal care services that the department requires to be used, except as provided in paragraph (4) of this subdivision.

(i) Under the following conditions, the social services district may attach local variations to the model contract:

(a) The local variations do not change the model contract's requirements.

(b) The social services district submits its proposed local variations to the department on forms the department requires to be used.

(ii) The social services district must not implement any local variations to the model contract until the department approves the local variations. The department will notify the social services district in writing of its approval or disapproval of the local variations within 60 business days after it receives the local variations. If the department disapproves the local variations, the social services district may submit revisions to the local variations. The department will notify the social services district in writing of its approval or disapproval of such revisions within 60 business days after it receives the revisions.

(i) Under the following conditions, the social services district may use a local contract or other written agreement as an alternative to the model contract:

(a) The social services district cannot use the model contract due to local programmatic, legal, or fiscal concerns;

(b) The social services district can demonstrate that the local contract or agreement includes a provision comparable to each provision contained in the model contract and, if the local contract or agreement is with another public or governmental agency, it includes all requirements specified in this section; and

(c) The social services district submits a request for use of a local contract or agreement to the department on forms the department requires to be used.

(ii) The social services district must not implement a local contract or agreement until the department approves it. The department will notify the social services district in writing of its approval or disapproval of the local contract or agreement within 60 business days after it receives the district's request to use the local contract or agreement. The district's request must be accompanied by the proposed local contract or agreement and a comparison of the contents of the proposed local contract or agreement with the department's requirements. If the department disapproves the local contract or agreement, the social services district may submit revisions to the contract or agreement. The department will notify the social services district in writing of its approval or disapproval of such revisions within 60 business days after it receives the revisions.

(i) The social services district must use a contract or other written agreement for support functions for the delivery of personal care services, including case management, nursing assessments and nursing supervision, that the department approves to be used.

(ii) The social services district must not implement any contract or agreement for case

management, nursing assessments, nursing supervision, or any other support function until the department approves such contract or agreement.

(iii) The department will notify the social services district in writing of its approval or disapproval of the contract or agreement within 60 business days after it receives the contract or agreement. If the department disapproves the contract or agreement, the social services district may submit revisions to the contract or agreement. The department will notify the social services district in writing of its approval or disapproval of such revisions within 60 business days after it receives the revisions.

(6) The social services district must include in each contract or other written agreement with a provider of personal care services the rate at which the provider will be reimbursed for the provision of personal care services or for any support functions for the delivery of personal care services. The rate at which the provider will be reimbursed is determined in accordance with subdivision (h) of this section.

(7) The social services district must base the duration of the contract or other written agreement on the district's fiscal year, or a portion thereof.

(8) Before entering into a contract or other written agreement with any provider agency, the social services district must determine that:

(i) the provider agency is certified in accordance with 10 NYCRR Parts 760 and 761, licensed in accordance with 10 NYCRR Part 765 or exempt from licensure in accordance with 10 NYCRR Subpart 765-2 because it provides personal care services exclusively to persons who are eligible for medical assistance (MA);

(ii) the provider agency, without subcontracting with other provider agencies, is able to provide personnel who meet the minimum criteria for providers of personal care services, as described in subdivision (d) of this section, and who have successfully completed a training program approved by the department, as provided in subdivision (e) of this section;

(iii) the provider agency is fiscally sound;

(iv) the provider agency has obtained appropriate insurance coverage to protect the social services district from liability claims resulting from acts, omissions, or negligence of provider agency personnel that cause personal injuries to personal care services recipients or such personnel and that the provider agency has agreed to maintain such insurance coverage while its contract with the social services district is in effect; and

(v) the provider agency has agreed that it will not substitute another provider agency to provide personal care services to an MA recipient unless the provider agency has notified the district of the provider agency's need to substitute another provider agency and the district has approved such substitution.

(9) Each social services district must have a plan to monitor and audit the delivery of personal care services provided pursuant to its contracts or other written agreements with provider agencies. The social services district must submit this plan to the department for approval. At a minimum, the plan must include the following:

(i) an evaluation of the provider agency's ability to deliver personal care services, including the extent to which trained personnel are available to provide such services;

(ii) a comparison of the provider agency's performance with the requirements of this section and with the performance standards specified in the contract or agreement; and

(iii) a review of the provider agency's fiscal practices.

(10) When the provider agency is a home care services agency that provides personal care services exclusively to persons eligible for MA and is therefore exempt from licensure, the social services district must include the following items in the monitoring plan in addition to those required by paragraph (11) of this subdivision:

(i) a review of the provider agency's administrative and personnel policies;

(ii) a review of all provider agency recordkeeping relevant to the provision of personal care services; and

(iii) an evaluation of the quality of care the provider agency provides.

(11) Each social services district must also have a plan to monitor and audit any support functions for the delivery of personal care services, as defined in paragraph (1) of this subdivision. The social services district must submit this plan to the department for approval.

(12) The social services district must maintain a record of its monitoring activities. The district must include a report of such monitoring activities in the annual plan the district submits to the department pursuant to subdivision (j) of this section.

(d) Providers of personal care services.

(1) Personal care services may be provided by persons with the title of homemaker, homemaker-home health aide, home health aide, or personal care aide. Such persons must meet all other requirements of this section. When Level I (environmental and nutritional) personal care functions

only, as defined in subdivision (a) of this section, are required, persons with the title of housekeeper may be used.

(2) The local social services department shall use one or a combination of the following to provide personal care services:

(i) local social services department staff employed and trained to provide personal care services and other home care services;

(ii) a contractual agreement with a long-term home health care program for services of a person providing personal care services;

(iii) a contractual agreement approved by the department and the State Director of the Budget with a certified home health agency for the services of a person providing personal care services;

(iv) a contractual agreement approved by the department and the State Director of the Budget with a voluntary homemaker-home health aide agency for the service of persons providing personal care services;

(v) a contractual agreement approved by the department and the State Director of the Budget with a proprietary agency for the service of persons providing personal care services;

(vi) a contractual agreement approved by the department and the State Director of the Budget with an individual provider of service for the provision of Level I (environmental and nutritional) personal care functions only;

(vii) a contractual agreement approved by the department and the State Director of the Budget with an individual provider of service when the service needs require more than Level I (environmental and nutritional) personal care functions only. Such providers of service may be used only under the following conditions:

(a) prior approval has been received by the local social services department from the department to use individual providers in cases where the local social services department can justify that such providers of service are the only alternative available to the district. Such approval will be based upon the justification provided by the local department of social services and the agency's plan for the use of such individual providers of service;

(b) the local social services department shall review and evaluate the qualifications of each individual provider in accordance with procedures established by the local department of social services and approved by the department;

(c) in each case where an individual provider of personal care services is used, the individual provider shall receive on-the-job instruction and on-going nursing supervision from a nurse on staff of the local department of social services or a nurse from a certified home health agency. When such supervision is provided under contract with a certified home health agency, the local social services department shall monitor the case to assure that the service is delivered as authorized;

(d) the local social services department shall conform with all State and Federal requirements for employment benefits and taxes and shall follow appropriate procedures for payment for this service under this Title. Appropriate insurance coverage shall be provided to cover both personal injury and property damage liability; and

(e) State approval shall be limited to a period or periods not in excess of one year, but may be renewed.

(3) The provider agency or the local department of social services shall assign a person to provide the required services according to the authorization. In the event that this person is unable to meet the client's needs or is unacceptable to the client, the local department of social services shall request assignment of another person. Attention should be given in the selection of a person to provide services to assure that the person can communicate with a patient or on behalf of the patient.

(4) The minimum criteria for the selection of all persons providing personal care services shall include, but are not limited to, the following:

(i) maturity, emotional and mental stability, and experience in personal care or homemaking;

(ii) ability to read and write, understand and carry out directions and instructions, record messages, and keep simple records;

(iii) sympathetic attitude toward providing services for patients at home who have medical problems;

(iv) good physical health, as indicated by the documentation in the personnel file of all persons providing personal care services. This documentation must include the same assurances and proof of good physical health that the Department of Health requires for employees of certified home health agencies pursuant to 10 NYCRR 763.4; and

(v) a criminal history record check to the extent required by 10 NYCRR Part 402.

(e) Required training.

(1) Each person performing personal care services other than household functions only shall be required as a condition of initial or continued participation in the provision of personal care services

under this Part to participate successfully in a training program approved by the department.

(2) An approved training program shall include basic training, periodic and continuing in- service training, and on-the-job instruction and supervision.

(i) Basic training shall meet the following minimum requirements:

(a) Include content related to:

(1) orientation to the agency, community and services;

(2) the family and family relationships;

(3) the child in the family;

(4) working with the elderly;

(5) mental illness and mental health;

(6) body mechanics;

(7) personal care skills;

(8) care of the home and personal belongings;

(9) safety and accident prevention;

(10) family spending and budgeting; and

(11) food, nutrition and meal preparation.

(b) Total 40 hours in length.

(c) Be directed by a registered professional nurse, or a social worker, or home economist who has, at a minimum, a bachelor's degree in an area related to the delivery of human services or education.

(d) Involve appropriate staff and community resources, such as public health nurses, home economics, physical therapists and social workers. Skills training in personal care techniques shall be taught by a registered nurse.

(e) Include, as an integral part, evaluation of each person's competency in the required content. Criteria and methods for determining each person's successful completion of basic training shall be established. Criteria shall include attendance at all classes or equivalent instruction. Additional criteria shall be established to determine whether each person can competently perform required tasks and establish good working relationships with others. Methods of evaluating competency may include written, performance and oral testing; instructor observations of overall performance, attitudes and work habits; preparation of assignments/home study materials or any combination of these and other methods. Attendance records and evaluation materials for determining each person's successful completion of basic training shall be maintained.

(ii) In-service training shall be provided, at a minimum, for three hours semi-annually for each person providing personal care services to develop specialized skills or knowledge not included in basic training or to review or expand skills or knowledge included in basic training.

(iii) On-the-job training shall be provided, as needed, to instruct the person providing personal care services in a specific skill or technique, or to assist the person in resolving problems in individual case situations. Criteria and methodology for evaluating the overall job performance of each person providing personal care services shall be established. The supervising professional registered nurse shall be responsible for evaluating each person's ability to function competently and safely and for providing or arranging for necessary on- the-job training.

(3) Prior to performing any service, each person providing personal care services, other than household functions only, shall successfully complete the prescribed part of the basic training program. The prescribed part of basic training shall include the following content areas:

(i) orientation to the agency, community and the service;

(ii) working with the elderly;

(iii) body mechanics;

(iv) personal care skills;

(v) safety and accident prevention; and

(vi) food, nutrition and meal preparation.

The entire basic training program shall be completed by each person providing personal care services within three months after the date he is so hired.

(4) The requirement for completion of a basic training program may be waived by the department if the person performing personal care services can demonstrate competency in the required areas of content included in the basic training as specified in clause (2)(i)(a) of this subdivision. Methods of evaluating competency shall be approved by the department and shall meet the following minimum requirements:

(i) Be designed for persons having:

(a) documented training through related training programs such as nurse's aide and home health aide training programs; or

(b) documented related experience in an institutional or home setting which involves the performance of skills included in required basic training.

(ii) Include procedures and instruments for evaluating each person's competency. Content of evaluation instruments shall be compatible with required basic training program content, and shall assess appropriate skills and understandings of persons providing personal care services.

(iii) Identify the standard(s) of competency which shall be achieved through application of the procedures and instruments included.

(iv) Include a plan for remedial basic training of persons who fail to meet the standard(s) of competency established. Remedial basic training shall be provided which includes the prescribed part of basic training set forth in paragraph (3) of this subdivision.

(v) Include a mechanism for documenting successful demonstration of competency. Certificates awarded on the basis of successful demonstration of competency shall be designed to reflect issuance on this basis.

(5) Persons performing household tasks only shall be oriented to their responsibilities at the time of assignment by the supervising registered professional nurse.

(6) Each local social services department shall require that agencies with whom they contract for services submit to them a training program for providers of personal care services. This training program shall be submitted by the local social services department to the department for approval. The department shall notify the local social services department of its decision within 45 days of the plan's receipt by the department.

(7) The successful participation of each person providing personal care services in approved basic training, competency testing and continuing in-service training programs shall be documented in that person's personnel records. Documentation shall include the following items:

(i) a completed employment application or other satisfactory proof of the date on which the person was hired; and

(ii) a dated certificate, letter or other satisfactory proof of the person's successful completion of a basic training program approved by the department; and

(iii) dated certificates, written references, letters or other satisfactory proof that the person:

(a) meets the qualifications specified in clause (4)(i)(a) or (b) of this subdivision; and

(b) has successfully completed competency testing and any remedial basic training necessary as a result of such testing. The dated and scored competency testing instruments and record of any remedial training provided shall be maintained;

(iv) an in-service card, log or other satisfactory proof of the employee's participation in three hours of in-service training semiannually.

(8) The local social services district shall develop a plan for monitoring the assignments of individuals providing personal care services to assure that individuals are in compliance with the training requirements. This plan shall be submitted by the local social services district to the department for approval and shall include, as a minimum, specific methods for monitoring each individual's compliance with the basic training, competency testing, and in-service requirements specified in this subdivision. Methods of monitoring may include: onsite reviews of employee personnel records; establishment of a formal reporting system on training activities; establishment of requirements for submittal of certificates or other documentation prior to each individual's assignment to a personal care service case; or any combination of these or other methods.

(9) When a provider agency is not in compliance with department requirements for training, or when the agency's training efforts do not comply with the approved plan for that agency, the department shall withdraw the approval of that agency's training plan. No reimbursement shall be available to local social services districts, and no payments shall be made to provider agencies for services provided by individuals who are not trained in accordance with department requirements and the agency's approved training plan.

(f) Administrative and nursing supervision.

(1) All persons providing personal care services are subject to administrative and nursing supervision.

(2) Administrative supervision must assure that personal care services are provided according to the authorization of the agency responsible for case management (the case management agency) for the level, amount, frequency and duration of personal care services to be provided and the social services district's contract or other written agreement with the agency providing such services.

(i) The agency providing personal care services is responsible for administrative supervision.

(ii) Administrative supervision includes the following activities:

(a) receiving initial referrals from the case management agency, including its authorization for the level, amount, frequency and duration of personal care services to be provided;

(b) notifying the case management agency when the agency providing services accepts or rejects a patient; and

(1) when accepted, the arrangements made for providing personal care service; or

(2) when rejected, the reason for such rejection;

(c) initially assigning a person to provide personal care services to a patient according to the case management agency's authorization for the level, amount, frequency and duration of personal care services to be provided. In making assignments, the agency providing services must consider the following:

(1) the patient's cultural background, primary language, personal characteristics and geographic location;

(2) the experience and training required of the person providing personal care services; and

(3) the ability of the person providing personal care services to communicate with the patient or on the patient's behalf;

(d) assigning another person to provide personal care services to a patient when the person the agency providing services initially assigned is:

(1) unable to work effectively with the patient and any informal caregivers involved in the patient's care; or

(2) providing personal care services inappropriately or unsafely; or

(3) unavailable to provide personal care services due to unexpected illness or other reasons;

(e) promptly notifying the case management agency when the agency providing services cannot assign another person to provide personal care services to the patient;

(f) verifying that the patient is receiving personal care services according to the case management agency's authorization;

(g) notifying the case management agency, or cooperating with the nurse supervisor to notify such agency, when the agency providing services has questions regarding the adequacy of the case management agency's authorization for personal care services;

(h) promptly notifying the case management agency when the agency providing services is unable to maintain case coverage, including cases requiring services at night, on weekends or on holidays;

(i) participating in, or arranging for, the orientation of persons providing personal care services to the employment policies and procedures of the agency providing services;

(j) evaluating the overall job performances of persons providing personal care services, or assisting the nurse supervisor or other personnel of the agency providing nursing supervision, with such evaluations;

(k) giving support to persons providing personal care services;

(l) checking time cards of persons providing personal care services for required documentation;

(m) maintaining scheduling records and any other records necessary to implement required administrative activities; and

(n) complying with the requirements for advance directives that are set forth in 10 NYCRR 700.5 or any successor regulation. The agency providing personal care services, as well as any individual provider of personal care services who provides services pursuant to his or her contract with the social services district, may contract with another entity, including but not limited to a case management agency, to perform such agency's or individual provider's advance directive responsibilities.

(3) Nursing supervision must assure that the patient's needs are appropriately met by the case management agency's authorization for the level, amount, frequency and duration of personal care services and that the person providing such services is competently and safely performing the functions and tasks specified in the patient' s plan of care.

(i) Nursing supervision must be provided by a registered professional nurse employed by a voluntary, proprietary, or public agency with which the social services district has a contract or other written agreement or by the social services district. When an individual provider of personal care services is used, nursing supervision must be provided in accordance with the requirements specified in subdivision (d) of this section.

(ii) The agency providing nursing supervision must employ nurses meeting the qualifications in subparagraph (iii) of this paragraph in sufficient numbers to perform the activities in subparagraph (iv) of this paragraph.

(iii) Nursing supervision must be provided by a registered professional nurse who:

(a) is licensed and currently certified to practice as a registered professional nurse in New York State;

(b) meets the health requirements specified in subparagraph (d)(4)(iv) of this section; and

(c) meets either of the following qualifications:

(1) has at least two years satisfactory recent home health care experience; or

(2) has a combination of education and experience equivalent to the requirement described in subclause (1) of this clause, with at least one year of home health care experience; or

(d) acts under the direction of a registered professional nurse who meets the qualifications listed in clauses (a) and (b) of this subparagraph and either of the qualifications listed in

subclause (c)(1) or (2) of this subparagraph.
(iv) Nursing supervision includes the following activities:
(a) orienting the person providing personal care services to his or her responsibilities.
(1) Except as otherwise provided in subclause (3) of this clause, the nurse supervisor must conduct an orientation visit in the patient's home when the person providing personal care services is also present.
(i) For all initial authorizations of personal care services, the nurse supervisor must conduct an orientation visit within seven calendar days after the person providing personal care services is assigned to the patient.
(ii) Scheduling of orientation visits for all initial authorizations of personal care services should be based on the following four criteria:
(A) the patient's ability to be self-directing, as defined in subparagraph (a)(4)(ii) of this section;
(B) the availability of any informal caregivers who will be involved in the patient's plan of care;
(C) the scope and complexity of the functions and tasks identified in the patient's plan of care; and
(D) the training and experience the person providing personal care services has in performing the functions and tasks identified in the patient's plan of care.
(2) The nurse supervisor must perform the following functions during the orientation visit and document his or her performance of these functions in the report he or she prepares pursuant to subparagraph (vii) of this paragraph:
(i) review, with the person providing personal care services, the patient, and the patient's family, the plan of care received from the case management agency to assure that all parties understand the functions and tasks that the person providing services must perform and the frequency at which the person must perform these functions and tasks;
(ii) instruct the person providing personal care services in the observations the person must make and the oral and written reports and records the person must submit and maintain; and
(iii) demonstrate, when indicated, any procedures that the person providing personal care services is to perform with or for the patient.
(3) The nurse supervisor is not required to conduct an orientation visit when:
(i) personal care services are reauthorized, the patient requires a continuation or resumption of services initially authorized and the patient's mental status, social circumstances and medical condition have not changed; or
(ii) the person providing personal care services is temporarily substituting for or replacing the person assigned to provide services; the patient's plan of care is current and available to the person providing personal care services; the patient is self- directing, as defined in subparagraph (a)(4)(ii) of this section or, if non-self-directing, has a self-directing individual or other agency willing to assume responsibility for making choices about the patient's activities of daily living, as provided in such subdivision; and the person providing personal care services has the documented training or experience to appropriately and safely perform the functions and tasks identified in the patient's plan of care.
(4) The nurse supervisor must continue to perform the functions specified in items (iv)(a)(2) (i) and (ii) of this paragraph when an exception is made to the requirement for a home orientation visit.
(b) Making nursing supervisory visits at the frequency established pursuant to subparagraph (vi) of this paragraph.
(1) The supervisory visit must be made to the patient's home when the person providing personal care services is present, except when a supervisory visit is made solely to obtain the patient's evaluation of the person's job performance.
(2) The nurse supervisor must perform the following functions during the supervisory visit and document his or her performance of these functions in the report he or she prepares pursuant to subparagraph (vii) of this paragraph:
(i) evaluate the patient's needs to determine if the level, amount, frequency and duration of personal care services authorized continue to be appropriate;
(ii) evaluate the skills and performance of the person providing personal care services, including the person's ability to work effectively with the patient and the patient's family;
(iii) arrange for or provide on-the-job training according to subparagraph (e)(2)(iii) of this section;
(c) immediately notifying the case management agency when either of the following occurs:
(1) there is a change in the patient's social circumstances, mental status or medical condition that would affect the level, amount, frequency or duration of personal care services authorized

or indicate the patient needs a different type of service; or
(2) the actions taken by persons involved in the patient's care are inappropriate or jeopardize the patient's health and safety;
(d) participating in case conferences to discuss individual patient cases;
(e) assisting in complaint investigations according to the policies and procedures of the agency that employs the nurse supervisor;
(f) participating, if requested, in basic, supplementary and in-service training, as defined in subdivisions (a) and (e) of this section, of persons providing personal care services;
(g) being available to the person providing personal care services for nursing consultation while such person is in the patient's home;
(h) evaluating the overall job performance of persons providing personal care services, or assist the administrative supervisor or other personnel with such evaluations;
(i) reviewing reports prepared by persons providing personal care services;
(j) preparing, maintaining or forwarding written reports of orientation visits and nursing supervisory visits, according to subparagraph (vii) of this paragraph; and
(k) reporting to the registered professional nurse responsible for directing a nurse supervisor lacking home health care experience, when applicable, and in accordance with policies and procedures of the agency that employs the nurse supervisor.
(v) The registered professional nurse who provides direction to nurse supervisors without the home health care experience specified in clause (3)(iii)(c) of this subdivision is responsible for the following activities:
(a) training and orienting the nurse supervisor to his or her supervisory responsibilities;
(b) consulting with the nurse supervisor regarding patients or persons providing personal care services;
(c) monitoring orientation visits and nursing supervisory visits to assure that such visits are performed at the required frequencies;
(d) assuring availability of nursing consultation to the person providing personal care services when such person is in the patient's home;
(e) reviewing the orientation visit reports and nursing supervisory reports and assuring that copies are maintained or forwarded according to subparagraph (vii) of this paragraph; and
(f) evaluating each nurse supervisor's overall job performance or assisting with such evaluations.
(vi) The nurse who completes the nursing assessment, as specified in subparagraph (b)(3)(iii) of this section, must recommend the frequency of nursing supervisory visits for a personal care services patient and must specify the recommended frequency in the patient's plan of care.
(a) Frequency of nursing supervisory visits must be recommended on an individual patient basis. The following factors must be considered:
(1) the patient's ability to be self-directing, as defined in subparagraph (a)(4)(ii) of this section;
(2) the patient's need for assistance in carrying out specific functions and tasks in the plan of care; and
(3) the skills needed by the person who will be providing personal care services.
(b) The nursing supervisor must make nursing supervisory visits at least every 90 days for a personal care services patient except that:
(1) nursing supervisory visits must be made more frequently than every 90 days when:
(i) the patient's medical condition requires more frequent visits; or
(ii) the person providing personal care services needs additional or more frequent on-the-job training to perform assigned functions and tasks competently and safely; and
(2) supervisory and nursing assessment visits may be combined and conducted every six months when:
(i) the patient is self-directing, as defined in subparagraph (a)(4)(ii) of this section; and
(ii) the patient's medical condition is not expected to require any change in the level, amount or frequency of personal care services authorized during this time period.
(vii) The nurse supervisor must prepare a written report of each orientation visit and each nursing supervisory visit. These reports must be prepared on a form prescribed by the department.
(a) The nurse supervisor must maintain a copy of each report in the patient's record.
(b) The nurse supervisor must maintain a copy of each report in the personnel record of the person providing personal care services or forward a copy, within 14 calendar days of the orientation visit or nursing supervisory visit, to the provider agency for inclusion in such person's personnel record.
(c) The nurse supervisor must forward a copy of each report to the case management agency, if different from the agency providing nursing supervision, within 14 calendar days of each

orientation visit or nursing supervisory visit.

(viii) Arrangements for nursing supervision must be reflected in the social services district's annual plan for the delivery of personal care services.

(ix) Arrangements for nursing supervision provided by a voluntary, proprietary or public agency must be specified in the contract or other written agreement between the social services district and the agency providing nursing supervision.

(g) Case management.

(1) All patients receiving personal care services must be provided with case management services according to this subdivision.

(2) Case management may be provided either by social services district professional staff who meet the department's minimum qualifications for caseworker, professional staff of one or more agencies to which the district has delegated case management responsibility and that meet standards established by the department, or both.

(i) The social services district may delegate, pursuant to standards established by the department, responsibility for performance of either or both of the following:

(a) one or more of the case management activities listed in paragraph (3) of this subdivision;

(b) one or more such case management activities at specific times, such as during weekends or at night.

(ii) A social services district may delegate responsibility for case management activities only when:

(a) the department has approved the delegation of case management responsibilities;

(b) the social services district and each agency that is to perform case management activities have a contract or other written agreement pursuant to subdivision (c) of this section; and

(c) the social services district monitors the case management activities provided under the contract or other written agreement to ensure that such activities comply with the requirements of this subdivision.

(3) Case management includes the following activities:

(i) receiving referrals for personal care services, providing information about such services and determining, when appropriate, that the patient is financially eligible for medical assistance;

(ii) informing the patient or the patient's representative that a physician's order is needed, making copies of the physician's order form available to hospital discharge planners, physicians, and other appropriate persons or entities, and assisting the patient to obtain a physician's order when the patient or the patient's representative is unable to obtain the order;

(iii) completing the social assessment according to subdivision (b) of this section, including an evaluation of:

(a) the potential contribution of informal caregivers to the patient's plan of care, as specified in subparagraph (b)(3)(ii) of this section;

(b) the patient's physical environment, as determined by a visit to the patient's home; and

(c) the patient's mental status;

(iv) obtaining or completing the nursing assessment according to subparagraph (b)(3)(iii) of this section;

(v) assessing the patient's eligibility for hospice services and assessing the appropriateness and cost-effectiveness of the services specified in subparagraph (b)(3)(iv) of this section;

(vi) forwarding the physician's order; the social and nursing assessments; the assessments required by subparagraph (b)(3)(iv) of this section; for an independent medical review according to subparagraph (b)(4)(i) of this section;

(vii) negotiating with informal caregivers to encourage or maintain their involvement in the patient's care;

(viii) determining the level, amount, frequency and duration of personal care services to be authorized or reauthorized according to subdivisions (a) and (b) of this section, or, if the case involves an independent medical review, obtaining the review determination;

(ix) obtaining or completing the authorization for personal care services, according to subdivision (b) of this section;

(x) assuring that the patient is provided written notification of personal care services initially authorized, reauthorized, denied, increased, reduced, discontinued, or suspended and his or her right to a fair hearing, as specified in Part 358 of this Title and subparagraph (b)(5)(v) of this section;

(xi) arranging for the delivery of personal care services according to subdivision (c) of this section;

(xii) forwarding, prior to the initiation of personal care services, a copy of the patient's plan of care developed by the nurse responsible for completion of the nursing assessment, as specified in subdivision (a) of this section, to the following persons or agencies:

(a) the patient or the patient's representative;

(b) the agency providing personal care services under a contract or other written agreement with the social services district; and

(c) the agency providing nursing supervision under a contract or other written agreement with the social services district;

(xiii) monitoring personal care services to ensure that such services are provided according to the authorization and that the patient's needs are appropriately met;

(xiv) obtaining or completing a copy of the orientation visit report and the nursing supervisory visit report and forwarding a copy of these reports in accordance with subparagraphs (f)(3)(vi) and (vii) of this section;

(xv) allowing access by the patient to his or her written records, including physicians' orders and nursing assessments and, pursuant to 10 NYCRR 766.2(e), by the State Department of Health and licensed provider agencies;

(xvi) receiving and promptly reviewing recommendations from the agency providing nursing supervision for changes in the level, amount, frequency or duration of personal care services being provided;

(xvii) promptly initiating and complying with the procedures specified in subparagraph (b)(5)(x) of this section when the patient's social circumstances, mental status or medical condition unexpectedly change during the authorization period;

(xviii) assuring that capability exists 24 hours per day, seven days per week for the following activities:

(a) arranging for continued delivery of personal care services to the patient when the agency providing such services is unable to maintain case coverage; and

(b) making temporary changes in the level, amount or frequency of personal care services provided or arranging for another type of service when there is an unexpected change in the patient's social circumstances, mental status or medical condition;

(xix) informing the patient or the patient's representative of the procedure for addressing the situations specified in subparagraph (xv) of this paragraph;

(xx) establishing linkages to services provided by other community agencies including:

(a) providing information about these services to the patient and the patient's family; and

(b) identifying the criteria by which patients are referred to these services;

(xxi) establishing linkages to other services provided by the social services district including, but not limited to, adult protective services as specified in paragraph (5) of this subdivision;

(xxii) arranging for the termination of personal care services when indicated and, when necessary, making referrals to other types of services or levels of care that the patient may require; and

(xxiii) complying with the requirements for advance directives that are set forth in the regulations at 10 NYCRR 700.5 or any successor regulation when personal care services are provided by social services district employees. For purposes of this subparagraph, the term facility/agency as used in such regulations is deemed to mean the case management agency.

(4) The case management agency must maintain current case records on each patient receiving personal care services. Such records must include, at a minimum, a copy of the following documents:

(i) the physician's orders;

(ii) the nursing and social assessments;

(iii) the assessment of the patient's eligibility for hospice services and the assessments of the appropriateness and cost-effectiveness of the services specified in subparagraph (b)(3)(iv) of this section;

(iv) for a patient whose case must be referred to the local professional director or designee in accordance with subparagraph (b)(4)(i) of this section, a record that the physician's order, the social and nursing assessments, and the assessments required by subparagraph (b)(3)(iv) of this section were forwarded to the local professional director or designee;

(v) for a patient whose case must be referred to the local professional director or designee in accordance with subparagraph (b)(4)(i) of this section, a copy of the local professional director's or designee's determination;

(vi) the patient's plan of care;

(vii) any consent form signed by the patient authorizing release of confidential information;

(viii) the authorization for personal care services;

(ix) the written notification of personal care services initially authorized, reauthorized, denied, increased, reduced, discontinued, or suspended and the patient's right to a fair hearing;

(x) notifications of acceptance, rejection or discontinuance of the case by the agency providing personal care services;

(xi) the orientation visit and nursing supervisory reports;

(xii) the case narrative notes; and

(xiii) any criminal investigation or incident reports involving the patient or any person providing personal care services to the patient.

(i) Social services district professional staff responsible for personal care services and staff responsible for adult protective services, as specified in Part 457 of this Title, must coordinate their activities to assure that:

(a) they identify and understand the criteria for referring personal care services patients to adult protective services and for referring adult protective services clients to the personal care services program;

(b) mechanisms exist to discuss individual patients;

(c) personal care services as part of an adult protective services plan are provided according to existing requirements; and

(d) staff understand their respective responsibilities in cases involving the provision of personal care services as part of adult protective services plans.

(ii) Professional staff responsible for adult protective services have primary responsibility for case management for a patient who:

(a) is eligible for protective services for adults, as defined in section 457.1(b) of this Title;

(b) receives or requires personal care services as part of an adult protective services plan; and

(1) is nonself-directing and has no self-directing individual or agency to assume responsibility for his or her direction, as specified in subparagraph (a)(4)(ii) of this section; or

(2) is self-directing, as defined in subparagraph (a)(4)(ii) of this section, but refuses to accept personal care services in accordance with the plan of care developed by the nurse who completed the nursing assessment.

(iii) Professional staff responsible for personal care services must assist adult protective services staff with arrangements for provision of personal care services.

(6) Arrangements for case management, including arrangements for delegation of case management activities, must be reflected in the social services district's annual plan for the delivery of personal care services.

(h) Payment.

(1) No payment to the provider shall be made for authorized service unless such claim is supported by the documentation of the time spent in provision of service for each individual patient. Such documentation must be maintained by the provider pursuant to section 540.7(a)(8) of this Title.

(2) Payment for personal care services shall not be made to a patient's spouse, parent, son, son-in-law, daughter or daughter-in-law, but may be made to another relative if that other relative:

(i) is not residing in the patient's home; or

(ii) is residing in the patient's home because the amount of care required by the patient makes his presence necessary.

(3) For personal care services, payment shall be made as follows:

(i) If services are provided directly by the staff of the local department of social services, payment shall be based upon the local department's salary schedule. The local department is responsible for withholding all applicable income taxes and payment of the employer's share of FICA, Workers' Compensation, Unemployment Insurance and all other benefits covered under labor management contracts.

(a) When personal care services are provided by a voluntary, proprietary or public personal care services provider, payment is based upon the following:

(1) For providers having contracts with social services districts for the provision of personal care services during a rate year or years beginning prior to January 1, 1994, payment will be made at the lower of the local prevailing rate or a rate that is negotiated between the district and the provider, unless a different rate has been ordered by a court for any such rate year or years. The social services district must submit the rates to the department on forms the department requires to be used and must not implement the rates until the department and the Director of the Budget approve them. Such rates are also subject to the provisions of paragraph (5) or (6), as applicable, of this subdivision.

(2) For providers having contracts with social services districts for the provision of personal care services during a rate year or years beginning on or after January 1, 1994, payment will be made in accordance with paragraph (7) of this subdivision.

(b) Providers must pay salaries to the personal care workers they employ; comply with all required State, Federal or local income tax or other payroll withholding requirements; and pay FICA, workers' compensation, unemployment insurance, and other employee benefits included in the providers' labor contracts.

(iii) If the services are provided by or under arrangements with an individual provider of personal care services, payment is made directly to the individual provider of service at a rate approved by the department and the Director of the Budget. The social services district is responsible for

establishing policies for the withholding of all applicable income taxes and payment of the employer's share of FICA, workers' compensation, unemployment insurance and any other benefits included in the contract with the provider.

(4) Payment for assessment and supervisory services provided by a certified home health agency as part of a local social services department's plan for delivery of personal care services shall be at rates established by the State Commissioner of Health and approved by the State Director of the Budget.

(i) This paragraph applies to Medical Assistance (MA) payments to personal care services providers that had personal care services payment rates in effect for the rate or contract year beginning prior to July 1, 1990, and seek approval of personal care services payment rates for the rate or contract year beginning on or after July 1, 1990.

(ii) For the rate or contract year beginning on or after July 1, 1990, MA payments to a provider of personal care services must be based on and, except as provided in subparagraph (iv) of this paragraph, be at or below the provider's personal care services payment rate in effect for the rate or contract year beginning prior to July 1, 1990, as adjusted by a personal care services trend factor that the department establishes with the approval of the Director of the Budget.

(iii) The department will establish the personal care services trend factor by designating an external price indicator for each of the three components that comprise the total costs of personal care services, determining the average percentage of total personal care services costs that each component represents, and weighing each component's average percentage of total personal care services costs by the external price indicator for that component. The three components of the costs of personal care services are listed below:

(a) an aide wage and benefit component;
(b) an administrative and operating component; and
(c) a clinical component.

(iv) At the written request of a social services district and with the approval of the Director of the Budget, the department may grant an exception to the requirement that a personal care services provider's payment rate must be based on, and be at or below, the provider's personal care services payment rate in effect for the rate or contract year beginning prior to July 1, 1990, as adjusted by the personal care services trend factor. The personal care services provider must cooperate with the social services district's exception request by providing such reports or other information that may be necessary to justify the exception request. The department will grant a social services district's exception request only when the social services district demonstrates to the department's and the Director of the Budget's satisfaction that:

(a) the social services district will otherwise be unable to ensure that personal care services recipients will receive the personal care services for which they are authorized;
(b) additional payment for personal care services is necessary to maintain the quality of services provided; or
(c) additional payment for personal care services is necessary due to extraordinary or other circumstances, as specified in department guidelines.

(v) A social services district must submit each proposed personal care services payment rate to the department in a format that the department requires. The district must not implement any proposed personal care services payment rate until the department and the Director of the Budget approve the rate.

(vi) Within two months after the day on which the department and the Director of the Budget receive a proposed personal care services payment rate that is equal to or less than the provider's personal care services payment rate for the rate or contract year beginning prior to July 1, 1990, as adjusted by the personal care services trend factor, the department and the Director of the Budget will approve the rate. The department will send the social services district written notice of the approval of the rate.

(vii) Within four months after the day on which the department and the Director of the Budget receive a proposed personal care services payment rate that exceeds the provider's personal care services payment rate for the rate or contract year beginning prior to July 1, 1990, as adjusted by the personal care services trend factor, and for which the social services district has requested an exception to the trend factor requirement, the department and the Director of the Budget will approve, disapprove, or otherwise act upon the rate. The department will send the social services district written notice of the approval or disapproval of the proposed personal care services rate or the results of the department's and the Director of the Budget's other action regarding the proposed rate. If the department and the Director of the Budget disapprove a proposed personal care services payment rate, the social services district may submit a revised rate for the department's and the Director of the Budget's approval, disapproval, or other action.

(viii) The department and the Director of the Budget, when determining whether to approve a proposed personal care services payment rate, may consider various factors including, but not

limited to, the following:

(a) whether the proposed personal care services payment rate exceeds the provider's personal care services payment rate for the rate or contract year beginning prior to July 1, 1990, as adjusted by the personal care services trend factor; and

(b) if the proposed personal care services payment rate exceeds the provider's personal care services payment rate for such rate or contract year, as adjusted by the personal care services trend factor, whether the social services district has requested an exception to the trend factor requirement and demonstrated to the department's and the Director of the Budget's satisfaction that an exception should be granted.

(i) This paragraph applies to MA payments to the following personal care services providers:

(a) a provider that did not have a personal care services payment rate in effect for a rate or contract year beginning prior to July 1, 1990; and

(b) a provider that had a personal care services payment rate in effect for a rate or contract year beginning prior to July 1, 1990, and seeks approval of a personal care services payment rate for a rate or contract year beginning prior to July 1, 1990.

(ii) The department and the Director of the Budget, when determining whether to approve a proposed personal care services payment rate under this paragraph, may consider various factors including, but not limited to, the following:

(a) the justification the social services district provides, in a format the department requires, for the proposed rate;

(b) any changes in the appropriate consumer price index for urban or rural consumers;

(c) any changes in federal or State-mandated standard payroll deductions;

(d) the applicable minimum wage laws;

(e) a comparison of the proposed personal care services payment rate to other personal care services providers' payment rates in the social services district and to personal care services providers' payment rates in social services districts of similar size, geography and demographics; and

(f) a comparison of the proposed personal care services payment rate for the provider to the provider's personal care services payment rate, if any, for the previous rate or contract year.

(iii) A social services district must submit each proposed personal care services payment rate to the department in a format that the department requires. The district must not implement any proposed personal care services payment rate until the department and the Director of the Budget approve the rate. The department will send the social services district written notice of the approval or disapproval of the proposed rate.

(7) This paragraph sets forth the methodology by which the department will determine MA payment rates for personal care services providers that have contracts with social services districts for any rate year that begins on or after January 1, 1994.

(i) Providers' submission of required cost reports.

(a) Providers with cost experience.

(1) This clause applies to providers with cost experience. A provider with cost experience is defined as any provider of personal care services that can report its actual operating costs for the full rate year specified in the required cost report.

(2) Each provider must complete and submit to the department such cost report as the department may require. Each provider must complete the cost report by reporting such of the provider's actual operating costs of providing personal care services as the cost report may require for the full rate year specified in the cost report.

(3) The department will furnish each provider with the cost report form. The cost report form will specify the date by which the provider must submit the completed report to the department; however, no provider will have fewer than 90 calendar days to submit the report after its receipt. The department may grant a provider an additional 30 calendar days to submit the cost report when the provider, prior to the date the report is due, submits a written request to the department for an extension and establishes to the department's satisfaction that the provider cannot submit the report by the date the report is due for reasons beyond the provider's control.

(i) If the department determines that the cost report submitted by a provider is inaccurate or incomplete, the department will notify the provider in writing. The notice will advise the provider of the corrected or additional information that the provider must submit.

(ii) The provider must submit the corrected or additional information within 30 calendar days from the date the provider receives the department's notice. The department may grant the provider an additional 30 calendar days to submit the corrected or additional information when the provider, prior to the date that the corrected or additional information is due, submits a written request to the department for an extension and establishes to the

department's satisfaction that the provider cannot submit the corrected or additional information by the date the information is due for reasons beyond the provider's control.

(5) If the provider determines that the cost report that it has submitted to the department is inaccurate or incomplete, the provider must submit corrected or additional information. The provider must submit such corrected or additional information to the department within 45 calendar days from the date the provider submitted the original cost report to the department.

(i) In the event a provider fails to file the required cost report on or before the due date, or as the same may be extended pursuant to subclause (3) of this clause, the State Commissioner of Health shall reduce the current rate paid by state governmental agencies by two percent for a period beginning on the first day of the calendar month following the original due date of the required report and continuing until the last day of the calendar month in which the required report is filed.

(ii) Failure to timely file the corrected or additional data as required pursuant to subclause (4) of this clause will result in application of item (i) of this subclause. Lack of certification by the operator or by the accountant, as required pursuant to subclauses (8) and (9) of this clause, shall render a cost report incomplete.

(7) The provider must complete the cost report in accordance with generally accepted accounting principles as applied to the provider, unless the department specifies otherwise on the cost report form.

(8) The cost report must be certified by the owner or administrator of a proprietary personal care services provider, the chief executive officer or administrator of a voluntary personal care services provider, or the public official responsible for the operation of a publicly operated personal care services provider. The cost report form will include a certification form, which will specify who must certify the report.

(9) The provider must submit an opinion of an independent certified public accountant that the provider's cost report, or such portions of the cost report as the department may specify, has been examined and determined to comply with generally accepted accounting principles and with the allowable costs and recoveries of expenses requirements specified in subclauses (ii)( a) (3) and (4), respectively, of this paragraph. The provider must submit such independent certified public accountant's opinion on a form as the department may require.

(b) New providers.

(1) This clause applies to new providers of personal care services. A new provider of personal care services is defined as any provider of personal care services that cannot report its actual operating costs for the full rate year specified in the required cost report.

(2) Each new provider must complete and submit to the department such cost reports as the department may require. Each new provider must complete the cost report by reporting such of the provider's estimated operating costs of providing personal care services as the cost report may require for the full rate year specified in the cost report.

(3) The department will furnish each new provider with the cost report form. The cost report form will specify the date by which the provider must submit the completed report to the department; however, no provider will have fewer than 90 calendar days to submit the report after its receipt. The department may grant a provider an additional 30 calendar days to submit the cost report when the provider, prior to the date the report is due, submits a written request to the department for an extension and establishes to the department's satisfaction that the provider cannot submit the report by the date the report is due for reasons beyond the provider's control.

(i) If the department determines that the cost report that a new provider has submitted is inaccurate or incomplete, the department will notify the provider in writing. The notice will advise the provider of the corrected or additional information that the provider must submit.

(ii) The new provider must submit the corrected or additional information within 30 calendar days from the date the provider receives the department's notice. The department may grant the provider an additional 30 calendar days to submit the corrected or additional information when the provider, prior to the date that the corrected or additional information is due, submits a written request to the department for an extension and establishes to the department's satisfaction that the provider cannot submit the corrected or additional information by the date the information is due for reasons beyond the provider's control.

(5) If the new provider determines that the cost report that it has submitted to the department is inaccurate or incomplete, the provider must submit corrected or additional information. The provider must submit such corrected or additional information to the department within 45 calendar days from the date the provider submitted the original cost report to the department.

(6) If a new provider fails to submit the cost report or any corrected or additional information

regarding the cost report by the original or extended date on which such report or such corrected or additional information is due, the provider's existing approved payment rate, if any, will remain in effect until such time as the provider submits such cost report or such corrected or additional information and otherwise complies with the requirements of this clause, and the department is able to determine a rate for the provider. The rate will be effective for the full rate year regardless of the date on which the provider submitted such cost report or such corrected or additional information and otherwise complied with the requirements of this clause.

(7) The new provider must complete the cost report in accordance with generally accepted accounting principles as applied to the provider, unless the report specifies otherwise.

(8) The cost report must be certified by the owner or administrator of a proprietary personal care services provider, the chief executive officer or administrator of a voluntary personal care services provider, or the public official responsible for the operation of a publicly operated personal care services provider. The cost report form will include a certification form, which will specify who must certify the report.

(9) When a new provider has contracted with a social services district for the provision of personal care services for one year and can report its actual operating costs for such year, the provider must report its actual operating costs for such year to the department by completing a new cost report and submitting such report to the department in accordance with the requirements for providers with cost experience as set forth in clause (a) of this subparagraph.

(ii) Determination of payment rate.

(a) Providers with cost experience.

(1) Medical assistance payments to personal care services providers for any rate year beginning on or after January 1, 1994, are made at the lower of the following rates:

(i) the rate the provider charges the general public for personal care services; or

(ii) the rate determined by the department in accordance with subclauses (2) through (7) of this clause.

(2) The department will determine a provider's payment rate based on the cost report the provider submits. Each provider must report its personnel and nonpersonnel operating costs as specified in the cost report. The department will consider only the provider's operating costs that are allowable costs, as defined in subclause (3) of this clause and as adjusted by the provider in accordance with subclause (4) of this clause. The department will adjust the provider's allowable costs by trend factors, as determined in accordance with subclause (5) of this clause. The department will determine whether the provider's allowable costs exceed the ceilings that the department has established for such costs in accordance with subclause (6) of this clause and, if so, consider only such of the provider's allowable costs that do not exceed such ceilings. The department will calculate an amount for profit, for proprietary providers, or surplus, for voluntary providers, as determined in accordance with subclause (7) of this clause. The resulting rate will be payment-in-full for all personal care services provided to MA recipients during the applicable rate year, subject to any revisions the department may make in accordance with the rate revision or audit processes authorized by subparagraphs (iii) or (iv) of this paragraph.

(3) Allowable costs.

(i) Allowable costs are defined as a provider's documented costs that are necessary for the provider's operation, are directly or indirectly related to recipients' care, and are not expressly declared nonallowable by Federal or State law or regulations.

(ii) Allowable costs will be determined in accordance with reimbursement principles developed for determining payments under title XVIII of the federal Social Security Act (Medicare). These reimbursement principles are set forth in the Medicare Provider Reimbursement Manual, Part 1, entitled "HCFAPub. 15-1 thru T. 365," which is published by the Health Care Financing Administration of the United States Department of Health and Human Services. The department has incorporated by reference Chapters 1-14, 21-23 and 26 of such manual, as revised effective January 1, 1992. A copy of such manual is available for public use and inspection at the Department of Social Services, 40 North Pearl St., Albany, NY 12243.

(iii) Allowable costs include the following:

(A) a monetary value assigned to services provided by religious orders and for services rendered by an owner or operator of a provider;

(B) only that portion of the dues the provider pays to any professional association that has been demonstrated, to the department's satisfaction, to be allocable to expenditures other than for public relations, advertising or political contributions;

(C) costs allocated to the provider from a related organization when the costs are reasonably related to the efficient provision of personal care services and the bases of

allocation of such costs are consistent with regulations applicable to the cost reporting of the related organization. An organization is related to the provider when the provider, to a significant extent, is associated or affiliated with, or has control of, or is controlled by, the organization furnishing the services, facilities or supplies. To a significant extent means that:

the provider or an officer, director or partner of such provider has an ownership interest, as defined in section 505.2(i) of this Part, in such organization equal to five percent or more; has an indirect ownership interest, as defined in section 505.2(g) of this Part, in such organization equal to five percent or more; has a combination of an ownership interest and an indirect ownership interest in such organization equal to five percent or more; has an interest of five percent or more in any mortgage, deed of trust, note or other obligation secured by such organization if that interest equals at least five percent of the value of the organization's property or assets; or is an officer, director or partner of such organization or otherwise has the power, directly or indirectly, significantly to influence or direct the actions or policies of such organization; or

the organization furnishing the services, facilities or supplies to the provider, or an officer, director or partner of such organization has an ownership interest, as defined in section 505.2(i) of this Part, in the provider equal to five percent or more; has an indirect ownership interest, as defined in section 505.2(g) of this Part, in the provider equal to five percent or more; has a combination of an ownership interest and an indirect ownership interest in the provider equal to five percent or more; has an interest of five percent or more in any mortgage, deed of trust, note or other obligation secured by the provider if that interest equals at least five percent of the value of the provider's property or assets; or is an officer, director or partner of the provider or otherwise has the power, directly or indirectly, significantly to influence or direct the actions or policies of the provider;

(D) reasonable compensation for owners or operators, their employees and their relatives for services actually performed and required to be performed. A relative is defined in accordance with section 902.5 of the Medicare Provider Reimbursement Manual as follows: the spouse; natural parent, child and sibling; adopted child and adoptive parent; stepparent, stepchild, stepbrother, and stepsister; father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law and sister-in-law; and grandparent and grandchild of an owner or operator. The amount of allowable costs for reasonable compensation is equal to the amount of compensation normally required to be paid for the same services provided by a nonrelated employee, as determined by the department. Allowable costs do not include compensation for any services which owners or operators and their employees and relatives are not authorized to perform under State law or regulation;

(E) costs of advertising, public relations or promotion when such costs are specifically related to the provision of personal care services and are not for the purpose of attracting patients; and

(F) such other costs as are determined allowable in accordance with reimbursement principles specified in the Medicare Provider Reimbursement Manual.

(iv) Allowable costs do not include the following:

(A) amounts in excess of reasonable or maximum costs authorized under title XVIII of the federal Social Security Act or in excess of customary charges to the general public. This provision does not apply to services furnished by public providers free of charge or at a nominal fee;

(B) expenses or portions of expenses reported by providers that the department determines are not reasonably related to the efficient provision of personal care services because of either the nature or the amount of the particular item;

(C) costs that are not properly related to patient care and that principally afford diversion, entertainment or amusement to owners, operators, their employees or relatives;

(D) any interest paid by the provider that is related to a rate determination or penalties imposed by governmental agencies or courts except tax penalties that are imposed through no fault of the provider and the costs of insurance policies that the provider obtains solely to insure against the imposition of such penalties;

(E) costs of contributions or other payments to political parties, political candidates or political organizations;

(F) any element of cost as determined by the department to have been created by the sale of a provider;

(G) the amount of the personal care services provider assessment required by section 367-i of the Social Services Law or section 3614-b of the Public Health Law; or

(H) such other costs as are determined to be unallowable in accordance with reimbursement principles specified in the Medicare Provider Reimbursement Manual.

(4) Recoveries of expense. The provider must reduce its reported operating costs by the costs

of services or activities that are not properly chargeable to patient care. When the department determines that it is not practical to establish the costs of such services or activities, the provider will reduce its reported operating costs by the income that the provider receives from such services or activities. Examples of such income include, but are not limited to, the following:

(i) any amount the provider receives as a discount on purchases;

(ii) any amount the provider receives from tuition payments or from other payments made to the provider for educational services or other services not directly related to personal care services;

(iii) any amount the provider receives from a lease of office or other space to concessionaires that provide services not related to personal care services; and

(iv) any amount the provider charges for the use of telephone, telefax or telegraph services.

(5) Trend factors.

(i) The department will establish annual trend factors to be applied to providers' reported allowable costs for the provision of personal care services other than nursing supervision or nursing assessment. The department will also establish annual trend factors to be applied to providers' reported allowable costs for the provision of nursing supervision and nursing assessment when providers have contracts with social services districts for the provision of nursing supervision and nursing assessment.

(ii) The department has designated an external price indicator for the aide/nurse direct care component, the administrative component and the training component of the costs of personal care services and the costs of nursing supervision and nursing assessment.

(A) The external price indicators that the department has designated for the costs of personal care services are as follows: for the aide direct care component, the external price indicator is the Employment Cost Index for Compensation for December of each year, as published by the United States Department of Labor, Bureau of Labor Statistics; for the administrative component, the external price indicator is the Consumer Price Index for All Urban Consumers, as published for December of each year by the United States Department of Labor, Bureau of Labor Statistics; and for the training component, the external price indicator is the trend factor established by the Department of Health for certified home health agencies in upstate urban areas.

(B) The external price indicators that the department has designated for the costs of nursing supervision and nursing assessment are as follows: for the nurse direct care and the training components, the external price indicator is the trend factor established by the Department of Health for certified home health agencies in upstate urban areas; and for the administrative component, the trend factor is the Consumer Price Index for All Urban Consumers, as published for December of each year by the United States Department of Labor, Bureau of Labor Statistics.

(iii) The department will determine the average percentage of all providers' total reported costs for personal care services and for nursing supervision and nursing assessment that each component represents as of June 30th of the year prior to the year for which the department is establishing a rate; and the department will weigh each component's average percentage of total personal care services costs and nursing supervision and nursing assessment costs by the external price indicator for that component.

(iv) The department will multiply each provider's reported allowable costs for personal care services and, if applicable, for nursing supervision and nursing assessment, for the year specified in the required cost report by two annual projected trend factors: a projected trend factor that the department has estimated for the year that immediately follows the year for which the provider has reported its costs and a projected trend factor that the department has estimated for the year for which the department is determining a rate.

(v) The department will revise trend factors as specified in this item. Such revisions, if they occur, will occur after the department has determined providers' rates for a particular rate year and is determining providers' rates for the subsequent rate year. When the department determines, based upon the external price indicators, that the actual trend factor for the previous rate year deviated by one-half of one percent or more from the department's projected trend factor for such rate year, the department will revise the projected trend factor for the year immediately following such rate year by the amount of the deviation.

(6) Ceilings on payment for allowable costs.

(i) The department will establish ceilings on payment for providers' allowable costs. The department will determine the ceilings as set forth in this item:

(A) The department will assign providers to one of the following five regional groups: the Metropolitan Downstate Group, which includes providers located in Nassau, Rockland, Suffolk or

Westchester County;

the Metropolitan Upstate Group, which includes providers located in Albany, Broome, Dutchess, Erie, Monroe, Niagara, Oneida, Onondaga or Orange County;

the Suburban Group, which includes providers located in Cayuga, Fulton, Genesee, Madison, Montgomery, Ontario, Oswego, Rensselaer, Saratoga, Schenectady or Wayne County;

the New York City Group, which includes providers located in the five boroughs of New York City; and

the Rural County Group, which includes providers located in any of the remaining 33 social services districts not included in the Metropolitan Downstate, Metropolitan Upstate, Suburban or New York City group.

(B) The department will use providers' reported allowable costs for the 1990 calendar year as the base from which it will determine the ceilings for the rate year that begins on or after January 1, 1994. The department will use providers' reported allowable costs for the 1992 calendar year as the base from which it will determine the ceilings for each rate year that begins on or after January 1, 1995.

(C) For each regional group of providers, the department will calculate the centered means of the appropriate base year costs, other than costs attributable to the administrative component, that the providers in the regional group have reported on the cost reports required by the department.

(D) The department will apply an annual trend factor, as determined in accordance with subclause (5) of this clause, to the centered means of the appropriate base year costs. The department will apply such an annual trend factor for each of the following years: the year that immediately follows the appropriate base year and each subsequent year up to and including but not exceeding the year for which the department will be determining providers' rates.

(E) The department will determine regional ceilings for allowable costs within the combined aide/nurse direct care and the training components of the costs of personal care services and nursing supervision and nursing assessment. The ceiling will be expressed as a percentage of the applicable centered mean, as adjusted by annual trend factors, for each such allowable cost.

(F) The department will establish the following ceilings:

(I) Within the combined aide/nurse direct care and the training components, the ceiling for allowable costs will be 115 percent of the applicable trended regional centered mean; however, any costs providers may incur under their contracts with social services districts to determine whether prospective personal care aides or nurses have Federal or state criminal records or to fingerprint personal care aides will not be subject to such ceiling;

(II) (Effective January 1, 1994, to December 31, 1994) Payment for a provider's administrative and general expenses, excluding capital costs, will not exceed 28 percent of the provider's total allowable costs, as reported by the provider in its cost report. The department will reduce payment for a provider's administrative and general expenses in accordance with the following schedule: when a provider's reported administrative and general expenses, expressed as a percentage of the provider's total allowable costs, are greater than 26 percent, but do not exceed 31 percent, of the provider's total allowable costs, the department will reduce payment for the provider's administrative and general expenses by four percent; when a provider's reported administrative and general expenses, expressed as a percentage of the provider's total allowable costs, are greater than 22 percent, but do not exceed 26 percent, of the provider's total allowable costs, the department will reduce payment for the provider's administrative and general expenses by three percentage points; and when a provider's reported administrative and general expenses, expressed as a percentage of the provider's total allowable costs, are greater than 20 percent, but do not exceed 22 percent, of the provider's total allowable costs, the department will reduce payment for the provider's administrative and general expenses by two percentage points; however, no provider's administrative and general expenses will be reduced to less than 20 percent of the provider's total allowable costs.

(III) (Effective January 1, 1995) Payment for a provider's administrative and general expenses, excluding capital costs, will not exceed 28 percent of the provider's total allowable costs, as reported by the provider in its cost report.

(ii) The department will apply the ceilings as follows: when a provider's reported allowable costs are equal to or less than the ceiling that the department has established, the provider will receive full payment for its reported allowable costs. When a provider's reported allowable costs exceed the ceiling that the department has established, the provider will receive payment for such reported allowable costs in an amount not to exceed the ceiling.

(7) Adjustments for profit or surplus.
    (i) The department will include an adjustment for profit, for proprietary providers, or surplus, for voluntary providers. The department will determine the amount of the adjustment by calculating the ratio of the provider's allowable costs for aide wages and benefits to the provider's total allowable personal care services costs; multiplying such ratio by the 26 week United States Treasury Bill rate ("treasury bill rate"), as published by the United States Department of the Treasury in the last week of September of the year preceding the year for which the department is determining the rate; and multiplying the provider's rate, as determined in accordance with subclauses (2)-(6) of this clause, by the product of such multiplication. The result is an amount which the department will add to the provider's rate, subject to items (ii) and (iii) of this subclause.
    (ii) When the treasury bill rate used for purposes of this subclause has increased or decreased from the previous applicable treasury bill rate by more than two percent, the department will consider only a two percent increase or decrease in the treasury bill rate when determining providers' adjustments for profit or surplus for a particular year.
    (iii) The amount that the department will add to the provider's rate as an adjustment for profit or surplus will in no event exceed an amount equal to five percent of the provider's rate absent such adjustment for profit or surplus.
(b) New providers.
    (1) Medical assistance payments to new personal care services providers for any rate year beginning on or after January 1, 1994, will be made at the lower of the following rates:
        (i) the rate the provider charges the general public for personal care services; or
        (ii) the rate determined by the department in accordance with subclause (2) of this clause.
    (i) The department will determine a new provider's payment rate based on the cost report the provider submits. Each provider must report its estimated personnel and non-personnel operating costs as specified in the cost report.
    (ii) The department will consider only the provider's estimated operating costs that are allowable costs, as determined in accordance with subclause (a)(3) of this subparagraph and as adjusted by the provider in accordance with subclause (a)(4) of this subparagraph.
    (iii) The department will determine whether the provider's estimated allowable costs exceed the ceilings that the department will establish for such costs in accordance with subclause (a)(6) of this subparagraph, except that the limitation on providers' administrative and general expenses that is set forth in phrases (a)(6)(i)(F)(II) and (III) of this subparagraph will not apply to new providers in the first year of operation, and if the provider's estimated allowable costs otherwise exceed such ceilings, the department will consider only such of the provider's estimated allowable costs that do not exceed such ceilings.
    (iv) The department will calculate an amount for profit, for proprietary providers, or surplus, for voluntary providers, as determined in accordance with subclause (a)(7) of this subparagraph.
    (v) The resulting rate will be payment-in-full for all personal care services provided to MA recipients during the applicable rate year, subject to any revisions the department may make in accordance with the rate revision or audit processes authorized by subparagraph (iii) or (iv) of this paragraph.
(iii) Revisions to rates.
    (a) The department will notify each provider of its approved rates of payment at least 30 days prior to the beginning of an established rate period for which the rate is to become effective. In the case of payments to be made by State governmental agencies notification shall be made only after approval of rate schedules by the State Director of the Budget. The advance notification of rates shall not apply to prospective or retroactive adjustments to rates that are based on rate appeals filed by the provider, audits, corrections of errors or omission of data or errors in the computation of such rates or the submission of cost report data from providers without an estimated cost basis.
    (1) Within 90 calendar days after the provider receives the written notification of its rate, the provider must notify the department of any errors in the rate resulting either from the provider's submission of erroneous information in its cost report or the department's erroneous computation of the rate and of the provider's request for a revised rate.
    (2) The provider must submit its notice and request for a revised rate on forms as may be required by the department. The request for a revised rate must specify the basis for the revision, as specified in clause (c) of this subparagraph, and contain documentation supporting the request. The department may request such additional documentation as determined necessary.
    (c) The department will consider only those requests for rate revisions that are based on one or

more of the following:

(1) the provider's claim that the rate contains mathematical, statistical, fiscal or clerical errors;

(2) the provider's claim that it has incurred new or unanticipated costs for programs or services mandated or approved by the department and that the cost report that the provider submitted to the department does not reflect the provider's actual costs for reasons beyond the provider's control; or

(3) the provider's desire to obtain a rate that is lower than the rate promulgated by the department.

(d) When the department determines that a provider's request for a revised rate does not meet one or more requirements of clause (c) of this subparagraph, the department will notify the provider in writing within 30 calendar days of such determination.

(e) When the department determines that a provider's request for a revised rate meets one or more requirements of clause (c) of this subparagraph, the department will determine whether the provider's rate should be revised. The department will notify the provider in writing of the results of its determination and, if the department determines that the provider's rate should be revised, of the revised rate. Within six months after the date the department receives the provider's request for a revised rate, the department will submit its determination regarding the revised rate to the Division of the Budget for its review and approval.

(f) Within 30 calendar days after the provider receives the written notification of its revised rate, the provider must notify the department in writing of any errors in the revised rate.

(iv) Audits, hearings and recoveries of overpayments. Parts 517, 518, and 519 of this Title, which concern provider audits, recoveries of overpayments and provider hearings respectively, apply to audits of, recoveries of overpayments from, and hearings granted to providers subject to the requirements of this paragraph.

(v) Exemptions.

(a) A social services district may request an exemption from the application of the methodology, as set forth in subparagraphs (i) through (iii) of this paragraph, to providers with which the district has contracts for the provision of personal care services. A social services district that seeks an exemption must submit a written exemption request to the department. The exemption request must describe the alternative rate methodology that the district has developed and will use to determine payments to personal care services providers and such other information as the department may require.

(b) The department may grant a social services district's exemption request when it determines that the alternative rate methodology that the district will use is based on providers' costs of providing personal care services; includes an adjustment for inflationary increases in the providers' costs of doing business; and contains provisions comparable, as determined by the department, to the rate methodology and other provisions set forth in this paragraph.

(i) Reimbursement. State reimbursement shall be available pursuant to section 368-a of the Social Services Law for expenditures for services provided in accordance with the provisions of this section.

(j) Annual plan. The local social services department shall submit annually to the New York State Department of Social Services a plan for provision of personal care services on forms required by the department.

(k) Shared aide plans.

(1) Except as provided in paragraph (2) of this subdivision, each social services district must implement a shared aide plan approved by the department.

(i) Prior to implementing a shared aide plan, a social services district must develop a proposed shared aide plan and submit the proposed plan to the department for its review and approval or disapproval. The social services district must submit its proposed shared aide plan to the department on forms the department requires and within 60 business days after the department issues an administrative directive to all social services districts regarding the districts' development and implementation of shared aide plans.

(ii) In its proposed shared aide plan, the social services district must document the following information to the department's satisfaction:

(a) the number of shared aide sites the social services district plans to establish and the projected implementation date at each site;

(b) the number of nurse supervisors, case managers, provider agency coordinators, and other personnel who will serve personal care services recipients under the district's shared aide plan;

(c) the methods the social services district will use to inform personal care services recipients and providers regarding the district's shared aide plan;

(d) the methods the social services district will use to select the personal care services providers that will participate in the district's shared aide plan;

(e) the differences, if any, between the provision of nursing assessments, nursing supervision, and case management to personal care services recipients under the district's shared aide plan and the district's existing method of delivering personal care services; and

(f) the methods the social services district will use to monitor and evaluate the district's shared aide plan, including how the district will evaluate personal care services recipients' satisfaction with the district's shared aide plan.

(iii) The department will approve proposed shared aide plans that comply with the requirements set forth in this paragraph. The department will notify the social services district in writing of its approval or disapproval of the district's proposed plan within 45 business days after receipt of the plan. If the department disapproves the social services district's proposed plan, the district must submit a revised plan within 30 business days after receipt of the department's disapproval notice. The department will notify the social services district in writing of its approval or disapproval of the district's revised plan within 45 business days after receipt of the revised plan.

(iv) Each social services district with an approved shared aide plan must submit to the department such reports or information relating to the plan's implementation as the department may require. Personal care services providers must furnish such reports or information relating to the social services district's implementation of its shared aide plan as the district or the department may require.

(v) Except as otherwise provided in this subdivision, personal care services provided under a shared aide plan must conform to the standards specified in this section.

(vi) A social services district may delegate to another agency or entity the responsibility for developing and implementing a shared aide plan provided that the department has approved the delegation, and the social services district and such other agency or entity have a written agreement or contract specifying each entity's responsibilities.

(2) A social services district is not required to develop and implement a shared aide plan if the district has requested an exemption from the shared aide plan requirement and the department has approved the district's exemption request.

(i) A social services district that seeks an exemption from the shared aide plan requirement must submit an exemption request to the department for its review and approval or disapproval. The social services district must submit its exemption request to the department on forms the department requires and within 60 business days after the department issues an administrative directive to all social services districts regarding the districts' development and implementation of shared aide plans.

(ii) In its exemption request, the social services district must satisfactorily document that the district's existing method of delivering personal care services adequately meets, and can continue to meet, recipients' personal care services needs and that a sufficient supply of personal care services providers is available, and is reasonably expected to continue to be available, to provide personal care services to recipients in the district. A social services district's exemption request must also satisfactorily document that at least one of the following exemption criteria exists in the district:

(a) the number of personal care services recipients is either too few to support a shared aide plan or so geographically dispersed that the district cannot identify a group of recipients for which a shared aide plan would be appropriate;

(b) the annual costs of delivering personal care services under a shared aide plan would be equal to, or greater than, the annual costs of delivering personal care services under the district's existing method; or

(c) the district has another cost-effective method to improve the efficiency of the delivery of personal care services.

(iii) The department will approve exemption requests that comply with the requirements set forth in this paragraph. The department will notify the social services district in writing of its approval or disapproval of the district's exemption request within 45 business days after receipt of the exemption request.

(a) If the department disapproves the district's exemption request, the district must submit either a revised exemption request or a proposed shared aide plan within 30 business days after receipt of the disapproval notice. The department will notify the social services district in writing of its approval or disapproval of the district's revised exemption request or proposed shared aide plan within 45 business days after receipt of the revised exemption request or proposed shared aide plan.

(1) If the social services district submits a revised exemption request and the department disapproves the revised exemption request, the district must submit a proposed shared aide plan within 30 business days after receipt of the disapproval notice. The social services district's proposed shared aide plan, and the department's review and approval or disapproval of the proposed shared aide plan, must otherwise meet the requirements of paragraph (1) of this

subdivision.

(2) If the social services district submits a proposed shared aide plan and the department disapproves the proposed shared aide plan, the district must submit a revised shared aide plan within 30 business days after receipt of the disapproval notice. The social services district's revised shared aide plan, and the department's review and approval or disapproval of the revised shared aide plan must otherwise meet the requirements of paragraph (1) of this subdivision.

(iv) An approved exemption request is effective only for the year covered by the social services district's current approved annual plan for the provision of personal care services, as required by subdivision (j) of this section. A social services district that has been exempted from the shared aide plan requirement must submit a new exemption request or a proposed shared aide plan when the district submits a new annual plan for the provision of personal care services or before the day that the district's approved exemption request expires.

18 NY ADC 505.14

18 NY ADC 505.14

2008 WL 75311174

18 NY ADC 505.14

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.
Adobe Reader is required to view PDF images.



Docs In Sequence

Westlaw, part of Thomson Reuters
© 2010 West | Privacy | Accessibility



# rgm

**http://weblinks.westlaw.com/result/default.aspx?**
**05/05/10   02:45 PM**



NY Department of
State-Division of
Administrative
Rules

**Welcome to the online source for the
New York Codes, Rules and Regulations**

**18 NY ADC 505.23**

18 NYCRR 505.23

18 N.Y. Comp. Codes R. & Regs. 505.23

OFFICIAL COMPILATION OF CODES, RULES AND REGULATIONS OF THE STATE OF NEW YORK
TITLE 18. DEPARTMENT OF SOCIAL SERVICES
CHAPTER II. REGULATIONS OF THE DEPARTMENT OF SOCIAL SERVICES
SUBCHAPTER E. MEDICAL CARE
ARTICLE 3. POLICIES AND STANDARDS GOVERNING PROVISION OF MEDICAL AND DENTAL
CARE
PART 505. MEDICAL CARE
Current through March 31, 2010.

* Section 505.23.* Home health services.

(a) Policy, scope and definitions.
(1) It is the policy of the department to pay for home health services under the medical assistance (MA) program only when:
(i) the services are medically necessary;
(ii) the services can maintain the recipient's health and safety in his or her own home, as determined by the certified home health agency in accordance with the regulations of the Department of Health; and
(iii) services are reasonably expected to be authorized for more than 60 continuous days, either:
(a) the average monthly cost of providing home health services is equal to or less than 90 percent of the average monthly cost, as determined by the department, for 12 months of residential health care facility (RHCF) services in the social services district that is fiscally responsible for the recipient, as determined under this section; or
(b) the average monthly cost of providing home health services exceeds 90 percent of the average monthly cost, as determined by the department, for 12 months of RHCF services in the social services district that is fiscally responsible for the recipient; and the recipient either:
(1) meets at least one exception criterion; or
(2) is continuing to receive home health services while awaiting the availability of other appropriate long-term care services.
(2) This regulation defines home health services as available under the MA program; sets forth the conditions under which home health services are available under the MA program; provides for fiscal assessments of the cost-effectiveness of the provision of home health services and for exception criteria; provides for referrals to appropriate alternative care, services and supplies; provides for notification of social services districts and recipients concerning the provision of home health services by certified home health agencies; establishes review criteria for social services districts and local professional directors or designees; sets forth the responsibilities of the social services districts and local professional directors or designees; and provides for fair hearings for recipients who have had home health services discontinued by the final determination of a local professional director or designee or who have had the amount, duration or scope of such services reduced by the final determination of a local professional director or designee.
(3) Home health services mean the following services when prescribed by a physician and provided to an MA recipient in his or her home other than a general hospital or an RHCF:

(i) nursing services provided on a part-time or intermittent basis by a certified home health agency or, if no certified home health agency is available, by a registered professional nurse or a licensed practical nurse acting under the direction of a recipient's physician;

(ii) physical therapy, occupational therapy, or speech pathology and audiology services; and

(iii) home health aide services, as defined in the regulations of the Department of Health, provided by a person who meets the training requirements of the Department of Health, is assigned by a registered professional nurse to provide home health aide services in accordance with a recipient's plan of care, and is supervised by a registered professional nurse from a certified home health agency or a therapist, in accordance with the regulations of the Department of Health.

(b) Provision of home health services.

(1) A certified home health agency must provide home health services in accordance with applicable provisions of the regulations of the Department of Health (article 7 of Subchapter C of Chapter V of Title 10 NYCRR) and with federal regulations governing home health services (42 CFR 440.70 and Part 484). (42 CFR part 430 to end, revised as of October 1, 1991, is published by the Office of the Federal Register, National Archives and Records Administration, and is available for public use and inspection at the Department of Social Services, 40 North Pearl St., Albany, NY 12243.)

(2) As part of the comprehensive assessment or reassessment that a certified home health agency must conduct for each recipient in accordance with the regulations of the Department of Health, a certified home health agency must complete the home care assessment instrument required by this department.

(a) For recipients provided with more than 156 hours of home health services per month prior to July 1, 1992:

(1) The certified home health agency must notify each recipient, or the recipient's representative, and the recipient's physician that the certified home health agency must reassess the recipient and if the recipient or the recipient's representative does not cooperate with the scheduling and completion of the reassessment, and if a reduction in authorized services hours will not jeopardize the patient's health or safety, the certified home health agency must reduce the recipient's home health services hours to not more than 156 hours of home health services per month.

(2) The certified home health agency must use the home care assessment instrument to reassess each recipient.

(b) For recipients provided with 156 hours, or less, of home health services per month prior to July 1, 1992, the certified home health agency must use the home care assessment instrument to reassess each recipient to determine whether to continue to provide home health services to the recipient.

(c) For recipients initially provided with home health services on or after July 1, 1992, who the agency reasonably expects will require home health services for more than 60 continuous days, the certified home health agency must use the home care assessment instrument to determine initially whether to provide home health services.

(d) Exemptions:

(1) A recipient who receives home health services from a model waiver program authorized in accordance with subdivision (6) or (7) of section 366 of the Social Services Law is exempt from the requirements of this paragraph.

(2) A recipient who receives home health services from a long-term home health care program is exempt from any maximum hours per month limitation that would otherwise be imposed as a result of the use of the home care assessment instrument.

(3) As part of the comprehensive assessment or reassessment which a certified home health agency must conduct for each recipient in accordance with the regulations of the Department of Health, a certified home health agency must consider the following factors:

(i) whether home health services can be provided according to the recipient's plan of care, are medically necessary and can maintain the recipient's health and safety in his or her own home, as determined in accordance with the regulations of the Department of Health;

(ii) whether the recipient can be served appropriately and more cost-effectively by home health services provided under a patient managed home care program authorized in accordance with section 365-f of the Social Services Law;

(iii) whether the functional needs, living arrangements and working arrangements of a recipient who receives home health services solely for monitoring the recipient's medical condition and well-being can be monitored appropriately and more cost-effectively by personal emergency response services provided in accordance with section 505.33 of this Part;

(iv) whether the functional needs, living arrangements and working arrangements of the recipient can be maintained appropriately and more cost-effectively by home health services provided by shared aides;

(v) whether a recipient who requires only personal care services or an appropriate substitute and who does not, as a part of a routine plan of care, require part-time or intermittent nursing or other therapeutic services, except for services expected to be required for fewer than 60 continuous days or nursing services provided to a medically stable recipient, can be served appropriately and more cost-effectively through the provision of personal care services available in the district in accordance with section 505.14 of this Part;

(vi) whether home health services can be provided appropriately and more cost-effectively by the certified home health agency in cooperation with an adult day health program or a clinic, rather than on a fee-for-service basis;

(vii) whether the recipient can be served appropriately and more cost-effectively by other long-term care services including, but not limited to, services provided under the long-term home health care program (LTHHCP), the assisted living program or the enriched housing program; and

(viii) whether the recipient can be served appropriately and more cost-effectively by using specialized medical equipment covered by the MA program including, but not limited to, insulin pens.

(4) If a certified home health agency determines that a recipient can be served appropriately and more cost-effectively through the provision of services which are described in subparagraphs (3)(ii) through (viii) of this subdivision and the certified home health agency determines that such services are available in the social services district, the certified home health agency must first consider the use of such services in developing the recipient's plan of care. The recipient must use such services rather than home health services to achieve the maximum reduction in his or her need for home health services or other long-term care services.

(5) If a certified home health agency determines that home health services are medically necessary and can maintain the recipient's health and safety in his or her own home, as determined in accordance with the regulations of the Department of Health, and the certified home health agency reasonably expects that the recipient will require home health services for more than 60 continuous days, the certified home health agency must conduct a fiscal assessment in accordance with subdivision (c) of this section for a recipient described in such subdivision.

(6) A certified home health agency must have a written agreement with each hospice that is available in the certified home health agency's service area. The agreement must specify the procedures for notifying recipients who the certified home health agency reasonably expects would be appropriate for hospice services of the availability of hospice services and for referring such recipients to hospice services. A certified home health agency must not refer a recipient to hospice services if the recipient's physician determines that hospice services are medically contra-indicated or the recipient does not choose to receive hospice services.

(c) Fiscal assessments.

(i) If a certified home health agency responsible for providing home health services to a recipient determines that home health services are medically necessary and can maintain the recipient's health and safety in his or her own home, as determined in accordance with the regulations of the Department of Health, it must conduct a fiscal assessment of the cost-effectiveness of the home health services when compared to RHCF services, in a format the department requires, for the recipients described in paragraph (3) of this subdivision.

(ii) The certified home health agency, in cooperation with the social services district that is fiscally responsible for the recipient, must establish a procedure for conducting the fiscal assessment that meets the standards specified in this subdivision. This procedure must ensure that the fiscal assessment is reviewed by a certified home health agency representative other than the agency representative who initially determined that the recipient was appropriate for home health services.

(i) To determine the cost-effectiveness of the home health services, the certified home health agency must compare the estimated average monthly cost of the home health services that the agency reasonably expects the recipient will require for 12 months to 90 percent of the average monthly cost, as determined by the department, for 12 months of RHCF services in the social services district that is fiscally responsible for the recipient.

(a) To determine the estimated average monthly cost of the home health services that the certified home health agency reasonably expects the recipient will require for 12 months, the agency must:

(1) estimate the number of hours or visits of the following services that the certified home health agency reasonably expects the recipient will require for 12 months and that would be paid by the MA program: intermittent or part-time nursing services, home health aide services, physical therapy, occupational therapy, speech pathology, and audiology services;

(2) multiply the estimated number of hours or visits of each such service by the average MA rate in the social services district for the applicable service, as determined and provided to the certified home health agency by the department;

  (3) add the products of such multiplication;

  (4) divide the sum of such products by 12; and

  (5) subtract the estimated amount of the recipient's monthly excess income and excess resources, if any, as determined in accordance with Part 360 of this Title, from the quotient derived from the computation required by clause (a) of this subparagraph; and

  (b) the result is the estimated average monthly cost of the home health services that the certified home health agency reasonably expects the recipient will require for 12 months.

(3) The certified home health agency must conduct an initial fiscal assessment for:

 (i) each recipient:

  (a) who is not currently receiving home health services from the certified home health agency; and

  (b) who the certified home health agency reasonably expects will be authorized to receive home health services for more than 60 continuous days during the initial authorization period, regardless of the number of hours per day or days per week that the recipient will be authorized to receive services during the initial authorization period; and

 (ii) each recipient:

  (a) who is currently receiving home health services from the certified home health agency; and

  (b) who the certified home health agency, when it commenced the provision of home health services, did not reasonably expect would be authorized to receive home health services for more than 60 continuous days during the initial authorization period, but who the certified home health agency, prior to the 60th continuous day of the initial authorization period, reasonably expects will be authorized to receive home health services for more than 60 continuous days during the initial authorization period, regardless of the number of hours per day or days per week that the recipient will be authorized to receive services during the initial authorization period.

(4) A certified home health agency is not responsible for conducting a fiscal assessment for:

 (i) a recipient of LTHHCP services, AIDS home care program services, foster family care demonstration program services, chronic care management demonstration program services, services provided under a model waiver authorized by subdivision (6) or (7) of section 366 of the Social Services Law or who is receiving home health services while enrolled in a program licensed, certified or operated by the Office of Mental Retardation and Developmental Disabilities or the Office of Mental Health; or

 (ii) a recipient of home health services and personal care services or home health services and private duty nursing services, for whom the social services district will conduct a fiscal assessment.

(5) A certified home health agency must conduct an initial fiscal assessment at the following times:

 (i) for a recipient described in subparagraph (3)(i) of this subdivision, as part of the comprehensive assessment that the agency performs in accordance with the regulations of the Department of Health. A certified home health agency may conduct a fiscal assessment for a hospitalized recipient when the recipient is assessed for home care services, if the assessment for home care services indicates that home health services may be appropriate for the recipient; and

 (ii) for a recipient described in subparagraph (3)(ii) of this subdivision, by the 60th continuous day of the initial authorization period.

(6) A certified home health agency must conduct subsequent fiscal assessments as required by this paragraph:

 (i) The agency must conduct a subsequent fiscal assessment when a recipient was authorized to receive home health services for six months after the initial fiscal assessment was conducted. The agency must also conduct a subsequent fiscal assessment after each successive six month period during which the recipient was authorized to receive home health services. The agency may conduct such fiscal assessments when it conducts the comprehensive reassessments of the recipient.

 (ii) The agency must conduct a subsequent fiscal assessment when a recipient's medical condition, mental status, or other circumstances change during an authorization period and such change results in either of the following:

  (a) an increase of more than 25 percent in the average monthly cost of home health services;

  (b) for a recipient who was authorized to receive home health services because he or she met at least one exception criterion, the recipient's failure to continue to meet at least one exception criterion.

(7) If a certified home health agency determines that the average monthly cost of the home health services that the certified home health agency reasonably expects a recipient will require for 12 months will be equal to or less than 90 percent of the average monthly cost, as determined by the department, for 12 months of RHCF services in the social services district that is fiscally responsible for the recipient, the certified home health agency must:

 (i) notify the social services district of its determination within five business days; and

 (ii) provide, or continue to provide, home health services to the recipient when the services:

(a) are, or continue to be, medically necessary; and

(b) can maintain, or continue to maintain, the recipient's health and safety in his or her home, as determined in accordance with the regulations of the Department of Health.

(8) If a certified home health agency determines that the average monthly cost of the home health services that the certified home health agency reasonably expects a recipient will require for 12 months will exceed 90 percent of the average monthly cost, as determined by the department, for 12 months of RHCF services in the social services district that is fiscally responsible for the recipient, the certified home health agency must determine whether the recipient meets at least one exception criterion specified in paragraph (9) of this subdivision.

(9) Exception criteria.

(i) If a certified home health agency determines that the average monthly cost of the home health services that the certified home health agency reasonably expects a recipient will require for 12 months will exceed 90 percent of the average monthly cost, as determined by the department, for 12 months of RHCF services in the social services district that is fiscally responsible for the recipient, the certified home health agency must evaluate the recipient to determine whether the recipient meets at least one of the following exception criteria:

(a) the recipient is not medically eligible for RHCF services or other long-term care services, including other residential long-term care services or other non-residential long-term care services;

(b) home health services are cost-effective when compared to the cost of other long-term care services appropriate to the recipient's needs:

(1) for a recipient who would otherwise be placed in a general hospital, a certified home health agency must compare the average monthly cost of the home health services that the certified home health agency reasonably expects the recipient will require for 12 months to the average monthly cost of care in a general hospital, as determined by the Department of Health. The average monthly cost of care in a general hospital is determined by the Department of Health by adding the payments made to all general hospitals in the region for the diagnostic related group (DRG) in which the recipient would be classified, dividing such result by the sum of the group mean lengths of stay for persons classified in such DRG, multiplying such result by 365 and further dividing such result by 12;

(2) for a recipient who would otherwise be placed in an intermediate care facility for the developmentally disabled, a certified home health agency must compare the average monthly cost of the home health services that the certified home health agency reasonably expects the recipient will require for 12 months to the regional rate of payment for care in an intermediate care facility for the developmentally disabled as determined by the department in consultation with the Office of Mental Retardation and Developmental Disabilities;

(3) for a recipient who would otherwise be placed in an RHCF, a certified home health agency must compare the average monthly cost of the home health services that the certified home health agency reasonably expects the recipient will require for 12 months to the average monthly cost of RHCF services in the social services district for recipients classified in the same resource utilization group as the group in which the recipient would be classified, as determined by the Department of Health; and

(4) for a recipient who would otherwise be placed in other residential long-term care services or other non-residential long-term care services, a certified home health agency must compare the average monthly cost of the home health services that the certified home health agency reasonably expects the recipient will require for 12 months to the average monthly cost, as determined by the department, of such other residential long-term care services or non-residential long-term care services;

(c) the recipient is:

(1) employed, which means that the recipient is engaged in a work activity that involves significant physical or mental activities for pay or profit or is doing the type of work usually done for pay or profit, regardless of whether a profit is actually realized. Whether a recipient is employed for purposes of this subclause is determined in accordance with the Federal regulations for determining substantial gainful activity under title II of the Federal Social Security Act, as set forth at 20 CFR 404.1571 through 404.1576. (20 CFR parts 400-499, revised as of April 1, 1991, is published by the Office of the Federal Register, National Archives and Records Administration, and is available for public use and inspection at the Department of Social Services, 40 North Pearl St., Albany, NY 12243);

(2) enrolled in an educational program approved by a committee on pre-school special education established in accordance with section 4410 of the Education Law, a committee on special education established in accordance with section 4402 of the Education Law, or the State Board of Regents; or

(3) the parent or legal guardian of a child who lives with the recipient and who is:
  (i) younger than 18 years of age;
  (ii) younger than 21 years of age and enrolled in an educational program approved by the State Board of Regents; or
  (iii) 18 years of age or older and blind or disabled, as determined in accordance with Subpart 360-5 of Part 360 of this Title; or
  (4) blind or disabled, as determined in accordance with Subpart 360-5 of Part 360 of this Title, and would remain hospitalized or require long-term hospitalization without home health services;

  (d) home health services are appropriate for the recipient's functional needs and institutionalization is contra-indicated, based on a review by the certified home health agency of the recipient's medical case history. This review must include a certified statement from the recipient' physician, on a form required by the department and the Department of Health, that describes the potential impact of institutionalization. The form must be reviewed by an RHCF to determine if institutionalization would result in a diminishing of the recipient' ability to perform the activities of daily living; or
  (e) the recipient lives with another person who would need services if the recipient were institutionalized, and the cost of services for the recipient and the cost of any services for such other person, if either or both are institutionalized, would equal or exceed the cost of home health services for the recipient and the cost of any services for such other person.
  (ii) If a certified home health agency determines that a recipient meets at least one exception criterion, the certified home health agency must:
  (a) notify the social services district of its determination within five business days; and
  (b) provide, or continue to provide, home health services to the recipient when the services:
  (1) are, or continue to be, medically necessary; and
  (2) can maintain, or continue to maintain, the recipient's health and safety in his or her home, as determined in accordance with the regulations of the Department of Health.
  (iii) When a certified home health agency determines that a recipient does not meet at least one exception criterion, the certified home health agency must:
  (a) notify the social services district, the recipient and the recipient's physician of its determination within five business days; and
  (b) if home health services have already commenced, continue to provide home health services in accordance with paragraph (13) of this subdivision and assist the social services district, as specified in the certified home health agency's agreement with the social services district required under paragraph (14) of this subdivision, to refer the recipient to other appropriate long-term care services.
(10) Notification to the social services district and the recipient.
  (i) A certified home health agency and a social services district must jointly develop procedures to ensure that the certified home health agency notifies the social services district of its determination and:
  (a) the name of each recipient for whom the certified home health agency has conducted a fiscal assessment;
  (b) the results of the fiscal assessment that the certified home health agency has conducted for each such recipient including the certified home health agency's determination whether a recipient meets at least one exception criterion and whether home health services are medically necessary and can maintain the recipient's health and safety in his or her home, as determined in accordance with the regulations of the Department of Health;
  (c) the amount, duration, and scope of home health services that the certified home health agency has provided or will provide to each recipient for whom the certified home health agency has conducted a fiscal assessment; and
  (d) the factors that the certified home health agency has considered pursuant to subdivision (b) of this section for each recipient for whom the agency has conducted a fiscal assessment and the comprehensive assessment or reassessment, or a summary of such assessment or reassessment, that the certified home health agency has conducted in accordance with the regulations of the Department of Health for each recipient for whom the certified home health agency has also conducted a fiscal assessment.
  (ii) A certified home health agency must notify each recipient and the recipient's physician, in accordance with the regulations of the Department of Health, of the results of the fiscal assessment including whether the certified home health agency has determined that the recipient must be referred to other appropriate long-term care services and that the certified home health agency has referred the recipient's case to the social services district.
  (iii) A certified home health agency must maintain in the recipient's medical record a copy of the

documentation the agency has submitted to the social services district in accordance with this paragraph. The certified home health agency must also include in the recipient's medical record a summary of any subsequent consultations that agency representatives may have had with social services district representatives regarding the recipient.

(11) Responsibilities of a social services district upon receipt of notification from the certified home health agency.

(i) Within 10 business days after the social services district receives a certified home health agency's notice, the district must:

(a) provide for reviews of fiscal assessments, in accordance with subparagraph (ii) of this paragraph;

(b) consult with the certified home health agency, in accordance with subparagraph (iii) of this paragraph; and

(c) refer the recipient's case to the local professional director or designee, in accordance with subparagraph (iv) of this paragraph, if the district disagrees with the determination of the certified home health agency.

(a) A social services district must review a certified home health agency's fiscal assessment and the other documentation contained in the certified home health agency's notice to the district and determine:

(1) whether the certified home health agency considered the factors specified in paragraph (b) (3) of this section when it developed the recipient' plan of care;

(2) whether home health services are cost-effective;

(3) whether the home health services recipient meets at least one exception criterion;

(4) whether the amount, duration, or scope of home health services provided to the recipient should be modified; and

(5) whether the certified home health agency must continue to provide home health services to the recipient or whether the recipient should be referred to other appropriate long-term care services.

(b) A social services district's review of the fiscal assessment must be conducted by one of the following persons:

(1) a registered professional nurse who has experience in home care;

(2) a qualified social worker, as defined in the regulations of the Department of Health; or

(3) if no such registered professional nurse or qualified social worker is employed by, or under contract to, the social services district, a person for whom the social services district has received the department's approval to review fiscal assessments.

(c) A social services district may take one or more of the following actions after the district's review of the fiscal assessment conducted by a certified home health agency:

(1) require the certified home health agency to provide additional information or documentation regarding the home health services recipient and the amount, duration and scope of home health services the agency is providing to the recipient;

(2) consult with the recipient's physician and assess independently whether home health services are medically necessary and can maintain the recipient's health and safety in his or her home, as determined in accordance with the regulations of the Department of Health;

(3) conduct independently a fiscal assessment of the home health services that the recipient requires, which must include a consultation with the recipient, the recipient's family, or both regarding the proposed plan of care; or

(4) request that the certified home health agency reassess the recipient's home health care needs to determine if a plan of care that is medically appropriate and can maintain the recipient at home can be provided to the recipient at an average monthly cost for 12 months that is equal to or less than 90 percent of the average monthly cost of RHCF services in the social services district.

(a) After a social services district reviews the fiscal assessment conducted by a certified home health agency, a social services official must discuss the results of the district's review with a representative of the certified home health agency.

(b) When the social services official and the certified home health agency representative agree that home health services must be provided or must continue to be provided to the recipient and that the amount, duration, and scope of home health services that the certified home health agency recommends are appropriate or must be modified, the certified home health agency must provide or continue to provide home health services to the recipient or must modify the amount, duration, and scope of the recipient's home health services, but only if the certified home health agency has consulted with the recipient's physician in accordance with the regulations of the Department of Health.

(c) When the social services official and the certified home health agency representative agree

that the recipient must be referred to other appropriate long-term care services, the certified home health agency must consult with the recipient's physician in accordance with the regulations of the Department of Health and, if home health services have already commenced, continue to provide home health services to the recipient until other appropriate long-term care services for which the recipient is medically eligible are available.

(a) A social services district must refer a recipient's case to the local professional director or designee when a social services official and a certified home health agency representative or a recipient's physician disagree whether:

(1) home health services should be provided or continue to be provided to the recipient;

(2) the amount, duration and scope of the home health services are appropriate or should be modified; or

(3) the recipient should be referred to other appropriate long-term care services.

(b) A social services district must provide the local professional director or designee with a copy of the following documentation:

(1) documentation regarding the recipient included in the certified home health agency's notice to the social services district, as specified in clauses (10)(i)(a) through (d) of this subdivision; and

(2) documentation included in the social services district's review of the certified home health agency's fiscal assessment, including documentation of the district's determinations required in accordance with subclauses (11)(ii)(a)(1) through (5) of this subdivision and such documentation as the district may have obtained or produced in accordance with subclauses (11)(ii)(c)(1) through (4) of this subdivision.

(12) Local professional director.

(i) A local professional director may designate a physician to whom a social services district must refer a recipient's case; however, if the local professional director is employed by the social services district, the local professional director must designate a physician to whom the social services district must refer the recipient's case. The local professional director may not designate a physician who is the recipient's physician or who is employed by, or under contract to, the certified home health agency or the social services district.

(ii) A local professional director or designee must review the documentation submitted by the social services official in accordance with subclauses (11) (iv) (b) (1) and (2) of this subdivision and, based upon such documentation, determine:

(a) whether the average monthly cost of the home health services a recipient is reasonably expected to require for 12 months would exceed 90 percent of the average monthly cost, as determined by the department, for 12 months of RHCF services in the social services district that is fiscally responsible for the recipient;

(b) whether the recipient meets at least one exception criterion;

(c) whether the certified home health agency must provide, or continue to provide, home health services to the recipient;

(d) whether the certified home health agency must modify the amount, duration, or scope of home health services provided to the recipient; and

(e) whether the recipient must be referred to other appropriate long-term care services.

(iii) A local professional director or designee must notify the social services district and the certified home health agency of his or her final determination within 10 business days after receiving a recipient's case and all supporting documentation from the social services district.

(13) Continuation of home health services.

(i) Under the circumstances specified in clauses (a) through ( d) of this subparagraph, a certified home health agency must continue to provide home health services to a recipient, provided that home health services continue to be medically necessary and can continue to maintain the recipient's health and safety in the home, when the recipient has been receiving services from the agency but must be referred to other appropriate long-term care services. A certified home health agency is not required to commence providing home health services to a recipient who has not been receiving services from the agency and who must be referred to other appropriate long-term care services.

(a) When the social services district agrees with the certified home health agency that the recipient must be referred to other appropriate long-term care services, the certified home health agency must continue to provide services to the recipient until such other appropriate long-term care services are available to the recipient.

(b) When the social services district disagrees with the certified home health agency that the recipient must be referred to other appropriate long-term care services, and the social services district has referred the recipient's case to the local professional director or designee for such director's or designee's determination, the certified home health agency must continue to provide

services pending such director's or designee's determination.

(c) When the local professional director or designee determines that the recipient's home health services must be discontinued and that the recipient must be referred to other appropriate long-term care services, the certified home health agency must continue to provide services until such other long-term care services are available to the recipient.

(d) When the recipient requests a fair hearing to review a final determination of the local professional director or designee and the recipient is entitled to have services continued unchanged until the fair hearing decision is issued (aid-continuing) in accordance with Part 358 of this Title, the certified home health agency must continue to provide services to the recipient until the fair hearing decision is issued, unless the recipient has requested that services not be continued.

(ii) Under the circumstances specified in clauses (a) and ( b) of this subparagraph, a certified home health agency must continue to provide home health services to a recipient who is receiving services from the agency, provided that home health services continue to be medically necessary and can continue to maintain the recipient's health and safety in the home, when the certified home health agency and the social services district disagree that the amount, duration and scope of home health services that the certified home health agency recommends are appropriate or must be modified.

(a) When the social services district disagrees with the certified home health agency that the amount, duration, and scope of home health services the certified home health agency recommends are appropriate or must be modified, and the social services district has referred the recipient's case to the local professional director or designee, the certified home health agency must continue to provide services pending such director's or designee's determination.

(b) When the recipient requests a fair hearing to review a final determination of the local professional director or designee that the amount, duration, or scope of the recipient's home health services must be reduced and the recipient is entitled to have services continued unchanged until the fair hearing decision is issued (aid-continuing) in accordance with Part 358 of this Title, the certified home health agency must continue to provide services to the recipient until the fair hearing decision is issued, unless the recipient has requested that services not be continued.

(14) Referral to other appropriate long-term care services.

(i) The activities specified in subclauses (a)(1) through (a)(5) of this subparagraph must be performed for each recipient who is awaiting referral to other appropriate long-term care services. The social services district and the certified home health agency must enter into an agreement that specifies which such activities will be performed by the district and which such activities will be performed by the agency. The social services district must inform the department which such activities will be performed by the district and which such activities will be performed by the agency.

(a) The following activities must be performed for each recipient who is awaiting referral to other appropriate long-term care services:

(1) complete all required admission documentation for each recipient awaiting referral to other appropriate long-term care services;

(2) file such documentation with all long-term care services providers of the level of care appropriate for the recipient that are located within 50 miles of the recipient's home;

(3) notify such long-term care services providers of the names and telephone numbers of professional staff available to provide additional information to such providers regarding the recipient's medical conditions or services needs;

(4) contact by telephone each week at least three RHCFs, other residential long-term care services or other non-residential long-term care services that provide the level of care appropriate for the recipient and that are located within 50 miles of the recipient's home to determine whether the level of care appropriate for the recipient is available; and

(5) rotate such telephone contacts weekly among all such long-term care services providers and maintain a record of such contacts.

(ii) When other appropriate long-term care services become available, the certified home health agency must notify the recipient and the recipient's physician that the services are available to the recipient. If the recipient accepts the other appropriate long-term care services, the certified home health agency must assist the recipient to obtain the services and discharge the recipient in accordance with the regulations of the Department of Health. If the recipient refuses to accept the services, the certified home health agency must notify the recipient's physician and the social services district and comply with appropriate regulations of the Department of Health.

(15) Recordkeeping and reporting requirements.

(i) A social services district must maintain a case record on each recipient for whom a fiscal assessment has been reviewed. The case record must include a copy of the following

documentation:

(a) the documentation included in the certified home health agency's notice to the social services district, as specified in clauses (10)(i)( a) through (d) of this subdivision;

(b) the documentation included in the social services district's referral of a case to the local professional director or designee, as specified in subclauses (11)(iv)(b)(1) and (2) of this subdivision, for each case that the social services district has referred to such director or designee;

(c) the local professional director's or designee's determination made pursuant to paragraph (12) of this subdivision;

(d) the social services district's timely and adequate notice to the recipient, as required by subdivision (d) of this section, when the local professional director or designee determines that the recipient's home health services must be discontinued or reduced;

(e) documentation prepared by the district for use at any fair hearing the recipient may have requested to review the local professional director's or designee's determination; and

(f) the fair hearing decision.

(ii) A social services district must also submit to the department, on forms the department requires, such information regarding the district's implementation of this subdivision as the department may determine to be necessary to evaluate the fiscal assessment process. Such information may include the qualifications of social services district personnel who review fiscal assessments and such statistical data as the department may require regarding fiscal assessments including, but not limited to, the number of fiscal assessments performed by certified home health agencies, the number of recipients whose average monthly home health services cost exceeded 90 percent of the average monthly cost of RHCF services, and the number of such recipients who met one or more of the exception criteria.

(16) Delegation.

(i) A social services district may delegate to an agency or entity the responsibility for the performance of the district's fiscal assessment and other responsibilities under this section only when:

(a) the department has approved the delegation;

(b) the social services district and the agency or other entity have a contract or other written agreement specifying the parties' responsibilities; and

(c) the social services district monitors the activities provided under the contract or other written agreement to ensure that such activities comply with the requirements of this section.

(ii) The department will approve a social services district's delegation of the district's fiscal assessment and other responsibilities under this section when:

(a) the social services district submits a copy of the proposed contract or other written agreement to the department for its approval;

(b) the contract or other written agreement specifies which activities the district will delegate and describes the district's plan to monitor the proposed delegate's performance under the contract or other written agreement; and

(c) the social services district demonstrates to the department's satisfaction that the proposed delegate can perform the delegated responsibilities in compliance with the provisions of this section.

(iii) The department will notify the social services district in writing of its approval or disapproval of a proposed contract or other written agreement within 30 business days of receipt.

(d) Fair hearings.

(1) A recipient is entitled to a fair hearing and to have home health services continued unchanged until the fair hearing decision is issued (aid-continuing) in accordance with Part 358 of this Title only when home health services have been discontinued pursuant to a final determination of the local professional director or designee or the recipient believes that the final determination of a local professional director or designee erroneously reduced the amount, duration or scope of the home health services to be provided.

(2) The social services district must notify the recipient, on a form required by the department, of the local professional director's or designee's determination to discontinue or reduce the recipient's home health services and of the recipient's right to request a fair hearing and aid-continuing in accordance with Part 358 of this Title. The notice must be a timely and adequate notice, as provided by Part 358 of this Title.

(e) Payment and reimbursement.

(1) The department will pay providers of home health services for home health services provided under this section at rates established by the Commissioner of Health and approved by the Director of the Budget; however, no payment will be made unless the claim for payment is supported by documentation of the time spent providing services to each recipient. When a recipient is awaiting

referral to other appropriate long-term care services and such other appropriate long-term care services become available to the recipient, no payment will be made for any home health services that are provided to the recipient after the date that such other appropriate long-term care services become available to the recipient.

(2) Certified home health agencies must maximize Medicare and third-party revenues, in accordance with the requirements of this Title, and report to the department annually on such efforts.

(i) A certified home health agency with a proportion of Medicare or third-party revenue which is less than 20 percent of the Statewide or regional average for its peer group, whichever the commissioner determines more appropriate, must submit a statement to the department explaining the difference.

(ii) If an audit demonstrates that a certified home health agency has not implemented good faith efforts to collect Medicare and third-party revenues, the agency may be subject to the recoupment of MA payments for claims which are otherwise payable.

(3) The department may monitor and audit certified home health agencies' compliance with the home care assessment instrument procedure, notice requirements and fiscal assessment procedure set forth in this section. When the department has determined that any certified home health agency has submitted claims for home health services provided to recipients for whom home care assessment instruments or fiscal assessments are required, but the agency has failed to use the home care assessment instrument, has failed to provide notices required by this section, or has failed to conduct fiscal assessments, the department may require repayment of the full amount expended for home health services provided on and after the 60th day of services.

(4) Reimbursement. State reimbursement to social services districts for the costs of home health services provided under this section is available in accordance with Social Services Law, section 368-a (1)(g).

(f) Appendix 1--Catanzano Implementation Plan.

APPENDIX 1

REVISED

CATANZANO IMPLEMENTATION PLAN

Revised effective March 20, 1996 by order of the United States District Court
Western District of New York

This is to advise you that the Department has been ordered to issue the following directive by Order of the United States District Court, Western District of New York, in an action entitled "Catanzano et al. v. Dowling et al." 89 CV 1127L.

The Order is limited to adverse actions taken contrary to a treating physician's orders with respect to home health services.

I. HOME HEALTH SERVICES APPLICANTS:

§ 1.0. A home health services applicant means:

(a) each MA recipient who is not currently receiving home health services and who resides in his or her own home or in any other community setting in which home health services may be provided; and

(b) each hospitalized MA recipient who did not receive home health services immediately prior to hospitalization.

A. APPLICANT DENIALS BASED ON HEALTH AND SAFETY:

§ 100. Instructions to CHHAs:

(a) The following instructions apply when a certified home health agency (CHHA) determines that it will not admit a Medical Assistance (MA) recipient because the CHHA believes that the home health services ordered by the recipient's physician cannot maintain the recipient's health and safety in the home for one or more of the reasons specified in the New York State Department of Health (DOH) regulations at Title 10 NYCRR § 763.5(b)(1)(i) through (iv), § 763.5(b)(2)(i) or § 763.5(b)(2)(iv). These instructions do not apply when a CHHA determines not to admit an MA recipient for one or more of the reasons specified in DOH regulations at 10 NYCRR § 763.5(b)(2)(ii)(a) through (c) or § 763.5(b)(2)(iii).

(b) When a CHHA determines that the home health services that an MA recipient's physician has ordered would not maintain the recipient's health and safety, the CHHA must consult with the physician. The purpose of this consultation is for the physician and the CHHA to develop, if possible, a plan of care that would maintain the recipient's health and safety.

§ 101. If, after consulting with the MA recipient's physician, the CHHA determines not to admit the recipient because the CHHA and the physician are unable to develop a plan of care that the CHHA believes would maintain the recipient's health and safety, the CHHA must follow the procedures set

forth below:

(a) Hospitalized MA recipients:

The CHHA must refer a hospitalized MA recipient's case to the hospital discharge planner who, in accordance with existing procedures, will attempt to locate another CHHA that will agree to admit the recipient and provide home health services in accordance with the physician's order. If the discharge planner is unable to locate another CHHA, the discharge planner or the original CHHA must refer the recipient's case to the social services district. The referral must include a copy of the CHHA's assessment of the recipient, all other documentation that the CHHA has either prepared regarding the recipient or has received from the recipient's physician, and the name and telephone number or fax number of the recipient's physician. The CHHA or the discharge planner must inform the recipient and the recipient's physician that the recipient's case has been referred to the social services district.

(b) Non-hospitalization MA recipients:

The CHHA must refer a non-hospitalized MA recipient's case to the social services district. The CHHA's referral must include a copy of the documentation set forth in (a), above. The CHHA must inform the recipient and the recipient's physician that it has referred the recipient's case to the social services district.

§ 102. Instructions to social services districts:

(a) When a CHHA or a hospital discharge planner refers an MA recipient to the social services district in accordance with the procedures outlined in § 101(a) or (b) above, the social services district must forward the recipient's case and all relevant documentation to the local professional director or designee.

(b) The local professional director or designee will review the documentation and determine, on behalf of the social services district, whether home health services should be denied contrary to the physician's order or should be provided according to the physician's order.

(c) The local professional director or designee will notify the social services district and the CHHA of his or her final determination within 10 business days after receiving the MA recipient's case and all supporting documentation from the social services district.

§ 103. Depending on the local professional director's or designee's determination, the social services district must take the following action:

(a) Determinations denying home health services contrary to physician's order:

When the local professional director or designee determines that home health services should be denied contrary to the physician's order, the social services district must send the MA recipient an adequate notice, as defined in Department regulation 18 NYCRR § 358-2.2. The social services district must use the new notice attached to this directive as Appendix A and entitled "NOTICE OF INTENT TO DENY HOME HEALTH SERVICES (HEALTH AND SAFETY)." Until further notice, the social services district must photocopy this notice and issue it on legal-size rather than letter-size paper. The social services district must also issue the notice as a two-sided rather than a two-page notice.

(b) Decisions that home health services should be provided according to physician's order:

When the local professional director or designee determines that home health services should be provided according to the physician's order, the social services district must attempt to refer the MA recipient's case to a CHHA that will agree to admit the recipient and provide home health services according to the physician's order. If the social services district is unable to find a CHHA that will do so, the social services district must direct a CHHA to admit the recipient and to provide the recipient with home health services according to the physician's order.

B. APPLICANT DENIALS BASED ON FISCAL ASSESSMENTS:

§ 104. By letter dated February 18, 1994, the Department advised CHHAs and social services districts that, until further notice, CHHAs must not conduct, and social services districts must not review, fiscal assessments of home health services applicants. The Department is now changing those instructions, as set forth below.

§ 105. Instructions to CHHAs:

Beginning immediately, each CHHA must resume the conduct of fiscal assessments of each MA recipient who is applying for home health services and whom the CHHA reasonably expects will require home health services for more than 60 continuous days.

§ 106. Instructions to social services districts:

Beginning immediately, each social services district must resume the review of fiscal assessments that CHHAs conduct of MA recipients who are applying to the CHHAs for home health services.

§ 107. Agreement with CHHA's determination that home health services should be denied based on the fiscal assessment:

(a) The social services district must send the recipient an adequate notice when the district agrees with the CHHA's determination that the home health services ordered by the recipient's physician should be denied based on the fiscal assessment or should be denied because the recipient is appropriate for an "efficiency." (A list of the "efficiencies" as set forth at page 8 of the 92 ADM-50.)

(b) The social services district must use the new notice attached to this directive as Appendix B and entitled "NOTICE OF INTENT TO DENY HOME HEALTH SERVICES (FISCAL ASSESSMENT AND EFFICIENCIES)." Until further notice, the social services district must photocopy this notice and issue it on legal-size paper rather than on letter-size paper. The social services district must also issue the notice as a two-sided notice, rather than a two-paged notice, and attach the one-page list of exception criteria to the notice.

§ 108. Disagreement with CHHA's determination that home health services should be denied or provided based on the fiscal assessment or based on the use of an "efficiency":

(a) The social services district must refer the recipient's case to the local professional director or designee when the district disagrees with the CHHA's determination that the home health services ordered by the recipient's physician should be denied or provided based on the fiscal assessment or based on the use of one or more "efficiencies."

(b) The local professional director or designee must review the documentation submitted by the social services district and determine whether the recipient should be denied or provided home health services.

(c) The local professional director or designee must notify the social services district and the CHHA of his or her determination within 10 business days after receiving the recipient's case and all supporting documentation from the social services district.

(d) When the local professional director or designee determines that the MA recipient should be denied home health services, the social services district must send the recipient an adequate notice. The social services district must use the new notice attached to this directive as Appendix B and entitled "NOTICE OF INTENT TO DENY HOME HEALTH SERVICES (FISCAL ASSESSMENT AND EFFICIENCIES)." This is the same notice described in § 107(b) above. Until further notice, the social services district must photocopy this notice and issue it on legal-size paper rather than on letter-size paper. The social services district must also issue the notice as a two-sided notice, rather than a two-paged notice, and attach the one-page list of exception criteria to the notice.

(e) When the local professional director or designee determines that the MA recipient should be provided home health services, the social services district must attempt to refer the MA recipient's case to a CHHA that will agree to admit the recipient and provide home health services according to the physician's order. If the social services district is unable to find a CHHA that will do so, the social services district must direct a CHHA to admit the recipient and to provide the recipient with home health services according to the physician's order.

II. HOME HEALTH SERVICES RECIPIENTS:

§ 2.0 A home health services recipient means:

(a) each MA recipient who is currently receiving home health services in his or her own home or in any other community setting in which home health services may be provided; and

(b) each hospitalized MA recipient who received home health services immediately prior to hospitalization.

A. CHHA DETERMINATIONS, CONTRARY TO PHYSICIAN'S ORDERS, TO DISCHARGE MA RECIPIENTS BECAUSE HOME HEALTH SERVICES CANNOT MAINTAIN RECIPIENTS' HEALTH AND SAFETY:

§ 200. Instructions to CHHAs:

(a) The following instructions apply when a CHHA determines that it should discharge an MA recipient, although the physician disagrees, because the home health services ordered by the recipient's physician can no longer maintain the recipient's health and safety for one or more of the reasons specified in DOH regulations at 10 NYCRR § 763.5(h)(1), § 763.5(h)(4) or § 763.5(h)(5).

(b) These instructions do not apply when a CHHA determines that it should discharge an MA recipient for one or more of the reasons specified in DOH regulations at 10 NYCRR § 763.5(h)(2).

(c) Determinations to discharge based on a recipient's request [10 NYCRR § 763.5(h)(3)] are covered in § 215 and § 216 below.

§ 201. When a CHHA determines that the home health services ordered by the recipient's physician can no longer maintain an MA recipient's health and safety, the CHHA must consult with the physician. The CHHA may discharge the recipient if the recipient's physician provides the CHHA with a written statement that the recipient may be discharged or if the recipient's physician directs the CHHA to immediately comply with his oral statement that the recipient may be discharged, in which event a written statement from the physician authorizing discharge shall be provided within seven (7) days.

§ 202. When the recipient's physician does not provide the CHHA with such a written or oral statement agreeing to the discharge, the CHHA must:

(a) refer the recipient's case to a CHHA that, after assessing the recipient, agrees to admit the recipient and provide home health services according to the physician's order and continue to provide home health services according to the physician's order until the new CHHA has assessed and admitted the recipient; OR

(b) refer the recipient's case to the social services district and continue to provide home health

services according to the physician's order until notified otherwise by the social services district. The CHHA's referral must include a copy of the CHHA's assessment of the recipient, all other documentation that the CHHA has either prepared regarding the recipient or has received from the recipient's physician, and the name and telephone number or fax number of the recipient's physician. The CHHA must inform the recipient and the recipient's physician that it has referred the recipient's case to the social services district.

§ 203. Instructions to social services districts:

(a) When a CHHA refers an MA recipient to the social services district in accordance with the procedures outlined in § 202(b) above, the social services district must forward the recipient's case and all relevant documentation to the local professional director or designee.

(b) The local professional director or designee must review the documentation and determine, on behalf of the social services district, whether home health services should be discontinued contrary to the physician's order or should be provided according to the physician's order.

(c) The local professional director or designee will notify the social services district and the CHHA of his or her determination within 10 business days after receiving the MA recipient's case and all supporting documentation from the social services district.

§ 204. Depending on the local professional director's or designee's determination, the social services district must take the following action:

(a) Determinations that home health services should be discontinued contrary to physicians' orders:
When the local professional director or designee determines that home health services should be discontinued contrary to the physician's order, the social services district must send the MA recipient a timely and adequate notice. The social services district must use the new notice attached to this directive as Appendix C and entitled "NOTICE OF INTENT TO REDUCE OR DISCONTINUE HOME HEALTH SERVICES (HEALTH AND SAFETY)." Until further notice, the social services district must photocopy this notice and issue it on legal-size paper rather than letter-size paper. The social services district must also issue this notice as a two-sided notice rather than a two-paged notice.

(b) Determinations that home health services should be provided according to physicians' orders:
When the local professional director or designee determines that home health services should be provided according to the physician's order, the social services district must inform the CHHA of the determination and that the CHHA must provide the services according to the physician's order.

§ 205. Aid-continuing instructions to CHHAs and social services districts:

(a) When the social services district determines that home health services should be discontinued contrary to the physician's order, the CHHA must not discharge the recipient until the effective date of the fair hearing notice. The CHHA must also continue to provide the recipient with aid-continuing, for which the CHHA will continue to be reimbursed by the Medical Assistance Program, when the recipient requests a fair hearing prior to the effective date of the notice.

The Department's Office of Administrative Hearings will notify the social services district of each recipient who has timely requested a fair hearing with aid-continuing. The social services district must then notify the CHHA of each such recipient who is entitled to receive aid-continuing.

B. CHHA DETERMINATIONS, CONTRARY TO PHYSICIANS' ORDERS, TO REDUCE MA RECIPIENTS' HOME HEALTH SERVICES BECAUSE THE RECIPIENTS' MEDICAL CONDITIONS HAVE IMPROVED:

§ 206. Instructions to CHHAs:
These instructions apply when a CHHA determines that a recipient's home health services should be reduced because the recipient's medical condition has improved, or for other reasons related to the recipient's medical condition or health and safety, but the recipient's physician disagrees with the CHHA's determination.

§ 207. When a CHHA determines that a recipient's home health services should be reduced for such reasons, the CHHA must consult with the recipient's physician. The CHHA may reduce the recipient's home health services if the recipient's physician provides the CHHA with a written statement that the recipient's services may be reduced or if the recipient's physician directs the CHHA to immediately comply with his oral statement to reduce services, in which event a written statement from the physician authorizing a reduction in services shall be provided within seven (7) days.

§ 208. If the recipient's physician does not provide the CHHA with such a written or oral statement agreeing to the reduction, the CHHA must:

(a) refer the recipient's case to a CHHA that, after assessing the recipient, agrees to admit the recipient and provide home health services according to the physician's order and continue to provide home health services according to the physician's order until the new CHHA has assessed and admitted the recipient; OR

(b) refer the recipient's case to the social services district and continue to provide home health services according to the physician's order until notified otherwise by the social services district. The CHHA's referral must include a copy of the CHHA's assessment of the recipient, all other documentation that the CHHA has either prepared regarding the recipient or has received from the recipient's

physician, and the name and telephone number or fax number of the recipient's physician. The CHHA must inform the recipient and the recipient's physician that it has referred the recipient's case to the social services district.

§ 209. Instructions to social services districts:

(a) When a CHHA refers an MA recipient to the social services district in accordance with the procedures outlined in § 208(b) above, the social services district must forward the recipient's case and all relevant documentation to the local professional director or designee.

(b) The local professional director or designee must review the documentation and determine, on behalf of the social services district, whether home health services should be reduced contrary to the physician's order or should be provided according to the physician's order.

(c) The local professional director or designee will notify the social services district and the CHHA of his or her determination with 10 business days after receiving the MA recipient's case and all supporting documentation from the social services district.

§ 210. Depending on the local professional director's or designee's determination, the social services district must take the following action:

(a) Determinations that home health services should be reduced contrary to physicians' orders:

When the local professional director or designee determines that home health services should be reduced contrary to the physician's order, the social services district must send the MA recipient a timely and adequate notice. The social services district must use the new notice attached to this directive as Appendix C and entitled: "NOTICE OF INTENT TO REDUCE OR DISCONTINUE HOME HEALTH SERVICES (HEALTH AND SAFETY)." Until further notice, the social services district must photocopy this notice and issue it on legal-size paper rather than letter-size paper. The social services district must also issue the notice as a two-sided notice rather than a two-paged notice.

(b) Determinations that home health services should be provided according to physicians' orders:

When the local professional director or designee determines that home health services should be provided according to the physician's order, the social services district must inform the CHHA of the determination and that the CHHA must provide the services according to the physician's order.

§ 211. Aid-continuing instructions to CHHAs and social services districts:

(a) When the social services district determines that home health services should be reduced contrary to the physician's order, the CHHA must not reduce the recipient's home health services until the effective date of the notice. The CHHA must also continue to provide the recipient with aid-continuing, for which the CHHA will continue to be reimbursed by the Medical Assistance Program, when the recipient requests a fair hearing prior to the effective date of the notice.

(b) The Department's Office of Administrative Hearings will notify the social services district of each recipient who has timely requested a fair hearing with aid-continuing. The social services district must then notify the CHHA of each such recipient who is entitled to receive aid-continuing.

C. DISCONTINUANCE BASED ON FISCAL ASSESSMENTS AND REDUCTIONS BASED ON THE USE OF EFFICIENCIES:

§ 212. Agreement cases:

When a social services district agrees with a CHHA's determination, which was made contrary to the physician's order, that the recipient's home health services should be reduced based on the use of one or more efficiencies or discontinued based on the fiscal assessment, the district must follow the procedures set forth below:

(a) Agreement on reductions:

When the social services district agrees with the CHHA that the recipient's home health services should be reduced based on the use of one or more efficiencies, the district must send the recipient a timely and adequate "NOTICE OF INTENT TO REDUCE HOME HEALTH SERVICES (FISCAL ASSESSMENT/EFFICIENCIES)." This is a new notice that is attached to this directive as Appendix D and that replaces Attachment 4 of 92 ADM-50. Until further notice, the social services district must photocopy this new notice and issue it as a two-sided notice rather than a two-paged notice on legal-size paper.

(b) Agreement on discontinuances:

When the social services district agrees with the CHHA that the recipient's home health services should be discontinued based on the fiscal assessment, the social services district must send the recipient a timely and adequate "NOTICE OF INTENT TO DISCONTINUE HOME HEALTH SERVICES (FISCAL ASSESSMENT)." This is a new notice that is attached to this directive as Appendix E and that replaces Attachment 5 of 92 ADM-50. Until further notice, the social services district must photocopy this new notice and issue it as a two-sided notice rather than a two-paged notice on legal-size paper. The social services district must also attach the one-page list of exception criteria as page 3 of this discontinuance notice.

§ 213. Disagreement cases:

(a) When a social services district disagrees with a CHHA's determination that a recipient's home

health services should be reduced based on the use of one or more efficiencies, or discontinued based on the fiscal assessment, the district must refer the recipient's case to the local professional director or designee.

(b) The local professional director or designee will review the documentation submitted by the social services district and determine whether the recipient's home health services should be reduced or discontinued.

(c) The local professional director or designee will notify the social services district and the CHHA of his or her final determination within 10 business days after receiving the recipient's case and all supporting documentation from the social services district.

(d) When the local professional director or designee determines that the recipient's home health services should be reduced or discontinued, the social services district must provide the recipient with timely and adequate notice. For reductions, the district must use the notice attached to this directive as Appendix D and entitled "NOTICE OF INTENT TO REDUCE HOME HEALTH SERVICES (FISCAL ASSESSMENT/EFFICIENCIES)." For discontinuances, the district must use the notice attached to this directive as Appendix E and entitled "NOTICE OF INTENT TO DISCONTINUE HOME HEALTH SERVICES (FISCAL ASSESSMENT)."

§ 214. Aid-continuing instructions to CHHAs and social services districts:

(a) The CHHA must not reduce or discontinue the recipient's home health services until the effective date of the fair hearing notice. In addition, the CHHA must continue to provide the recipient with aid-continuing, for which the CHHA will continue to be reimbursed by the Medical Assistance Program, when the recipient requests a fair hearing prior to the effective date of the notice. The Department's Office of Administrative Hearings will notify the social services district of each recipient who has timely requested a fair hearing with aid-continuing.

(b) The social services district must then notify the CHHA of each such recipient who is entitled to receive aid-continuing.

E. RECIPIENTS' REQUESTS TO BE DISCHARGED:

§ 215. Written requests for discharge:

(a) Instructions to CHHAs:

When a CHHA receives a clear, written statement that has been signed by a recipient and states that the recipient no longer wishes home health services, the CHHA must consult with the recipient's physician. When the recipient's physician believes that the recipient should continue to receive home health services according to the physician's recommendations, the CHHA must inform the social services district that the recipient wishes to be discharged contrary to the physician's recommendations. The CHHA must continue to provide home health services to the recipient in accordance with the physician's recommendations.

(b) Instructions to social services districts:

(i) When a social services district is informed by a CHHA, in accordance with § 215(a), that the recipient has submitted a clear, written statement that he or she no longer wishes to receive home health services, the district must send the recipient an adequate notice, as defined in Department regulation 18 NYCRR § 358-2.2. The social services district must use the new notice attached to this directive as Appendix F and entitled "ADEQUATE NOTICE OF INTENT TO DISCONTINUE HOME HEALTH CARE SERVICES (AT RECIPIENT'S REQUEST)." Until further notice, the social services district must photocopy this notice and issue it on legal-size paper rather than letter-size paper. The social services district must also issue the notice as a two-sided notice rather than a two-paged notice.

(ii) When the recipient requests a fair hearing within 10 days after the date that the fair hearing notice is postmarked, the social services district must notify the CHHA that it must provide aid-continuing, for which the CHHA will be reimbursed by the Medical Assistance Program.

(iii) The Department's Office of Administrative Hearings will notify the social services district of each recipient who has timely requested that his or her benefits be reinstated. The social services district must then notify the CHHA that it must provide aid-continuing to the recipient pending issuance of a fair hearing decision.

§ 216. Oral requests for discharge:

(a) Instructions to CHHAs:

When a recipient orally states to CHHA personnel that he or she no longer wishes to receive home health services, the CHHA must consult with the recipient's physician. When the recipient's physician believes that the recipient should continue to receive home health services according to the physician's recommendation, the CHHA must inform the social services district that the recipient wishes to be discharged contrary to the physician's recommendation and continue to provide home health services according to the physician's recommendations.

(b) Instructions to social services districts:

(i) When a social services district is informed by a CHHA, in accordance with § 216(a), that the recipient has orally stated that he or she no longer wishes to receive home health services, the district

must send the recipient a timely and adequate notice. The social services district must use the new notice attached to this directive as Appendix G and entitled "TIMELY AND ADEQUATE NOTICE OF INTENT TO DISCONTINUE HOME HEALTH SERVICES (AT RECIPIENT'S REQUEST)." Until further notice, the social services district must photocopy this notice and issue it on legal-size paper rather than letter-size paper. The social services district must also issue this notice as a two-sided notice rather than a two-paged notice.

(ii) When the recipient requests a fair hearing prior to the effective date of the notice, the social services district must notify the CHHA that it must provide aid-continuing, for which the CHHA will be reimbursed by the Medical Assistance Program.

(iii) The Department's Office of Administrative Hearings will notify the social services district of each recipient who has timely requested a fair hearing with aid-continuing. The social services district must then notify the CHHA that it must provide aid-continuing to the recipient pending issuance of a fair hearing decision.

III. RETROACTIVE RELIEF:

A. CHHA DETERMINATIONS MADE ON OR AFTER NOVEMBER 15, 1993, TO DENY ADMISSION TO OR DISCHARGE MA RECIPIENTS FOR REASONS RELATED TO RECIPIENTS' HEALTH AND SAFETY OR TO REDUCE MA RECIPIENTS' HOME HEALTH SERVICES FOR REASONS RELATED TO RECIPIENTS' HEALTH AND SAFETY:

§ 301. Except as provided below, the following instructions apply to the following CHHA determinations made on or after November 15, 1993:

(a) CHHA determinations not to admit MA recipients because home health services cannot maintain the recipients' health and safety;

(b) CHHA determinations to discharge MA recipients because home health services can no longer maintain the recipients' health and safety for one or more of the reasons specified in DOH regulations at 10 NYCRR § 763.5(h)(1), § 763.5(h)(4) or § 763.5(h)(5); and

(c) CHHA determinations to reduce MA recipients' home health services because the recipients' medical conditions have improved or for other reasons related to the recipients' medical conditions or health and safety.

§ 302. These instructions DO NOT apply to the following CHHA determinations made on or after November 15, 1993:

(a) Any CHHA determination made on or after November 15, 1993, to deny admission to an MA recipient when the recipient's physician agreed with the CHHA's determination not to admit the recipient;

(b) Any CHHA determination made on or after November 15, 1993, to reduce an MA recipient's home health services when the recipient's physician had ordered that the recipient's services be reduced and the CHHA reduced the services consistent with the physician's order;

(c) Any CHHA determination made on or after November 15, 1993, to discharge an MA recipient for reasons related to the recipient's medical condition when the recipient's physician had ordered that the recipient be discharged and the CHHA discharged the recipient consistent with the physician's order;

(d) Any CHHA determination made on or after November 15, 1993, to discharge an MA recipient for one or more of the reasons specified in DOH regulations at 10 NYCRR § 763.5(h)(2) or § 763.5(h)(3); and

(e) Any CHHA determination made with respect to an MA recipient who is now deceased.

§ 303. Instructions to CHHAs:

(a) Each CHHA must review its case records on all MA recipients whom the CHHA either denied admission to or discharged on or after November 15, 1993, or whose home health services were reduced on or after such date.

(b) The CHHA is not required to take any further action with respect to any MA recipient who was denied admission or discharged or whose services were reduced in accordance with § 302(a), (b), (c), (d), or (e) above. The CHHA is required, however, to take certain action with respect to all other MA recipients whom the CHHA denied admission to or discharged on or after November 15, 1993, or whose services were reduced on or after such date and who did not receive an adequate fair hearing notice and an opportunity to request a fair hearing with aid-continuing, when aid-continuing was appropriate.

Specifically, the CHHA must obtain a new physician's order and conduct a new assessment of the MA recipient in accordance with DOH regulations.

§ 304. When the CHHA agrees with the new physician's order, the CHHA must admit or discharge the recipient or provide the recipient services in accordance with the order.

§ 305. When the CHHA disagrees with the new physician's order, the CHHA must follow the appropriate instructions to CHHAs previously set forth in this directive. Specifically, the CHHA must follow the instructions to CHHAs in § 100 et seq. when the CHHA determines not to admit the recipient contrary to the physician's order; the CHHA must follow the instructions to CHHAs in § 200 et seq. and the aid-continuing instructions in § 205, when the CHHA determines that the recipient should be

discharged contrary to the physician's order; and the CHHA must follow the instructions to CHHAs in § 206 et seq. and the aid-continuing instructions in § 211 when the CHHA determines that the recipient's services should be reduced contrary to the physician's order. Aid-continuing must be provided at the level of services required by the physician's new order.

§ 306. Instructions to social services districts:

The social services district must follow the appropriate instructions to social services districts set forth in this directive. Specifically, the social services district must follow the instructions to social services districts in § 102 et seq. when acting upon a CHHA's determination, contrary to the physician's order, not to admit an MA recipient for health and safety reasons; the district must follow the instructions to social services districts in § 203 et seq. and the aid-continuing instructions in § 205 when acting upon a CHHA's determination, contrary to the physician's order, to discharge an MA recipient for health and safety reasons; and the district must follow the instructions to social services districts in § 209 et seq. and the aid-continuing instructions in § 211 herein when acting upon a CHHA's determination, contrary to the physician's order, to reduce a recipient's home health services. Aid-continuing must be provided at the level of services required by the physician's new order.

B. SOCIAL SERVICES DISTRICT DETERMINATIONS MADE ON OR AFTER NOVEMBER 15, 1993, TO DENY, REDUCE OR DISCONTINUE MA RECIPIENTS' HOME HEALTH SERVICES BASED UPON FISCAL ASSESSMENTS:

§ 307. Reductions or discontinuances:

Social services districts and CHHAs are reminded that the instructions set forth in the Department's February 25, 1994, memorandum entitled "Further Catanzano instructions: retroactive relief" remain in effect. These instructions apply to MA recipients whose home health services were reduced or discontinued on or after November 15, 1993, for reasons related to fiscal assessments. A copy of these instructions is attached to this directive as Appendix H.

§ 308. Denials contrary to physicians' orders:

Social services districts must identify each case that meets the following requirements:

(a) The CHHA conducted an initial fiscal assessment on or after November 15, 1993, on any MA recipient, regardless of whether the recipient was hospitalized or residing at home, who was not receiving home health services from the CHHA when it conducted the fiscal assessment;

(b) The social services district agreed or disagreed with the CHHA's determination not to admit the MA recipient because the recipient's home care costs exceeded 90 percent of RHCF costs and the recipient did not meet any exception criteria;

(c) The recipient was denied home health services as a result of the fiscal assessment and contrary to the physician's order; and

(d) The social services district did not send the MA recipient an adequate fair hearing notice advising the recipient of his or her right to request a fair hearing to appeal the denial of home health services.

§ 309. Social services districts have the following responsibilities for each MA recipient whom the districts identify as meeting the requirements set forth in (a) through (d) of § 308 above:

(a) The social services district must notify the CHHA of each recipient whom the district identifies as meeting these requirements;

(b) The CHHA must complete a new assessment of the recipient including a new fiscal assessment and forward the fiscal assessment to the district; and

(c) The social services district must follow the notice and fair hearing instructions previously set forth at § 107 herein when the social services district agrees with the CHHA's determination that home health services should be denied based on the fiscal assessment. When the social services district disagrees with the CHHA's determination that home health services should be denied or provided based on the fiscal assessment, the district must follow the notice and fair hearing instructions previously set forth at § 108 herein.

§ 310. Should you have questions regarding your responsibilities, please telephone Mary Jane Conroy, Medical Assistance Specialist II, at (518) 473-5565 or by fax at (518) 486-4112.



Image 1 (7.75" X 5") Not available for Offline Print to STP or FAX

[Click to View ]

Image 2 (7.5" X 5") Not available for Offline Print to STP or FAX

[Click to View ]

Image 3 (7.25" X 5") Not available for Offline Print to STP or FAX

[Click to View ]

Image 4 (7.5" X 5") Not available for Offline Print to STP or FAX

[Click to View ]

Image 5 (8" X 5") Not available for Offline Print to STP or FAX

[Click to View ]

Image 6 (7" X 4.5") Not available for Offline Print to STP or FAX

[Click to View ]

Image 7 (8.5" X 5") Not available for Offline Print to STP or FAX

[Click to View ]

Image 8 (7.75" X 5") Not available for Offline Print to STP or FAX

[Click to View ]

Image 9 (8.25" X 5") Not available for Offline Print to STP or FAX

[Click to View ]

Image 10 (7.75" X 5") Not available for Offline Print to STP or FAX

[Click to View ]

Image 11 (8.5" X 5") Not available for Offline Print to STP or FAX

[Click to View ]

Image 12 (8.5" X 5") Not available for Offline Print to STP or FAX

[Click to View ]

Image 13 (6.25" X 5") Not available for Offline Print to STP or FAX

[Click to View]

Image 14 (8.25" X 5") Not available for Offline Print to STP or FAX

[Click to View]

Image 15 (6.5" X 5") Not available for Offline Print to STP or FAX

[Click to View]

Image 16 (8.5" X 5") Not available for Offline Print to STP or FAX

APPENDIX H

MEMORANDUM

DSS-524EL

TO:    All Social Services          DATE:    February 25, 1994
       District Commissioners
FROM:  Barry T. Berberich           SUBJECT: Further Catanzano
       Assistant Commissioner                instructions: retroactive
                                             relief

This memorandum contains further instructions regarding the preliminary injunction issued on February 16, 1994, in Catanzano et al. v. Dowling et al. (USDC, WDNY). In Section IV of the Department's February 18th letter to social services districts and CHHAs regarding the Catanzano preliminary injunction, the Department informed them that it would be providing such instructions regarding retroactive relief as soon as possible.

The specific section of the court's order directing retroactive relief requires the State and County defendants to:

"take immediate steps to provide notice and hearing rights to members of plaintiffs' class who have had their home health care services suspended, terminated or reduced without the benefit of notice, the right to a hearing or aid-continuing since November 15, 1993."

To comply with this order, each social services district must review its case records on each home health services recipient for whom a CHHA conducted a fiscal assessment and, as a result of the fiscal assessment, reduced or discontinued (i.e. suspended or terminated) the recipient's home health services on or after November 15, 1993.

Please note that the order does not apply to Medical Assistance recipients who were hospitalized when the CHHA conducted the fiscal assessment. In addition, the order does not apply to CHHA determinations to reduce or discontinue a recipient's home health services for reasons that are unrelated to the costs of the recipient's care when compared to 90 percent of residential health care facility costs and the recipient's failure to meet any exception criteria.

Specifically, each district must identify each case that meets the following requirements:

a. The CHHA conducted a fiscal assessment on a Medical Assistance recipient who, at the time of the fiscal assessment, was receiving home health services from the CHHA and was not hospitalized, and the CHHA reduced or discontinued the recipient's home health services on or after November 15, 1993, as a result of the fiscal assessment;

b. The social services district agreed with the CHHA's determination that the recipient's home health services should be reduced or discontinued on or after November 15, 1993; and

c. The social services district did not provide the recipient with a timely notice and an opportunity for a fair hearing to review the determination that the recipient's home health services should be reduced

or discontinued.

Social services districts and CHHAs have the following responsibilities for each home health services recipient who meets the requirements set forth in a - c, above:

1. The social services district must notify the CHHA of each recipient whom the district has identified as meeting these requirements.

2. For each recipient who the district has determined meet these requirements, the CHHA must reinstate the home health services that the recipient received immediately prior to the CHHA's reduction or discontinuance made as a result of the fiscal assessment. The CHHA must notify the social services district when it has reinstated the recipient's home health services.

3. For each such recipient, the CHHA must then complete a new fiscal assessment in accordance with the provisions of 92 ADM-50 and notify the social services district of the results of the new fiscal assessment in accordance with 18 NYCRR 505.23(c) and 92 ADM-50.

4. The social services district must send the recipient a timely notice and an opportunity to request a fair hearing to review any proposed reduction or discontinuance that the CHHA proposes to take as a result of the new fiscal assessment that the CHHA has completed in accordance with Step 3, above. The district must use the appropriate fair hearing notice attached to 92 ADM-50, but must modify the notice as follows:

Agreement on Reductions:

When the social services district agrees with the CHHA that the recipient's home health services must be reduced, the social services district must send the recipient a timely "Notice of Decision to Reduce (Fiscal Assessment) Home Health Services" (Attachment 4 to 92 ADM-50). Please note that the social services district does not refer these cases to the local professional director or designee. In the "BECAUSE" section of the notice, the district must thus cross out the words, "Local Professional Director or designee," and insert the words, "social services official," so that the sentence reads as follows: "Your case has been reviewed by the social services official and it is his/her determination, based on your current medical condition, that your home health care services must be reduced."

Agreement on Discontinuances:

When the social services district agrees with the CHHA that the recipient's home health services must be discontinued, the social services district must send the recipient a timely "Notice of Decision to Discontinue (Fiscal Assessment) Home Health Services" (Attachment 5 to 92 ADM-50). Again, please note that the social services district does not refer these cases to the local professional director or designee. Consequently, in the first sentence of the second paragraph of the notice, the district must cross out the words, "the Local Professional Director or designee has," and insert the words, "the social services official," so that the sentence reads as follows: "We are taking this action because the social services official has decided that:"

5. The social services district must notify the CHHA of each recipient who timely requests a fair hearing with aid-continuing. The Department's Office of Administrative Hearings will notify the social services district of all such recipients.

6. The CHHA must not reduce or discontinue the recipient's home health services until the effective date of the notice and must continue to provide the recipient with aid-continuing upon being notified by the district that the recipient has timely requested a hearing with aid-continuing. Aid-continuing is defined as the same type of home health services, at the same scope and frequency, as the recipient received immediately prior to the reduction or discontinuance made as a result of the fiscal assessment.

The Department will issue instructions as soon as possible regarding notice and fair hearing rights for home health services applicants. Pending such further instructions, no fiscal assessments are to be performed on any MA recipient who first applies for home health services on or after February 16, 1994.

Please contact Mary Jane Conroy of my staff, at (518) 473-5565, should you have any questions regarding your responsibilities under this preliminary injunction.

18 NY ADC 505.23
18 NY ADC 505.23
2008 WL 75311183
18 NY ADC 505.23

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.
Adobe Reader is required to view PDF images.



Docs In Sequence

---

**Westlaw, part of Thomson Reuters**
© 2010 West | Privacy | Accessibility



Remote User

# rgm

http://public.leginfo.state.ny.us/LAWSSEAF.cgi?
05/05/10   02:48 PM

EXHIBIT C

Detail report for Melissa General                    10/17/2006

| Date | Hours | Type | Approver |
|---|---|---|---|
| 05/01/2001 | 8.0000 | REG | Marie J. Webster |
| 05/03/2001 | 8.0000 | REG | Marie J. Webster |
| 05/04/2001 | 8.0000 | REG | Marie J. Webster |
| 05/05/2001 | 8.0000 | WKND | Marie J. Webster |
| 05/06/2001 | 6.0000 | WKND | Marie J. Webster |
| 05/07/2001 | 10.0000 | REG | Marie J. Webster |
| 05/10/2001 | 8.0000 | REG | Marie J. Webster |
| 05/11/2001 | 8.0000 | REG | Marie J. Webster |
| 05/12/2001 | 8.0000 | WKND | Marie J. Webster |
| 05/13/2001 | 8.0000 | WKND | Marie J. Webster |
| 05/15/2001 | 8.0000 | REG | Marie J. Webster |
| 05/16/2001 | 8.0000 | REG | Marie J. Webster |
| 05/17/2001 | 8.0000 | REG | Marie J. Webster |
| 05/21/2001 | 8.0000 | REG | Marie J. Webster |
| 05/22/2001 | 8.0000 | REG | Marie J. Webster |
| 05/24/2001 | 8.0000 | REG | Marie J. Webster |
| 05/25/2001 | 8.0000 | REG | Marie J. Webster |
| 05/27/2001 | 8.0000 | WKND | Marie J. Webster |
| 05/28/2001 | 8.0000 | HOL1 | Marie J. Webster |
| 05/30/2001 | 8.0000 | REG | Marie J. Webster |
| 05/31/2001 | 8.0000 | REG | Marie J. Webster |
| 06/01/2001 | 8.0000 | REG | Marie J. Webster |
| 06/02/2001 | 8.0000 | WKND | Marie J. Webster |
| 06/03/2001 | 8.0000 | WKND | Marie J. Webster |
| 06/06/2001 | 8.0000 | REG | Marie J. Webster |
| 06/07/2001 | 8.0000 | REG | Marie J. Webster |
| 06/08/2001 | 8.0000 | REG | Marie J. Webster |
| 06/09/2001 | 8.0000 | WKND | Marie J. Webster |
| 06/10/2001 | 8.0000 | WKND | Marie J. Webster |
| 06/11/2001 | 8.0000 | REG | Marie J. Webster |
| 06/12/2001 | 8.0000 | REG | Marie J. Webster |
| 06/13/2001 | 8.0000 | REG | Marie J. Webster |
| 06/14/2001 | 8.0000 | REG | Marie J. Webster |
| 06/19/2001 | 8.0000 | REG | Marie J. Webster |
| 06/21/2001 | 8.0000 | REG | Marie J. Webster |
| 06/22/2001 | 8.0000 | REG | Marie J. Webster |
| 06/23/2001 | 8.0000 | WKND | Marie J. Webster |
| 06/24/2001 | 8.0000 | WKND | Marie J. Webster |
| 06/27/2001 | 8.0000 | REG | Marie J. Webster |
| 06/28/2001 | 8.0000 | REG | Marie J. Webster |
| 06/29/2001 | 8.0000 | REG | Marie J. Webster |
| 06/30/2001 | 8.0000 | WKND | Marie J. Webster |
| 07/01/2001 | 8.0000 | WKND | Marie J. Webster |
| 07/02/2001 | 5.0000 | REG | Marie J. Webster |
| 07/04/2001 | 8.0000 | HOL1 | Marie J. Webster |
| 07/05/2001 | 8.0000 | REG | Marie J. Webster |
| 07/06/2001 | 8.0000 | REG | Marie J. Webster |
| 07/07/2001 | 8.0000 | WKND | Marie J. Webster |
| 07/08/2001 | 8.0000 | WKND | Marie J. Webster |
| 07/09/2001 | 8.0000 | REG | Marie J. Webster |
| 07/10/2001 | 8.0000 | REG | Marie J. Webster |
| 07/11/2001 | 8.0000 | REG | Marie J. Webster |
| 07/12/2001 | 8.0000 | REG | Marie J. Webster |
| 07/16/2001 | 8.0000 | REG | Marie J. Webster |

| Date | Hours | Type | Name |
|---|---|---|---|
| 07/19/2001 | 8.0000 | REG | Marie J. Webster |
| 07/20/2001 | 8.0000 | REG | Marie J. Webster |
| 07/21/2001 | 8.0000 | WKND | Marie J. Webster |
| 07/25/2001 | 8.0000 | REG | Marie J. Webster |
| 07/26/2001 | 8.0000 | REG | Marie J. Webster |
| 07/27/2001 | 8.0000 | REG | Marie J. Webster |
| 07/28/2001 | 8.0000 | WKND | Marie J. Webster |
| 07/29/2001 | 8.0000 | WKND | Marie J. Webster |
| 07/31/2001 | 8.0000 | REG | Marie J. Webster |
| 08/01/2001 | 8.0000 | REG | Marie J. Webster |
| 08/02/2001 | 8.0000 | REG | Marie J. Webster |
| 08/04/2001 | 8.0000 | WKND | Marie J. Webster |
| 08/05/2001 | 8.0000 | WKND | Marie J. Webster |
| 08/06/2001 | 8.0000 | REG | Marie J. Webster |
| 08/07/2001 | 8.0000 | REG | Marie J. Webster |
| 08/08/2001 | 8.0000 | REG | Marie J. Webster |
| 08/09/2001 | 8.0000 | REG | Marie J. Webster |
| 08/15/2001 | 8.0000 | REG | Marie J. Webster |
| 08/16/2001 | 8.0000 | REG | Marie J. Webster |
| 08/17/2001 | 8.0000 | WKND | Marie J. Webster |
| 08/18/2001 | 8.0000 | WKND | Marie J. Webster |
| 08/19/2001 | 14.0000 | REG | Marie J. Webster |
| 08/22/2001 | 8.0000 | REG | Marie J. Webster |
| 08/23/2001 | 8.0000 | REG | Marie J. Webster |
| 08/24/2001 | 8.0000 | WKND | Marie J. Webster |
| 08/25/2001 | 8.0000 | WKND | Marie J. Webster |
| 08/26/2001 | 8.0000 | REG | Marie J. Webster |
| 08/28/2001 | 8.0000 | REG | Marie J. Webster |
| 08/30/2001 | 8.0000 | WKND | Marie J. Webster |
| 09/01/2001 | 8.0000 | WKND | Marie J. Webster |
| 09/02/2001 | 8.0000 | HOL1 | Marie J. Webster |
| 09/03/2001 | 8.0000 | REG | Marie J. Webster |
| 09/04/2001 | 8.0000 | REG | Marie J. Webster |
| 09/05/2001 | 8.0000 | REG | Marie J. Webster |
| 09/06/2001 | 8.0000 | REG | Marie J. Webster |
| 09/10/2001 | 8.0000 | REG | Marie J. Webster |
| 09/11/2001 | 8.0000 | REG | Marie J. Webster |
| 09/12/2001 | 8.0000 | REG | Marie J. Webster |
| 09/14/2001 | 8.0000 | WKND | Marie J. Webster |
| 09/16/2001 | 8.0000 | REG | Marie J. Webster |
| 09/17/2001 | 8.0000 | REG | Marie J. Webster |
| 09/19/2001 | 8.0000 | REG | Marie J. Webster |
| 09/20/2001 | 8.0000 | REG | Marie J. Webster |
| 09/21/2001 | 6.0000 | WKND | Marie J. Webster |
| 09/22/2001 | 8.0000 | WKND | Marie J. Webster |
| 09/23/2001 | 8.0000 | REG | Marie J. Webster |
| 09/25/2001 | 8.0000 | REG | Marie J. Webster |
| 09/26/2001 | 8.0000 | REG | Marie J. Webster |
| 09/27/2001 | 8.0000 | WKND | Marie J. Webster |
| 09/29/2001 | 8.0000 | WKND | Marie J. Webster |
| 09/30/2001 | 8.0000 | REG | Marie J. Webster |
| 10/01/2001 | 8.0000 | REG | Marie J. Webster |
| 10/02/2001 | 8.0000 | REG | Marie J. Webster |
| 10/03/2001 | | | |

| Date | Hours | Type | Name |
|---|---|---|---|
| 10/04/2001 | 8.0000 | REG | Marie J. Webster |
| 10/08/2001 | 8.0000 | REG | Marie J. Webster |
| 10/11/2001 | 8.0000 | REG | Marie J. Webster |
| 10/12/2001 | 8.0000 | REG | Marie J. Webster |
| 10/13/2001 | 8.0000 | WKND | Marie J. Webster |
| 10/14/2001 | 8.0000 | WKND | Marie J. Webster |
| 10/17/2001 | 8.0000 | REG | Marie J. Webster |
| 10/18/2001 | 8.0000 | REG | Marie J. Webster |
| 10/19/2001 | 8.0000 | REG | Marie J. Webster |
| 10/20/2001 | 8.0000 | WKND | Marie J. Webster |
| 10/21/2001 | 8.0000 | WKND | Marie J. Webster |
| 10/23/2001 | 8.0000 | REG | Marie J. Webster |
| 10/24/2001 | 8.0000 | REG | Marie J. Webster |
| 10/25/2001 | 8.0000 | REG | Marie J. Webster |
| 10/26/2001 | 3.2500 | REG | Virginia Kuentz |
| 10/27/2001 | 8.0000 | WKND | Marie J. Webster |
| 10/28/2001 | 8.0000 | WKND | Marie J. Webster |
| 10/29/2001 | 8.0000 | REG | Marie J. Webster |
| 10/30/2001 | 8.0000 | REG | Marie J. Webster |
| 10/31/2001 | 8.0000 | REG | Marie J. Webster |
| 11/01/2001 | 8.0000 | REG | Marie J. Webster |
| 11/05/2001 | 8.0000 | REG | Marie J. Webster |
| 11/08/2001 | 8.0000 | REG | Marie J. Webster |
| 11/09/2001 | 8.0000 | REG | Marie J. Webster |
| 11/10/2001 | 8.0000 | WKND | Marie J. Webster |
| 11/11/2001 | 8.0000 | WKND | Marie J. Webster |
| 11/11/2001 | 1.5000 | WKND | Virginia Kuentz |
| 11/14/2001 | 6.0000 | SICK | Marie J. Webster |
| 11/15/2001 | 6.0000 | SICK | Marie J. Webster |
| 11/16/2001 | 8.0000 | REG | Marie J. Webster |
| 11/17/2001 | 8.0000 | WKND | Marie J. Webster |
| 11/18/2001 | 8.0000 | WKND | Marie J. Webster |
| 11/19/2001 | 8.0000 | REG | Marie J. Webster |
| 11/20/2001 | 8.0000 | REG | Marie J. Webster |
| 11/21/2001 | 8.0000 | REG | Marie J. Webster |
| 11/22/2001 | 8.0000 | HOL2 | Marie J. Webster |
| 11/24/2001 | 8.0000 | WKND | Marie J. Webster |
| 11/25/2001 | 8.0000 | WKND | Marie J. Webster |
| 11/26/2001 | 8.0000 | REG | Marie J. Webster |
| 11/27/2001 | 8.0000 | REG | Marie J. Webster |
| 11/28/2001 | 8.0000 | REG | Marie J. Webster |
| 11/29/2001 | 8.0000 | REG | Marie J. Webster |
| 12/05/2001 | 8.0000 | REG | Marie J. Webster |
| 12/06/2001 | 8.0000 | REG | Marie J. Webster |
| 12/07/2001 | 8.0000 | REG | Marie J. Webster |
| 12/08/2001 | 8.0000 | WKND | Marie J. Webster |
| 12/09/2001 | 8.0000 | WKND | Marie J. Webster |
| 12/12/2001 | 8.0000 | REG | Marie J. Webster |
| 12/13/2001 | 8.0000 | REG | Marie J. Webster |
| 12/14/2001 | 8.0000 | REG | Marie J. Webster |
| 12/15/2001 | 8.0000 | WKND | Marie J. Webster |
| 12/16/2001 | 8.0000 | WKND | Marie J. Webster |
| 12/18/2001 | 8.0000 | REG | Marie J. Webster |
| 12/19/2001 | 8.0000 | REG | Marie J. Webster |

| Date | Hours | Type | Name |
|---|---|---|---|
| 12/20/2001 | 8.0000 | REG | Marie J. Webster |
| 12/22/2001 | 8.0000 | WKND | Marie J. Webster |
| 12/23/2001 | 8.0000 | WKND | Marie J. Webster |
| 12/25/2001 | 8.0000 | HOL2 | Marie J. Webster |
| 12/26/2001 | 8.0000 | REG | Marie J. Webster |
| 12/27/2001 | 8.0000 | REG | Marie J. Webster |
| 01/02/2002 | 8.0000 | REG | Marie J. Webster |
| 01/03/2002 | 8.0000 | REG | Marie J. Webster |
| 01/04/2002 | 8.0000 | REG | Marie J. Webster |
| 01/05/2002 | 8.0000 | WKND | Marie J. Webster |
| 01/06/2002 | 8.0000 | WKND | Marie J. Webster |
| 01/09/2002 | 8.0000 | REG | Marie J. Webster |
| 01/10/2002 | 8.0000 | REG | Marie J. Webster |
| 01/11/2002 | 8.0000 | REG | Marie J. Webster |
| 01/12/2002 | 8.0000 | WKND | Marie J. Webster |

| Date | Hours | Type | Name |
|---|---|---|---|
| 01/13/2002 | 8.0000 | WKND | Marie J. Webster |
| 01/15/2002 | 8.0000 | REG | Marie J. Webster |
| 01/16/2002 | 8.0000 | REG | Marie J. Webster |
| 01/17/2002 | 8.0000 | REG | Marie J. Webster |
| 01/19/2002 | 8.0000 | WKND | Marie J. Webster |
| 01/20/2002 | 8.0000 | WKND | Marie J. Webster |
| 01/21/2002 | 8.0000 | REG | Marie J. Webster |
| 01/22/2002 | 8.0000 | REG | Marie J. Webster |
| 01/23/2002 | 8.0000 | REG | Marie J. Webster |
| 01/24/2002 | 8.0000 | REG | Marie J. Webster |
| 01/28/2002 | 8.0000 | REG | Marie J. Webster |
| 01/31/2002 | 8.0000 | REG | Marie J. Webster |
| 02/01/2002 | 8.0000 | REG | Marie J. Webster |
| 02/02/2002 | 8.0000 | WKND | Marie J. Webster |
| 02/03/2002 | 8.0000 | WKND | Marie J. Webster |
| 02/06/2002 | 8.0000 | REG | Marie J. Webster |
| 02/07/2002 | 8.0000 | REG | Marie J. Webster |
| 02/08/2002 | 8.0000 | REG | Marie J. Webster |
| 02/09/2002 | 8.0000 | WKND | Marie J. Webster |
| 02/10/2002 | 8.0000 | WKND | Marie J. Webster |
| 02/12/2002 | 8.0000 | REG | Marie J. Webster |
| 02/13/2002 | 8.0000 | REG | Marie J. Webster |
| 02/14/2002 | 8.0000 | REG | Marie J. Webster |
| 02/16/2002 | 8.0000 | WKND | Marie J. Webster |
| 02/17/2002 | 8.0000 | WKND | Marie J. Webster |
| 02/18/2002 | 8.0000 | REG | Marie J. Webster |
| 02/19/2002 | 8.0000 | REG | Marie J. Webster |
| 02/20/2002 | 8.0000 | REG | Marie J. Webster |
| 02/21/2002 | 8.0000 | REG | Marie J. Webster |
| 02/25/2002 | 8.0000 | REG | Marie J. Webster |
| 02/28/2002 | 8.0000 | REG | Marie J. Webster |
| 03/01/2002 | 8.0000 | REG | Marie J. Webster |
| 03/02/2002 | 8.0000 | WKND | Marie J. Webster |
| 03/03/2002 | 8.0000 | WKND | Marie J. Webster |
| 03/06/2002 | 8.0000 | REG | Marie J. Webster |
| 03/07/2002 | 8.0000 | REG | Marie J. Webster |
| 03/08/2002 | 8.0000 | REG | Marie J. Webster |
| 03/09/2002 | 8.0000 | WKND | Marie J. Webster |
| 03/10/2002 | 8.0000 | WKND | Marie J. Webster |

| Date | Hours | Type | Name |
|------|-------|------|------|
| 03/12/2002 | 8.0000 | REG | Marie J. Webster |
| 03/13/2002 | 8.0000 | REG | Marie J. Webster |
| 03/14/2002 | 8.0000 | REG | Marie J. Webster |
| 03/16/2002 | 8.0000 | WKND | Marie J. Webster |
| 03/17/2002 | 8.0000 | WKND | Marie J. Webster |
| 03/18/2002 | 8.0000 | REG | Marie J. Webster |
| 03/19/2002 | 8.0000 | REG | Marie J. Webster |
| 03/20/2002 | 8.0000 | REG | Marie J. Webster |
| 03/21/2002 | 8.0000 | REG | Marie J. Webster |
| 03/25/2002 | 8.0000 | REG | Marie J. Webster |
| 03/28/2002 | 8.0000 | REG | Marie J. Webster |
| 03/29/2002 | 8.0000 | REG | Marie J. Webster |
| 03/30/2002 | 8.0000 | WKND | Marie J. Webster |
| 03/31/2002 | 8.0000 | HOL2 | Marie J. Webster |
| 04/03/2002 | 8.0000 | REG | Marie J. Webster |
| 04/04/2002 | 8.0000 | REG | Marie J. Webster |
| 04/05/2002 | 8.0000 | REG | Marie J. Webster |
| 04/06/2002 | 8.0000 | WKND | Marie J. Webster |
| 04/07/2002 | 8.0000 | WKND | Marie J. Webster |
| 04/09/2002 | 8.0000 | REG | Marie J. Webster |
| 04/10/2002 | 8.0000 | REG | Marie J. Webster |

| Date | Hours | Type | Name |
|------|-------|------|------|
| 04/11/2002 | 8.0000 | REG | Marie J. Webster |
| 04/13/2002 | 8.0000 | WKND | Marie J. Webster |
| 04/14/2002 | 8.0000 | WKND | Marie J. Webster |
| 04/15/2002 | 8.0000 | REG | Marie J. Webster |
| 04/16/2002 | 8.0000 | REG | Marie J. Webster |
| 04/17/2002 | 8.0000 | REG | Marie J. Webster |
| 04/18/2002 | 8.0000 | REG | Marie J. Webster |
| 04/22/2002 | 8.0000 | REG | Marie J. Webster |
| 04/25/2002 | 8.0000 | REG | Marie J. Webster |
| 04/26/2002 | 8.0000 | REG | Marie J. Webster |
| 04/27/2002 | 8.0000 | WKND | Marie J. Webster |
| 04/28/2002 | 8.0000 | WKND | Marie J. Webster |
| 05/01/2002 | 8.0000 | REG | Marie J. Webster |
| 05/02/2002 | 8.0000 | REG | Marie J. Webster |
| 05/03/2002 | 8.0000 | REG | Marie J. Webster |
| 05/04/2002 | 8.0000 | WKND | Marie J. Webster |
| 05/05/2002 | 8.0000 | WKND | Marie J. Webster |
| 05/05/2002 | 3.0000 | WKND | Virginia Kuentz |
| 05/07/2002 | 8.0000 | REG | Marie J. Webster |
| 05/08/2002 | 8.0000 | REG | Marie J. Webster |
| 05/09/2002 | 8.0000 | REG | Marie J. Webster |
| 05/11/2002 | 8.0000 | WKND | Marie J. Webster |
| 05/12/2002 | 8.0000 | WKND | Marie J. Webster |
| 05/13/2002 | 8.0000 | REG | Marie J. Webster |
| 05/14/2002 | 8.0000 | SICK | Marie J. Webster |
| 05/15/2002 | 8.0000 | REG | Marie J. Webster |
| 05/16/2002 | 8.0000 | REG | Marie J. Webster |
| 05/20/2002 | 8.0000 | REG | Marie J. Webster |
| 05/23/2002 | 8.0000 | REG | Marie J. Webster |
| 05/24/2002 | 8.0000 | REG | Marie J. Webster |
| 05/25/2002 | 8.0000 | WKND | Marie J. Webster |
| 05/26/2002 | 8.0000 | WKND | Marie J. Webster |
| 05/29/2002 | 8.0000 | REG | Marie J. Webster |

| Date | Hours | Type | Name |
|---|---|---|---|
| 05/30/2002 | 8.0000 | REG | Marie J. Webster |
| 05/31/2002 | 8.0000 | REG | Marie J. Webster |
| 06/01/2002 | 8.0000 | WKND | Marie J. Webster |
| 06/02/2002 | 8.0000 | WKND | Marie J. Webster |
| 06/04/2002 | 8.0000 | REG | Marie J. Webster |
| 06/05/2002 | 8.0000 | REG | Marie J. Webster |
| 06/06/2002 | 8.0000 | REG | Marie J. Webster |
| 06/08/2002 | 8.0000 | WKND | Marie J. Webster |
| 06/09/2002 | 8.0000 | WKND | Marie J. Webster |
| 06/10/2002 | 8.0000 | REG | Marie J. Webster |
| 06/11/2002 | 8.0000 | REG | Marie J. Webster |
| 06/12/2002 | 8.0000 | REG | Marie J. Webster |
| 06/13/2002 | 8.0000 | REG | Marie J. Webster |
| 06/17/2002 | 8.0000 | REG | Marie J. Webster |
| 06/20/2002 | 8.0000 | REG | Marie J. Webster |
| 06/21/2002 | 8.0000 | REG | Marie J. Webster |
| 06/22/2002 | 8.0000 | WKND | Marie J. Webster |
| 06/23/2002 | 8.0000 | WKND | Marie J. Webster |
| 06/26/2002 | 8.0000 | REG | Marie J. Webster |
| 06/27/2002 | 8.0000 | REG | Marie J. Webster |
| 06/28/2002 | 8.0000 | REG | Marie J. Webster |
| 06/29/2002 | 8.0000 | WKND | Marie J. Webster |
| 06/30/2002 | 8.0000 | WKND | Marie J. Webster |
| 07/02/2002 | 8.0000 | REG | Marie J. Webster |
| 07/03/2002 | 8.0000 | REG | Marie J. Webster |
| 07/04/2002 | 8.0000 | SICK | Marie J. Webster |
| 07/08/2002 | 8.0000 | REG | Marie J. Webster |

| Date | Hours | Type | Name |
|---|---|---|---|
| 07/09/2002 | 8.0000 | REG | Marie J. Webster |
| 07/10/2002 | 8.0000 | REG | Marie J. Webster |
| 07/11/2002 | 8.0000 | REG | Marie J. Webster |
| 07/13/2002 | 8.0000 | WKND | Marie J. Webster |
| 07/14/2002 | 8.0000 | WKND | Marie J. Webster |
| 07/15/2002 | 8.0000 | REG | Marie J. Webster |
| 07/18/2002 | 8.0000 | REG | Marie J. Webster |
| 07/19/2002 | 8.0000 | REG | Marie J. Webster |
| 07/20/2002 | 8.0000 | WKND | Marie J. Webster |
| 07/21/2002 | 8.0000 | WKND | Marie J. Webster |
| 07/24/2002 | 8.0000 | REG | Marie J. Webster |
| 07/25/2002 | 8.0000 | REG | Marie J. Webster |
| 07/26/2002 | 8.0000 | REG | Marie J. Webster |
| 07/27/2002 | 8.0000 | WKND | Marie J. Webster |
| 07/28/2002 | 8.0000 | WKND | Marie J. Webster |
| 07/30/2002 | 8.0000 | REG | Marie J. Webster |
| 07/31/2002 | 8.0000 | REG | Marie J. Webster |
| 08/01/2002 | 8.0000 | REG | Marie J. Webster |
| 08/03/2002 | 8.0000 | WKND | Marie J. Webster |
| 08/04/2002 | 8.0000 | WKND | Marie J. Webster |
| 08/05/2002 | 8.0000 | REG | Marie J. Webster |
| 08/06/2002 | 8.0000 | REG | Marie J. Webster |
| 08/07/2002 | 8.0000 | REG | Marie J. Webster |
| 08/08/2002 | 8.0000 | REG | Marie J. Webster |
| 08/14/2002 | 8.0000 | REG | Marie J. Webster |
| 08/15/2002 | 8.0000 | REG | Marie J. Webster |
| 08/16/2002 | 8.0000 | REG | Marie J. Webster |

| | | | |
|---|---|---|---|
| 08/17/2002 | | | |
| 08/18/2002 | 8.0000 | WKND | Marie J. Webster |
| 08/21/2002 | 8.0000 | WKND | Marie J. Webster |
| 08/22/2002 | 8.0000 | REG | Marie J. Webster |
| 08/23/2002 | 8.0000 | REG | Marie J. Webster |
| 08/24/2002 | 8.0000 | REG | Marie J. Webster |
| 08/25/2002 | 8.0000 | WKND | Marie J. Webster |
| 08/27/2002 | 8.0000 | WKND | Marie J. Webster |
| 08/28/2002 | 8.0000 | REG | Marie J. Webster |
| 08/29/2002 | 8.0000 | VAC | Marie J. Webster |
| 08/31/2002 | 8.0000 | REG | Marie J. Webster |
| 09/01/2002 | 8.0000 | WKND | Marie J. Webster |
| 09/02/2002 | 8.0000 | WKND | Marie J. Webster |
| 09/03/2002 | 8.0000 | HOL1 | Marie J. Webster |
| 09/04/2002 | 8.0000 | REG | Marie J. Webster |
| 09/05/2002 | 8.0000 | REG | Marie J. Webster |
| 09/09/2002 | 8.0000 | REG | Marie J. Webster |
| 09/12/2002 | 8.0000 | REG | Marie J. Webster |
| 09/13/2002 | 8.0000 | REG | Marie J. Webster |
| 09/14/2002 | 8.0000 | REG | Marie J. Webster |
| 09/15/2002 | 4.0000 | SICK | Marie J. Webster |
| 09/18/2002 | 8.0000 | WKND | Marie J. Webster |
| 09/19/2002 | 8.0000 | REG | Marie J. Webster |
| 09/20/2002 | 8.0000 | REG | Marie J. Webster |
| 09/21/2002 | 8.0000 | REG | Marie J. Webster |
| 09/22/2002 | 8.0000 | WKND | Marie J. Webster |
| 09/24/2002 | 8.0000 | WKND | Marie J. Webster |
| 09/25/2002 | 8.0000 | REG | Marie J. Webster |
| 09/26/2002 | 8.0000 | REG | Marie J. Webster |
| 09/28/2002 | 8.0000 | REG | Marie J. Webster |
| 09/29/2002 | 8.0000 | WKND | Marie J. Webster |
| 09/30/2002 | 8.0000 | WKND | Marie J. Webster |
| 10/01/2002 | 8.0000 | REG | Marie J. Webster |
| | 8.0000 | REG | Marie J. Webster |

| | | | |
|---|---|---|---|
| 10/02/2002 | | | |
| 10/03/2002 | 8.0000 | REG | Marie J. Webster |
| 10/07/2002 | 8.0000 | REG | Marie J. Webster |
| 10/10/2002 | 8.0000 | REG | Marie J. Webster |
| 10/11/2002 | 8.0000 | REG | Marie J. Webster |
| 10/12/2002 | 8.0000 | REG | Marie J. Webster |
| 10/13/2002 | 8.0000 | WKND | Marie J. Webster |
| 10/16/2002 | 8.0000 | WKND | Marie J. Webster |
| 10/17/2002 | 8.0000 | REG | Marie J. Webster |
| 10/18/2002 | 8.0000 | REG | Marie J. Webster |
| 10/19/2002 | 8.0000 | REG | Marie J. Webster |
| 10/20/2002 | 8.0000 | WKND | Marie J. Webster |
| 10/22/2002 | 8.0000 | WKND | Marie J. Webster |
| 10/23/2002 | 8.0000 | REG | Marie J. Webster |
| 10/24/2002 | 8.0000 | REG | Marie J. Webster |
| 10/27/2002 | 8.0000 | REG | Marie J. Webster |
| 10/28/2002 | 8.0000 | WKND | Marie J. Webster |
| 10/29/2002 | 8.0000 | REG | Marie J. Webster |
| 10/30/2002 | 8.0000 | REG | Marie J. Webster |
| 10/31/2002 | 8.0000 | REG | Marie J. Webster |
| 11/04/2002 | 8.0000 | REG | Marie J. Webster |
| | 8.0000 | REG | Marie J. Webster |

| Date | Hours | Type | Name |
|---|---|---|---|
| 11/07/2002 | 8.0000 | REG | Marie J. Webster |
| 11/08/2002 | 2.0000 | REG | Virginia Kuentz |
| 11/08/2002 | 8.5000 | REG | Marie J. Webster |
| 11/09/2002 | 8.0000 | WKND | Marie J. Webster |
| 11/10/2002 | 8.0000 | WKND | Marie J. Webster |
| 11/13/2002 | 8.0000 | REG | Marie J. Webster |
| 11/14/2002 | 8.0000 | REG | Marie J. Webster |
| 11/15/2002 | 8.0000 | REG | Marie J. Webster |
| 11/15/2002 | 2.0000 | REG | Virginia Kuentz |
| 11/16/2002 | 8.0000 | WKND | Marie J. Webster |
| 11/17/2002 | 8.0000 | WKND | Marie J. Webster |
| 11/19/2002 | 8.0000 | REG | Marie J. Webster |
| 11/20/2002 | 8.0000 | REG | Marie J. Webster |
| 11/21/2002 | 8.0000 | REG | Marie J. Webster |
| 11/23/2002 | 8.0000 | WKND | Marie J. Webster |
| 11/24/2002 | 8.0000 | WKND | Marie J. Webster |
| 11/25/2002 | 8.0000 | REG | Marie J. Webster |
| 11/26/2002 | 8.0000 | REG | Marie J. Webster |
| 11/27/2002 | 8.0000 | REG | Marie J. Webster |
| 11/28/2002 | 8.0000 | HOL2 | Marie J. Webster |
| 12/02/2002 | 8.0000 | REG | Marie J. Webster |
| 12/05/2002 | 8.0000 | REG | Marie J. Webster |
| 12/06/2002 | 8.0000 | REG | Marie J. Webster |
| 12/07/2002 | 8.0000 | WKND | Marie J. Webster |
| 12/08/2002 | 8.0000 | WKND | Marie J. Webster |
| 12/11/2002 | 8.0000 | REG | Marie J. Webster |
| 12/12/2002 | 8.0000 | REG | Marie J. Webster |
| 12/13/2002 | 8.0000 | REG | Marie J. Webster |
| 12/14/2002 | 8.0000 | WKND | Marie J. Webster |
| 12/15/2002 | 8.0000 | WKND | Marie J. Webster |
| 12/17/2002 | 8.0000 | REG | Marie J. Webster |
| 12/18/2002 | 8.0000 | REG | Marie J. Webster |
| 12/19/2002 | 8.0000 | REG | Marie J. Webster |
| 01/08/2003 | 8.0000 | REG | Marie J. Webster |
| 01/09/2003 | 8.0000 | REG | Marie J. Webster |
| 01/10/2003 | 8.0000 | WKND | Marie J. Webster |
| 01/11/2003 | 8.0000 | WKND | Marie J. Webster |
| 01/12/2003 | 8.0000 | REG | Marie J. Webster |
| 01/14/2003 | | | |

| Date | Hours | Type | Name |
|---|---|---|---|
| 01/15/2003 | 8.0000 | REG | Marie J. Webster |
| 01/16/2003 | 8.0000 | REG | Marie J. Webster |
| 01/18/2003 | 8.0000 | WKND | Marie J. Webster |
| 01/19/2003 | 8.0000 | WKND | Marie J. Webster |
| 01/20/2003 | 8.0000 | REG | Marie J. Webster |
| 01/21/2003 | 8.0000 | REG | Marie J. Webster |
| 01/22/2003 | 8.0000 | REG | Marie J. Webster |
| 01/23/2003 | 8.0000 | REG | Marie J. Webster |
| 01/27/2003 | 8.0000 | REG | Marie J. Webster |
| 01/30/2003 | 8.0000 | REG | Marie J. Webster |
| 01/31/2003 | 8.0000 | REG | Marie J. Webster |
| 02/01/2003 | 8.0000 | WKND | Marie J. Webster |
| 02/02/2003 | 8.0000 | WKND | Marie J. Webster |
| 02/05/2003 | 8.0000 | REG | Marie J. Webster |
| 02/06/2003 | 8.0000 | REG | Marie J. Webster |

| Date | Hours | Type | Name |
|---|---|---|---|
| 02/07/2003 | 8.0000 | REG | Marie J. Webster |
| 02/08/2003 | 8.0000 | WKND | Marie J. Webster |
| 02/09/2003 | 8.0000 | WKND | Marie J. Webster |
| 02/11/2003 | 8.0000 | REG | Marie J. Webster |
| 02/12/2003 | 8.0000 | REG | Marie J. Webster |
| 02/13/2003 | 8.0000 | REG | Marie J. Webster |
| 02/15/2003 | 8.0000 | WKND | Marie J. Webster |
| 02/16/2003 | 8.0000 | WKND | Marie J. Webster |
| 02/17/2003 | 8.0000 | REG | Marie J. Webster |
| 02/18/2003 | 8.0000 | REG | Marie J. Webster |
| 02/19/2003 | 8.0000 | REG | Marie J. Webster |
| 02/20/2003 | 8.0000 | REG | Marie J. Webster |
| 02/24/2003 | 8.0000 | REG | Marie J. Webster |
| 02/27/2003 | 8.0000 | REG | Marie J. Webster |
| 02/28/2003 | 8.0000 | REG | Marie J. Webster |
| 03/01/2003 | 8.0000 | WKND | Marie J. Webster |
| 03/02/2003 | 8.0000 | WKND | Marie J. Webster |
| 03/05/2003 | 8.0000 | REG | Marie J. Webster |
| 03/06/2003 | 8.0000 | REG | Marie J. Webster |
| 03/07/2003 | 8.0000 | REG | Marie J. Webster |
| 03/08/2003 | 8.0000 | WKND | Marie J. Webster |
| 03/09/2003 | 8.0000 | WKND | Marie J. Webster |
| 03/11/2003 | 8.0000 | REG | Marie J. Webster |
| 03/12/2003 | 8.0000 | REG | Marie J. Webster |
| 03/13/2003 | 8.0000 | REG | Marie J. Webster |
| 03/15/2003 | 8.0000 | WKND | Marie J. Webster |
| 03/16/2003 | 8.0000 | WKND | Marie J. Webster |
| 03/17/2003 | 8.0000 | REG | Marie J. Webster |
| 03/18/2003 | 8.0000 | REG | Marie J. Webster |
| 03/19/2003 | 8.0000 | REG | Marie J. Webster |
| 03/20/2003 | 5.0000 | REG | Marie J. Webster |
| 03/24/2003 | 8.0000 | REG | Marie J. Webster |
| 03/27/2003 | 8.0000 | REG | Marie J. Webster |
| 03/28/2003 | 8.0000 | REG | Marie J. Webster |
| 03/29/2003 | 8.0000 | WKND | Marie J. Webster |
| 03/30/2003 | 8.0000 | WKND | Marie J. Webster |
| 04/02/2003 | 8.0000 | REG | Marie J. Webster |
| 04/03/2003 | 8.0000 | REG | Marie J. Webster |
| 04/04/2003 | 8.0000 | REG | Marie J. Webster |
| 04/05/2003 | 8.0000 | WKND | Marie J. Webster |
| 04/06/2003 | 8.0000 | WKND | Marie J. Webster |
| 04/08/2003 | 8.0000 | REG | Marie J. Webster |
| 04/09/2003 | 8.0000 | REG | Marie J. Webster |
| 04/10/2003 | 8.0000 | REG | Marie J. Webster |
| 04/12/2003 | 8.0000 | WKND | Marie J. Webster |

| Date | Hours | Type | Name |
|---|---|---|---|
| 04/13/2003 | 8.0000 | WKND | Marie J. Webster |
| 04/14/2003 | 7.0000 | REG | Marie J. Webster |
| 04/14/2003 | 1.0000 | SICK | Marie J. Webster |
| 04/15/2003 | 8.0000 | REG | Marie J. Webster |
| 04/16/2003 | 8.0000 | REG | Marie J. Webster |
| 04/17/2003 | 8.0000 | REG | Marie J. Webster |
| 04/21/2003 | 8.0000 | REG | Marie J. Webster |
| 04/24/2003 | 8.0000 | REG | Marie J. Webster |
| 04/25/2003 | 8.0000 | REG | Marie J. Webster |

| Date | Hours | Type | Employee |
|---|---|---|---|
| 04/26/2003 | 8.0000 | WKND | Marie J. Webster |
| 04/27/2003 | 8.0000 | WKND | Marie J. Webster |
| 04/30/2003 | 8.0000 | SICK | Marie J. Webster |
| 05/01/2003 | 8.0000 | REG | Marie J. Webster |
| 05/02/2003 | 8.0000 | REG | Marie J. Webster |
| 05/03/2003 | 8.0000 | WKND | Marie J. Webster |
| 05/04/2003 | 8.0000 | WKND | Marie J. Webster |
| 05/06/2003 | 8.0000 | REG | Marie J. Webster |
| 05/07/2003 | 8.0000 | REG | Marie J. Webster |
| 05/08/2003 | 8.0000 | REG | Marie J. Webster |
| 05/10/2003 | 8.0000 | WKND | Marie J. Webster |
| 05/11/2003 | 8.0000 | WKND | Marie J. Webster |
| 05/12/2003 | 8.0000 | REG | Marie J. Webster |
| 05/13/2003 | 8.0000 | REG | Marie J. Webster |
| 05/14/2003 | 8.0000 | REG | Marie J. Webster |
| 05/15/2003 | 8.0000 | REG | Marie J. Webster |
| 05/19/2003 | 8.0000 | REG | Marie J. Webster |
| 05/22/2003 | 8.0000 | REG | Marie J. Webster |
| 05/23/2003 | 8.0000 | REG | Marie J. Webster |
| 05/24/2003 | 8.0000 | WKND | Marie J. Webster |
| 05/25/2003 | 6.0000 | SICK | Marie J. Webster |
| 05/28/2003 | 8.0000 | REG | Marie J. Webster |
| 05/29/2003 | 8.0000 | REG | Marie J. Webster |
| 05/30/2003 | 8.0000 | REG | Marie J. Webster |
| 05/31/2003 | 8.0000 | WKND | Marie J. Webster |
| 06/01/2003 | 8.0000 | WKND | Marie J. Webster |
| 06/03/2003 | 8.0000 | REG | Marie J. Webster |
| 06/04/2003 | 8.0000 | REG | Marie J. Webster |
| 06/05/2003 | 8.0000 | REG | Marie J. Webster |
| 06/07/2003 | 8.0000 | WKND | Marie J. Webster |
| 06/08/2003 | 8.0000 | WKND | Marie J. Webster |
| 06/09/2003 | 8.0000 | REG | Marie J. Webster |
| 06/10/2003 | 8.0000 | REG | Marie J. Webster |
| 06/11/2003 | 8.0000 | REG | Marie J. Webster |
| 06/12/2003 | 8.0000 | REG | Marie J. Webster |
| 06/17/2003 | 8.0000 | REG | Virginia Kuentz |
| 06/18/2003 | 8.0000 | REG | Virginia Kuentz |
| 06/21/2003 | 8.0000 | WKND | Virginia Kuentz |
| 06/22/2003 | 8.0000 | WKND | Virginia Kuentz |
| 06/23/2003 | 8.0000 | REG | Virginia Kuentz |
| 06/24/2003 | 8.0000 | REG | Virginia Kuentz |
| 06/25/2003 | 8.0000 | REG | Virginia Kuentz |
| 06/28/2003 | 8.0000 | WKND | Virginia Kuentz |
| 06/29/2003 | 8.0000 | WKND | Virginia Kuentz |
| 06/30/2003 | 8.0000 | REG | Virginia Kuentz |
| 07/01/2003 | 8.0000 | REG | Virginia Kuentz |
| 07/02/2003 | 8.0000 | REG | Virginia Kuentz |
| 07/05/2003 | 8.0000 | WKND | Virginia Kuentz |
| 07/06/2003 | 8.0000 | WKND | Virginia Kuentz |
| 07/07/2003 | 8.0000 | REG | Virginia Kuentz |
| 07/08/2003 | 8.0000 | REG | Virginia Kuentz |
| 07/09/2003 | 8.0000 | REG | Virginia Kuentz |
| 07/10/2003 | 8.0000 | REG | Virginia Kuentz |
| 07/14/2003 | 8.0000 | VAC | Virginia Kuentz |

| Date | Hours | Type | Name |
|---|---|---|---|
| 07/15/2003 | 8.0000 | VAC | Virginia Kuentz |
| 07/16/2003 | 8.0000 | VAC | Virginia Kuentz |
| 07/19/2003 | 8.0000 | VAC | Virginia Kuentz |
| 07/20/2003 | 8.0000 | VAC | Virginia Kuentz |
| 07/21/2003 | 8.0000 | REG | Virginia Kuentz |
| 07/22/2003 | 8.0000 | REG | Virginia Kuentz |
| 07/23/2003 | 8.0000 | REG | Virginia Kuentz |
| 07/26/2003 | 8.0000 | WKND | Virginia Kuentz |
| 07/27/2003 | 8.0000 | WKND | Virginia Kuentz |
| 07/28/2003 | 8.0000 | REG | Virginia Kuentz |
| 07/29/2003 | 8.0000 | REG | Virginia Kuentz |
| 07/30/2003 | 8.0000 | REG | Virginia Kuentz |
| 08/02/2003 | 8.0000 | WKND | Virginia Kuentz |
| 08/03/2003 | 8.0000 | WKND | Virginia Kuentz |
| 08/04/2003 | 8.0000 | REG | Virginia Kuentz |
| 08/05/2003 | 8.0000 | REG | Virginia Kuentz |
| 08/06/2003 | 8.0000 | REG | Virginia Kuentz |
| 08/07/2003 | 8.0000 | REG | Virginia Kuentz |
| 08/11/2003 | 8.0000 | REG | Virginia Kuentz |
| 08/12/2003 | 8.0000 | REG | Virginia Kuentz |
| 08/13/2003 | 8.0000 | REG | Virginia Kuentz |
| 08/16/2003 | 8.0000 | WKND | Virginia Kuentz |
| 08/17/2003 | 8.0000 | WKND | Virginia Kuentz |
| 08/18/2003 | 8.0000 | REG | Virginia Kuentz |
| 08/19/2003 | 8.0000 | REG | Virginia Kuentz |
| 08/20/2003 | 8.0000 | REG | Virginia Kuentz |
| 08/23/2003 | 8.0000 | WKND | Virginia Kuentz |
| 08/24/2003 | 8.0000 | WKND | Virginia Kuentz |
| 08/25/2003 | 8.0000 | REG | Virginia Kuentz |
| 08/26/2003 | 8.0000 | REG | Virginia Kuentz |
| 08/27/2003 | 8.0000 | REG | Virginia Kuentz |
| 08/28/2003 | 8.0000 | REG | Virginia Kuentz |
| 08/31/2003 | 8.0000 | WKND | Virginia Kuentz |
| 09/01/2003 | 8.0000 | HOL1 | Virginia Kuentz |
| 09/02/2003 | 8.0000 | REG | Virginia Kuentz |
| 09/03/2003 | 8.0000 | REG | Virginia Kuentz |
| 09/04/2003 | 8.0000 | REG | Virginia Kuentz |
| 09/08/2003 | 8.0000 | REG | Virginia Kuentz |
| 09/09/2003 | 8.0000 | REG | Virginia Kuentz |
| 09/09/2003 | 1.0000 | REG | Virginia Kuentz |
| 09/10/2003 | 7.0000 | REG | Virginia Kuentz |
| 09/10/2003 | 8.0000 | REG | Virginia Kuentz |
| 09/13/2003 | 8.0000 | SICK | Virginia Kuentz |
| 09/14/2003 | 8.0000 | WKND | Virginia Kuentz |
| 09/15/2003 | 8.0000 | REG | Virginia Kuentz |
| 09/16/2003 | 8.0000 | REG | Virginia Kuentz |
| 09/16/2003 | 1.0000 | REG | Virginia Kuentz |
| 09/17/2003 | 6.0000 | REG | Virginia Kuentz |
| 09/17/2003 | 8.0000 | REG | Virginia Kuentz |
| 09/18/2003 | 1.0000 | REG | Virginia Kuentz |
| 09/19/2003 | 6.0000 | REG | Virginia Kuentz |
| 09/20/2003 | 8.0000 | WKND | Virginia Kuentz |
| 09/21/2003 | 8.0000 | WKND | Virginia Kuentz |
| 09/22/2003 | 9.0000 | REG | Virginia Kuentz |
| 09/23/2003 | 7.0000 | REG | Virginia Kuentz |
| 09/23/2003 | 8.0000 | REG | Virginia Kuentz |
| 09/24/2003 | 8.0000 | REG | Virginia Kuentz |

| Date | Hours | Type | Name |
|---|---|---|---|
| 09/25/2003 | 1.0000 | REG | Virginia Kuentz |
| 09/26/2003 | 7.0000 | REG | Virginia Kuentz |
| 09/27/2003 | 8.0000 | WKND | Virginia Kuentz |
| 09/28/2003 | 9.0000 | WKND | Virginia Kuentz |
| 09/29/2003 | 8.0000 | REG | Virginia Kuentz |
| 09/30/2003 | 8.0000 | REG | Virginia Kuentz |
| 10/01/2003 | 8.0000 | REG | Virginia Kuentz |
| 10/01/2003 | 1.0000 | REG | Virginia Kuentz |
| 10/02/2003 | 1.0000 | REG | Virginia Kuentz |
| 10/02/2003 | 8.0000 | REG | Virginia Kuentz |
| 10/02/2003 | 1.0000 | REG | Virginia Kuentz |
| 10/03/2003 | 7.0000 | REG | Virginia Kuentz |
| 10/06/2003 | 8.0000 | REG | Virginia Kuentz |
| 10/07/2003 | 8.0000 | REG | Virginia Kuentz |
| 10/08/2003 | 8.0000 | REG | Virginia Kuentz |
| 10/08/2003 | 1.0000 | REG | Virginia Kuentz |
| 10/09/2003 | 7.0000 | REG | Virginia Kuentz |
| 10/11/2003 | 8.0000 | WKND | Virginia Kuentz |
| 10/12/2003 | 8.0000 | WKND | Virginia Kuentz |
| 10/13/2003 | 8.0000 | REG | Virginia Kuentz |
| 10/14/2003 | 8.0000 | REG | Virginia Kuentz |
| 10/14/2003 | 1.0000 | REG | Virginia Kuentz |
| 10/15/2003 | 7.0000 | REG | Virginia Kuentz |
| 10/15/2003 | 7.0000 | REG | Virginia Kuentz |
| 10/15/2003 | 1.0000 | REG | Virginia Kuentz |
| 10/18/2003 | 8.0000 | WKND | Virginia Kuentz |
| 10/19/2003 | 8.0000 | WKND | Virginia Kuentz |
| 10/20/2003 | 8.0000 | REG | Virginia Kuentz |
| 10/21/2003 | 8.0000 | REG | Virginia Kuentz |
| 10/22/2003 | 8.0000 | REG | Virginia Kuentz |
| 10/25/2003 | 8.0000 | WKND | Virginia Kuentz |
| 10/26/2003 | 8.0000 | WKND | Virginia Kuentz |
| 10/26/2003 | 1.0000 | WKND | Virginia Kuentz |
| 10/27/2003 | 7.0000 | REG | Virginia Kuentz |
| 10/27/2003 | 8.0000 | REG | Virginia Kuentz |
| 10/28/2003 | 8.0000 | REG | Virginia Kuentz |
| 10/29/2003 | 8.0000 | REG | Virginia Kuentz |
| 10/30/2003 | 8.0000 | REG | Virginia Kuentz |
| 11/02/2003 | 8.0000 | WKND | Virginia Kuentz |
| 11/03/2003 | 8.0000 | REG | Virginia Kuentz |
| 11/04/2003 | 8.0000 | REG | Virginia Kuentz |
| 11/05/2003 | 8.0000 | REG | Virginia Kuentz |
| 11/05/2003 | 1.0000 | REG | Virginia Kuentz |
| 11/06/2003 | 7.0000 | REG | Virginia Kuentz |
| 11/08/2003 | 8.0000 | WKND | Virginia Kuentz |
| 11/09/2003 | 8.0000 | WKND | Virginia Kuentz |
| 11/10/2003 | 8.0000 | REG | Virginia Kuentz |
| 11/11/2003 | 8.0000 | REG | Virginia Kuentz |
| 11/12/2003 | 8.0000 | REG | Virginia Kuentz |
| 11/15/2003 | 8.0000 | WKND | Virginia Kuentz |
| 11/16/2003 | 8.0000 | WKND | Virginia Kuentz |
| 11/16/2003 | 1.0000 | WKND | Virginia Kuentz |
| 11/17/2003 | 7.0000 | REG | Virginia Kuentz |
| 11/17/2003 | 8.0000 | REG | Virginia Kuentz |
| 11/18/2003 | 8.0000 | REG | Virginia Kuentz |
| 11/19/2003 | 9.0000 | REG | Virginia Kuentz |
| 11/20/2003 | 7.0000 | REG | Virginia Kuentz |

| Date | Hours | Type | Name |
|------|-------|------|------|
| 11/22/2003 | 8.0000 | WKND | Virginia Kuentz |
| 11/23/2003 | 9.0000 | WKND | Virginia Kuentz |
| 11/24/2003 | 7.0000 | REG | Virginia Kuentz |
| 11/24/2003 | 8.0000 | REG | Virginia Kuentz |
| 11/25/2003 | 8.0000 | REG | Virginia Kuentz |
| 11/26/2003 | 8.0000 | REG | Virginia Kuentz |
| 11/27/2003 | 8.0000 | HOL2 | Virginia Kuentz |
| 12/01/2003 | 8.0000 | REG | Virginia Kuentz |
| 12/02/2003 | 8.0000 | REG | Virginia Kuentz |
| 12/03/2003 | 9.0000 | REG | Virginia Kuentz |
| 12/04/2003 | 4.0000 | REG | Virginia Kuentz |
| 12/06/2003 | 8.0000 | WKND | Virginia Kuentz |
| 12/06/2003 | 1.0000 | WKND | Virginia Kuentz |
| 12/07/2003 | 7.0000 | WKND | Virginia Kuentz |
| 12/11/2003 | 1.0000 | REG | Virginia Kuentz |
| 12/12/2003 | 7.0000 | REG | Virginia Kuentz |
| 12/12/2003 | 1.0000 | REG | Virginia Kuentz |
| 12/13/2003 | 7.0000 | WKND | Virginia Kuentz |
| 12/13/2003 | 8.0000 | WKND | Virginia Kuentz |
| 12/13/2003 | 1.0000 | WKND | Virginia Kuentz |
| 12/14/2003 | 7.0000 | WKND | Virginia Kuentz |
| 12/14/2003 | 8.0000 | WKND | Virginia Kuentz |
| 12/15/2003 | 8.0000 | REG | Virginia Kuentz |
| 12/16/2003 | 8.0000 | REG | Virginia Kuentz |
| 12/17/2003 | 8.0000 | REG | Virginia Kuentz |
| 12/20/2003 | 8.0000 | WKND | Virginia Kuentz |
| 12/21/2003 | 8.0000 | WKND | Virginia Kuentz |
| 12/22/2003 | 8.0000 | REG | Virginia Kuentz |
| 12/23/2003 | 16.0000 | REG | Virginia Kuentz |
| 12/24/2003 | 8.0000 | REG | Virginia Kuentz |
| 12/25/2003 | 8.0000 | HOL2 | Virginia Kuentz |
| 12/28/2003 | 8.0000 | WKND | Virginia Kuentz |
| 12/28/2003 | 1.0000 | WKND | Virginia Kuentz |
| 12/29/2003 | 8.0000 | REG | Virginia Kuentz |
| 12/30/2003 | 8.0000 | REG | Virginia Kuentz |
| 12/31/2003 | 8.0000 | REG | Virginia Kuentz |
| 01/03/2004 | 8.0000 | WKND | Virginia Kuentz |
| 01/03/2004 | 1.0000 | WKND | Virginia Kuentz |
| 01/04/2004 | 8.0000 | WKND | Virginia Kuentz |
| 01/04/2004 | 7.0000 | WKND | Virginia Kuentz |
| 01/05/2004 | 8.0000 | REG | Virginia Kuentz |
| 01/06/2004 | 8.0000 | REG | Virginia Kuentz |
| 01/07/2004 | 8.0000 | REG | Virginia Kuentz |
| 01/10/2004 | 8.0000 | WKND | Virginia Kuentz |
| 01/11/2004 | 8.0000 | WKND | Virginia Kuentz |
| 01/12/2004 | 8.0000 | REG | Virginia Kuentz |
| 01/13/2004 | 8.0000 | REG | Virginia Kuentz |
| 01/14/2004 | 8.0000 | REG | Virginia Kuentz |
| 01/17/2004 | 8.0000 | WKND | Virginia Kuentz |
| 01/18/2004 | 8.0000 | WKND | Virginia Kuentz |
| 01/18/2004 | 1.0000 | WKND | Virginia Kuentz |
| 01/19/2004 | 7.0000 | REG | Virginia Kuentz |
| 01/19/2004 | 8.0000 | REG | Virginia Kuentz |
| 01/20/2004 | 8.0000 | REG | Virginia Kuentz |

| Date | Hours | Type | Name |
|---|---|---|---|
| 01/21/2004 | 8.0000 | REG | Virginia Kuentz |
| 01/22/2004 | 8.0000 | REG | Virginia Kuentz |
| 01/22/2004 | 1.0000 | REG | Virginia Kuentz |
| 01/23/2004 | 7.0000 | OT | Virginia Kuentz |
| 01/26/2004 | 8.0000 | REG | Virginia Kuentz |
| 01/27/2004 | 8.0000 | REG | Virginia Kuentz |
| 01/28/2004 | 8.0000 | REG | Virginia Kuentz |
| 01/31/2004 | 8.0000 | WKND | Virginia Kuentz |
| 02/01/2004 | 8.0000 | WKND | Virginia Kuentz |
| 02/02/2004 | 8.0000 | REG | Virginia Kuentz |
| 02/03/2004 | 8.0000 | REG | Virginia Kuentz |
| 02/03/2004 | 1.0000 | REG | Virginia Kuentz |
| 02/04/2004 | 7.0000 | REG | Virginia Kuentz |
| 02/04/2004 | 8.0000 | REG | Virginia Kuentz |
| 02/07/2004 | 8.0000 | WKND | Virginia Kuentz |
| 02/08/2004 | 8.0000 | WKND | Virginia Kuentz |
| 02/08/2004 | 1.0000 | WKND | Virginia Kuentz |
| 02/09/2004 | 7.0000 | REG | Virginia Kuentz |
| 02/09/2004 | 8.0000 | REG | Virginia Kuentz |
| 02/10/2004 | 8.0000 | REG | Virginia Kuentz |
| 02/11/2004 | 8.0000 | SICK | Virginia Kuentz |
| 02/14/2004 | 8.0000 | WKND | Virginia Kuentz |
| 02/15/2004 | 8.0000 | WKND | Virginia Kuentz |
| 02/16/2004 | 8.0000 | REG | Virginia Kuentz |
| 02/17/2004 | 8.0000 | REG | Virginia Kuentz |
| 02/18/2004 | 8.0000 | REG | Virginia Kuentz |
| 02/19/2004 | 8.0000 | REG | Virginia Kuentz |
| 02/19/2004 | 1.0000 | REG | Virginia Kuentz |
| 02/20/2004 | 7.0000 | REG | Virginia Kuentz |
| 02/23/2004 | 8.0000 | REG | Virginia Kuentz |
| 02/24/2004 | 8.0000 | REG | Virginia Kuentz |
| 02/24/2004 | 1.0000 | REG | Virginia Kuentz |
| 02/24/2004 | 7.0000 | REG | Virginia Kuentz |
| 02/25/2004 | 8.0000 | REG | Virginia Kuentz |
| 02/27/2004 | 1.0000 | REG | Virginia Kuentz |
| 02/27/2004 | 7.0000 | REG | Virginia Kuentz |
| 02/28/2004 | 8.0000 | WKND | Virginia Kuentz |
| 02/29/2004 | 8.0000 | WKND | Virginia Kuentz |
| 03/01/2004 | 8.0000 | REG | Virginia Kuentz |
| 03/02/2004 | 8.0000 | REG | Virginia Kuentz |
| 03/02/2004 | 1.0000 | REG | Virginia Kuentz |
| 03/03/2004 | 7.0000 | REG | Virginia Kuentz |
| 03/03/2004 | 8.0000 | REG | Virginia Kuentz |
| 03/05/2004 | 8.0000 | REG | Virginia Kuentz |
| 03/06/2004 | 8.0000 | WKND | Virginia Kuentz |
| 03/07/2004 | 8.0000 | WKND | Virginia Kuentz |
| 03/07/2004 | 8.0000 | WKND | Virginia Kuentz |
| 03/08/2004 | 8.0000 | REG | Virginia Kuentz |
| 03/08/2004 | 1.0000 | REG | Virginia Kuentz |
| 03/09/2004 | 7.0000 | REG | Virginia Kuentz |
| 03/09/2004 | 8.0000 | REG | Virginia Kuentz |
| 03/09/2004 | 1.0000 | REG | Virginia Kuentz |
| 03/10/2004 | 7.0000 | REG | Virginia Kuentz |
| 03/10/2004 | 8.0000 | REG | Virginia Kuentz |

| Date | | | Hours | Type | Name |
|---|---|---|---|---|---|
| 03/10/2004 | | | 1.0000 | OT | Virginia Kuentz |
| 03/11/2004 | | | 7.0000 | OT | Virginia Kuentz |
| 03/13/2004 | | | 8.0000 | WKND | Virginia Kuentz |
| 03/14/2004 | | | 8.0000 | WKND | Virginia Kuentz |
| 03/14/2004 | | | 1.0000 | WKND | Virginia Kuentz |
| 03/15/2004 | | | 7.0000 | REG | Virginia Kuentz |
| 03/15/2004 | | | 8.0000 | REG | Virginia Kuentz |
| 03/15/2004 | | | 1.0000 | REG | Virginia Kuentz |
| 03/16/2004 | | | 7.0000 | REG | Virginia Kuentz |
| 03/17/2004 | | | 7.0000 | REG | Virginia Kuentz |
| 03/17/2004 | | | 8.0000 | REG | Virginia Kuentz |
| 03/18/2004 | | | 2.0000 | REG | Virginia Kuentz |
| 03/18/2004 | | | 1.0000 | OT | Virginia Kuentz |
| 03/19/2004 | | | 7.0000 | OT | Virginia Kuentz |
| 03/18/2004 | | | 6.0000 | OT | Virginia Kuentz |
| 03/22/2004 | | | 8.0000 | REG | Virginia Kuentz |
| 03/23/2004 | | | 8.0000 | REG | Virginia Kuentz |
| 03/24/2004 | | | 8.0000 | REG | Virginia Kuentz |
| 03/26/2004 | | | 1.0000 | REG | Virginia Kuentz |
| 03/27/2004 | | | 7.0000 | WKND | Virginia Kuentz |
| 03/27/2004 | | | 1.0000 | WKND | Virginia Kuentz |
| 03/28/2004 | | | 7.0000 | WKND | Virginia Kuentz |
| 03/28/2004 | | | 7.0000 | WKND | Virginia Kuentz |
| 03/29/2004 | | | 8.0000 | REG | Virginia Kuentz |
| 03/30/2004 | | | 8.0000 | REG | Virginia Kuentz |
| 03/31/2004 | | | 8.0000 | REG | Virginia Kuentz |
| 04/01/2004 | | | 1.0000 | REG | Virginia Kuentz |
| 04/02/2004 | | | 7.0000 | REG | Virginia Kuentz |
| 04/03/2004 | | | 8.0000 | WKND | Virginia Kuentz |
| 04/04/2004 | | | 8.0000 | WKND | Virginia Kuentz |
| 04/05/2004 | | | 8.0000 | REG | Virginia Kuentz |
| 04/06/2004 | | | 8.0000 | REG | Virginia Kuentz |
| 04/08/2004 | | | 8.0000 | REG | Virginia Kuentz |
| 04/10/2004 | | | 8.0000 | WKND | Virginia Kuentz |
| 04/10/2004 | | | 1.0000 | WKND | Virginia Kuentz |
| 04/11/2004 | | | 7.0000 | HOL2 | Virginia Kuentz |
| 04/11/2004 | | | 8.0000 | HOL2 | Virginia Kuentz |
| 04/12/2004 | | | 8.0000 | REG | Virginia Kuentz |
| 04/13/2004 | | | 8.0000 | REG | Virginia Kuentz |
| 04/14/2004 | | | 8.0000 | REG | Virginia Kuentz |
| 04/15/2004 | | | 8.0000 | REG | Virginia Kuentz |
| 04/17/2004 | | | 1.0000 | WKND | Virginia Kuentz |
| 04/18/2004 | | | 7.0000 | WKND | Virginia Kuentz |
| 04/19/2004 | | | 8.0000 | REG | Virginia Kuentz |
| 04/20/2004 | | | 8.0000 | REG | Virginia Kuentz |
| 04/21/2004 | | | 8.0000 | REG | Virginia Kuentz |
| 04/23/2004 | | | 1.0000 | REG | Virginia Kuentz |
| 04/24/2004 | | | 7.0000 | WKND | Virginia Kuentz |
| 04/24/2004 | | | 8.0000 | WKND | Virginia Kuentz |
| 04/25/2004 | | | 8.0000 | WKND | Virginia Kuentz |
| 04/26/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 04/27/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 04/27/2004 | 11:00 PM | 12:00 AM | 1.0000 | REG | Virginia Kuentz |
| 04/28/2004 | 12:00 AM | 7:00 AM | 7.0000 | REG | Virginia Kuentz |

| Date | Start | End | Hours | Type | Name |
|---|---|---|---|---|---|
| 04/28/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 05/01/2004 | 7:00 AM | 3:00 PM | 8.0000 | WKND | Virginia Kuentz |
| 05/02/2004 | 3:00 PM | 11:00 PM | 8.0000 | WKND | Virginia Kuentz |
| 05/03/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 05/04/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 05/05/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 05/08/2004 | 7:00 AM | 3:00 PM | 8.0000 | WKND | Virginia Kuentz |
| 05/09/2004 | 3:00 PM | 11:00 PM | 8.0000 | WKND | Virginia Kuentz |
| 05/09/2004 | 11:00 PM | 12:00 AM | 1.0000 | WKND | Virginia Kuentz |
| 05/10/2004 | 12:00 AM | 07:00 AM | 7.0000 | REG | Virginia Kuentz |
| 05/10/2004 | 03:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 05/11/2004 | 03:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 05/12/2004 | 03:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 05/13/2004 | 03:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 05/17/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 05/18/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 05/19/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 05/20/2004 | 11:00 PM | 12:00 AM | 1.0000 | REG | Virginia Kuentz |
| 05/21/2004 | 12:00 AM | 1:00 PM | 7.0000 | REG | Virginia Kuentz |
| 05/22/2004 | 7:00 AM | 3:00 PM | 8.0000 | WKND | Virginia Kuentz |
| 05/23/2004 | 7:00 AM | 3:00 PM | 8.0000 | WKND | Virginia Kuentz |

| Date | Start | End | Hours | Type | Name |
|---|---|---|---|---|---|
| 05/23/2004 | 3:00 PM | 11:00 PM | 8.0000 | WKND | Virginia Kuentz |
| 05/24/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 05/25/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 05/26/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 05/28/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 05/29/2004 | 7:00 AM | 3:00 PM | 8.0000 | WKND | Virginia Kuentz |
| 05/30/2004 | 7:00 AM | 3:00 PM | 8.0000 | WKND | Virginia Kuentz |
| 05/31/2004 | 12:00 AM | 07:00 AM | 7.0000 | HOL1 | Virginia Kuentz |
| 05/31/2004 | 03:00 PM | 11:00 PM | 8.0000 | HOL1 | Virginia Kuentz |
| 06/01/2004 | 03:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 06/02/2004 | 03:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 06/05/2004 | 07:00 AM | 03:00 PM | 8.0000 | WKND | Virginia Kuentz |
| 06/06/2004 | 07:00 AM | 03:00 PM | 8.0000 | WKND | Virginia Kuentz |
| 06/06/2004 | 03:00 PM | 11:00 PM | 8.0000 | WKND | Virginia Kuentz |
| 06/07/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 06/08/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 06/09/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 06/10/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 06/14/2004 | 3:00 AM | 3:30 AM | 0.5000 | SICK | Virginia Kuentz |
| 06/14/2004 | 3:30 AM | 4:00 AM | 7.5000 | REG | Virginia Kuentz |
| 06/15/2004 | 3:00 AM | 3:30 AM | 0.5000 | SICK | Virginia Kuentz |
| 06/15/2004 | 3:30 PM | 11:00 PM | 7.5000 | REG | Virginia Kuentz |
| 06/16/2004 | 3:00 AM | 11:00 AM | 8.0000 | REG | Virginia Kuentz |
| 06/19/2004 | 7:00 AM | 3:00 PM | 8.0000 | WKND | Virginia Kuentz |
| 06/20/2004 | 7:00 AM | 3:00 PM | 8.0000 | WKND | Virginia Kuentz |
| 06/20/2004 | 11:00 PM | 12:00 AM | 1.0000 | WKND | Virginia Kuentz |
| 06/21/2004 | 12:00 AM | 7:00 AM | 7.0000 | REG | Virginia Kuentz |
| 06/21/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 06/22/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 06/22/2004 | 11:00 PM | 12:00 AM | 1.0000 | REG | Virginia Kuentz |
| 06/23/2004 | 12:00 AM | 7:00 AM | 7.0000 | REG | Virginia Kuentz |
| 06/23/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 06/27/2004 | 3:00 PM | 11:00 PM | 8.0000 | WKND | Virginia Kuentz |

| Date | Start | End | Hours | Type | Name |
|---|---|---|---|---|---|
| 06/28/2004 | 03:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 06/29/2004 | 03:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 06/30/2004 | 03:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 07/03/2004 | 07:00 AM | 03:00 PM | 8.0000 | WKND | Virginia Kuentz |
| 07/04/2004 | 03:00 PM | 11:00 PM | 8.0000 | VAC | Virginia Kuentz |
| 07/05/2004 | 03:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 07/06/2004 | 03:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 07/07/2004 | 03:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 07/08/2004 | 03:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 07/12/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 07/13/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 07/14/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 07/17/2004 | 7:00 AM | 3:00 PM | 8.0000 | WKND | Virginia Kuentz |
| 07/18/2004 | 3:00 PM | 11:00 PM | 8.0000 | WKND | Virginia Kuentz |
| 07/19/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 07/20/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 07/21/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 07/24/2004 | 7:00 AM | 3:00 PM | 8.0000 | WKND | Virginia Kuentz |
| 07/25/2004 | 3:00 PM | 11:00 PM | 8.0000 | WKND | Virginia Kuentz |
| 07/26/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 07/27/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 07/28/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 07/31/2004 | 7:00 AM | 3:00 PM | 8.0000 | WKND | Virginia Kuentz |
| 08/01/2004 | 3:00 PM | 11:00 PM | 8.0000 | WKND | Virginia Kuentz |
| 08/02/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 08/03/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 08/04/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |

| Date | Start | End | Hours | Type | Name |
|---|---|---|---|---|---|
| 08/05/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 08/09/2004 | 3:00 AM | 11:00 AM | 8.0000 | REG | Virginia Kuentz |
| 08/10/2004 | 3:00 AM | 11:00 AM | 8.0000 | REG | Virginia Kuentz |
| 08/11/2004 | 3:00 AM | 11:00 AM | 8.0000 | REG | Virginia Kuentz |
| 08/14/2004 | 7:00 AM | 3:00 PM | 8.0000 | WKND | Virginia Kuentz |
| 08/15/2004 | 3:00 AM | 11:00 AM | 8.0000 | WKND | Virginia Kuentz |
| 08/16/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 08/17/2004 | 3:00 AM | 11:00 AM | 8.0000 | REG | Virginia Kuentz |
| 08/18/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 08/21/2004 | 7:00 AM | 3:00 PM | 8.0000 | WKND | Virginia Kuentz |
| 08/22/2004 | 3:00 PM | 11:00 PM | 8.0000 | WKND | Virginia Kuentz |
| 08/23/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 08/24/2004 | 3:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 08/25/2004 | 3:00 PM | 11:00 PM | 8.0000 | VAC | Virginia Kuentz |
| 08/28/2004 | 7:00 AM | 3:00 PM | 8.0000 | VAC | Virginia Kuentz |
| 08/29/2004 | 3:00 PM | 11:00 PM | 8.0000 | VAC | Virginia Kuentz |
| 08/30/2004 | 03:00 PM | 11:00 PM | 8.0000 | VAC | Virginia Kuentz |
| 08/31/2004 | 03:00 PM | 11:00 PM | 8.0000 | VAC | Virginia Kuentz |
| 09/01/2004 | 03:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 09/02/2004 | 03:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 09/04/2004 | 12:00 AM | 07:00 AM | 7.0000 | HOL1 | Virginia Kuentz |
| 09/06/2004 | 03:00 PM | 11:00 PM | 8.0000 | HOL1 | Virginia Kuentz |
| 09/07/2004 | 03:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 09/08/2004 | 03:00 PM | 11:00 PM | 8.0000 | REG | Virginia Kuentz |
| 09/11/2004 | 07:00 AM | 03:00 PM | 8.0000 | WKND | Virginia Kuentz |
| 09/12/2004 | 03:00 PM | 11:00 PM | 8.0000 | WKND | Virginia Kuentz |
| 09/13/2004 | 3:00 AM | 11:00 AM | 8.0000 | SICK | Virginia Kuentz |

| Date | Start | End | Hours | Type | Name |
|---|---|---|---|---|---|
| 09/14/2004 | 3:00 AM | 9:00 AM | 6.0000 | SICK | Virginia Kuentz |
| 09/18/2004 | 3:00 AM | 11:00 AM | 8.0000 | VAC | Virginia Kuentz |
| 09/18/2004 | 7:00 AM | 3:00 PM | 8.0000 | VAC | Virginia Kuentz |
| 09/20/2004 | 4:30 AM | 11:00 AM | 6.5000 | REG | Virginia Kuentz |
| 09/21/2004 | 4:30 AM | 11:00 AM | 6.5000 | REG | Virginia Kuentz |
| 09/22/2004 | 4:30 AM | 11:00 AM | 6.5000 | REG | Virginia Kuentz |
| 09/25/2004 | 7:00 AM | 3:00 PM | 8.0000 | WKND | Virginia Kuentz |
| 09/26/2004 | 3:00 AM | 11:00 AM | 8.0000 | WKND | Virginia Kuentz |
| 10/11/2004 | 6:00 PM | 11:00 PM | 4.0000 | REG | Shelly Perrin |
| 10/13/2004 | 6:00 PM | 10:00 PM | 4.0000 | REG | Shelly Perrin |
| 10/17/2004 | 6:00 PM | 10:00 PM | 4.0000 | WKND | Shelly Perrin |
| 10/18/2004 | 6:00 PM | 10:00 PM | 4.0000 | REG | Shelly Perrin |
| 10/25/2004 | 6:00 AM | 10:00 AM | 6.0000 | REG | Shelly Perrin |
| 10/27/2004 | 2:00 PM | 12:00 AM | 10.0000 | REG | Shelly Perrin |
| 10/31/2004 | 4:00 AM | 5:00 AM | 1.0000 | WKND | Shelly Perrin |
| 11/01/2004 | 06:00 PM | 10:00 PM | 4.0000 | REG | Shelly Perrin |
| 11/03/2004 | 06:00 PM | 10:00 PM | 4.0000 | REG | Shelly Perrin |
| 11/07/2004 | 06:00 PM | 11:00 PM | 5.0000 | WKND | Shelly Perrin |
| 11/08/2004 | 06:00 PM | 10:00 PM | 4.0000 | REG | Shelly Perrin |
| 11/10/2004 | 06:00 PM | 10:00 PM | 4.0000 | REG | Shelly Perrin |
| 11/15/2004 | 10:00 AM | 11:30 AM | 1.5000 | REG | Nancy Culbertson |
| 11/15/2004 | 04:00 PM | 06:00 PM | 2.0000 | REG | Shelly Perrin |
| 11/17/2004 | 06:00 PM | 10:00 PM | 4.0000 | REG | Shelly Perrin |
| 11/21/2004 | 06:00 PM | 10:00 PM | 4.0000 | WKND | Shelly Perrin |
| 11/29/2004 | 9:00 AM | 11:40 AM | 2.7500 | REG | Nancy Culbertson |
| 11/29/2004 | 6:00 PM | 10:00 PM | 4.0000 | REG | Shelly Perrin |
| 12/01/2004 | 6:00 PM | 10:00 PM | 4.0000 | REG | Shelly Perrin |
| 12/06/2004 | 12:45 PM | 02:00 PM | 1.2500 | REG | Nancy Culbertson |
| 12/06/2004 | 6:00 AM | 10:00 AM | 4.0000 | REG | Shelly Perrin |
| 12/08/2004 | 6:00 AM | 10:30 AM | 4.5000 | REG | Shelly Perrin |
| 12/19/2004 | 6:00 AM | 10:00 AM | 4.0000 | WKND | Shelly Perrin |
| 12/20/2004 | 10:45 AM | 12:45 PM | 2.0000 | REG | Nancy Culbertson |
| 12/20/2004 | 6:00 AM | 11:23 AM | 5.2500 | REG | Shelly Perrin |

| Date | Start | End | Hours | Type | Name |
|---|---|---|---|---|---|
| 12/22/2004 | 6:00 AM | 10:00 AM | 4.0000 | REG | Shelly Perrin |
| 12/26/2004 | 6:20 AM | 10:00 AM | 3.7500 | WKND | Shelly Perrin |
| 12/27/2004 | 10:00 AM | 11:15 AM | 1.2500 | REG | Nancy Culbertson |
| 12/27/2004 | 6:00 AM | 10:15 AM | 4.2500 | REG | Shelly Perrin |
| 12/29/2004 | 6:00 AM | 10:15 AM | 4.2500 | REG | Shelly Perrin |
| 01/02/2005 | 6:00 AM | 10:15 AM | 4.2500 | WKND | Shelly Perrin |
| 01/03/2005 | 6:00 AM | 10:44 AM | 4.7500 | REG | Shelly Perrin |
| 01/05/2005 | 8:30 AM | 11:20 AM | 2.7500 | REG | Shelly Perrin |
| 01/09/2005 | 6:00 AM | 12:30 PM | 6.5000 | WKND | Shelly Perrin |
| 01/10/2005 | 11:15 AM | 12:15 PM | 1.0000 | REG | Nancy Culbertson |
| 01/10/2005 | 8:15 AM | 11:15 AM | 3.0000 | REG | Shelly Perrin |
| 01/12/2005 | 8:30 AM | 11:30 AM | 3.0000 | REG | Shelly Perrin |
| 01/16/2005 | 6:30 AM | 11:30 AM | 5.0000 | WKND | Shelly Perrin |
| 01/17/2005 | 07:00 PM | 11:00 PM | 4.0000 | REG | Shelly Perrin |
| 01/17/2005 | 11:15 AM | 12:34 PM | 1.2500 | REG | Nancy Culbertson |
| 01/19/2005 | 06:00 PM | 10:30 PM | 4.5000 | REG | Shelly Perrin |
| 01/23/2005 | 06:00 PM | 10:45 PM | 4.7500 | WKND | Shelly Perrin |
| 01/24/2005 | 5:30 AM | 7:30 AM | 2.0000 | REG | Shelly Perrin |
| 01/26/2005 | 6:00 AM | 10:30 AM | 4.5000 | REG | Shelly Perrin |
| 01/30/2005 | 6:30 AM | 10:30 AM | 4.0000 | WKND | Shelly Perrin |
| 01/31/2005 | 6:30 PM | 10:30 PM | 4.0000 | REG | Shelly Perrin |

| Date | Start | End | Hours | Type | Name |
|---|---|---|---|---|---|
| 01/31/2005 | 11:30 AM | 12:30 PM | 1.0000 | REG | Nancy Culbertson |
| 02/02/2005 | 9:00 PM | 12:00 AM | 3.0000 | REG | Shelly Perrin |
| 02/06/2005 | 4:00 PM | 5:30 PM | 1.5000 | WKND | Shelly Perrin |
| 02/06/2005 | 11:00 PM | 12:00 AM | 1.0000 | WKND | Shelly Perrin |
| 02/11/2005 | 7:00 PM | 11:00 PM | 4.0000 | REG | Shelly Perrin |
| 02/13/2005 | 6:00 PM | 10:00 PM | 4.0000 | WKND | Shelly Perrin |
| 02/18/2005 | 9:00 AM | 3:00 PM | 6.0000 | REG | Christy Wilson |
| 02/20/2005 | 06:00 PM | 10:30 PM | 4.5000 | WKND | Shelly Perrin |
| 03/07/2005 | 6:30 PM | 10:30 PM | 4.0000 | REG | Shelly Perrin |
| 03/08/2005 | 09:00 AM | 01:30 PM | 4.5000 | REG | Christy Wilson |
| 03/09/2005 | 6:15 PM | 11:15 PM | 5.0000 | REG | Shelly Perrin |
| 03/09/2005 | 09:00 AM | 03:00 PM | 6.0000 | REG | Christy Wilson |
| 03/11/2005 | 6:00 PM | 7:00 PM | 1.0000 | REG | Shelly Perrin |
| 03/11/2005 | 09:00 AM | 03:00 PM | 6.0000 | REG | Christy Wilson |
| 03/13/2005 | 6:00 PM | 10:30 PM | 4.5000 | WKND | Shelly Perrin |
| 03/14/2005 | 10:15 AM | 3:00 PM | 4.7500 | REG | Christy Wilson |
| 03/14/2005 | 06:50 AM | 11:10 AM | 4.2500 | REG | Shelly Perrin |
| 03/15/2005 | 10:15 AM | 2:00 PM | 3.7500 | REG | Christy Wilson |
| 03/16/2005 | 9:30 AM | 3:00 PM | 5.5000 | REG | Christy Wilson |
| 03/16/2005 | 07:30 PM | 11:30 PM | 4.0000 | REG | Shelly Perrin |
| 03/18/2005 | 9:00 AM | 3:00 PM | 6.0000 | REG | Christy Wilson |
| 03/20/2005 | 07:30 PM | 11:30 PM | 4.0000 | WKND | Shelly Perrin |
| 03/21/2005 | 09:00 AM | 03:00 PM | 6.0000 | REG | Christy Wilson |
| 03/21/2005 | 6:15 PM | 11:45 PM | 5.5000 | REG | Shelly Perrin |
| 03/22/2005 | 09:00 AM | 01:30 PM | 4.5000 | REG | Christy Wilson |
| 03/23/2005 | 09:00 AM | 03:00 PM | 6.0000 | REG | Christy Wilson |
| 03/23/2005 | 6:00 PM | 11:30 PM | 5.5000 | REG | Shelly Perrin |
| 03/28/2005 | 09:00 AM | 03:00 PM | 6.0000 | REG | Christy Wilson |
| 03/29/2005 | 09:00 AM | 01:30 PM | 4.5000 | REG | Christy Wilson |
| 03/30/2005 | 06:00 PM | 10:00 PM | 4.0000 | REG | Shelly Perrin |
| 03/30/2005 | 09:00 AM | 03:00 PM | 6.0000 | REG | Christy Wilson |
| 04/01/2005 | 09:00 AM | 03:00 PM | 6.0000 | REG | Christy Wilson |
| 04/03/2005 | 06:05 PM | 07:05 PM | 1.0000 | WKND | Shelly Perrin |
| 04/03/2005 | 10:00 PM | 11:15 PM | 1.2500 | WKND | Shelly Perrin |
| 04/04/2005 | 9:00 AM | 3:00 PM | 6.0000 | REG | Christy Wilson |
| 04/04/2005 | 06:15 PM | 11:25 PM | 5.2500 | REG | Shelly Perrin |
| 04/05/2005 | 9:00 AM | 1:30 PM | 4.5000 | REG | Christy Wilson |
| 04/06/2005 | 9:00 AM | 3:00 PM | 6.0000 | REG | Christy Wilson |
| 04/06/2005 | 06:15 PM | 07:50 PM | 1.5000 | REG | Shelly Perrin |

| Date | Start | End | Hours | Type | Name |
|---|---|---|---|---|---|
| 04/10/2005 | 06:30 AM | 07:30 AM | 1.0000 | WKND | Shelly Perrin |
| 04/10/2005 | 08:30 AM | 11:15 AM | 2.7500 | WKND | Shelly Perrin |
| 04/11/2005 | 09:00 AM | 03:00 PM | 6.0000 | REG | Christy Wilson |
| 04/11/2005 | 6:15 PM | 11:00 PM | 4.7500 | REG | Shelly Perrin |
| 04/12/2005 | 09:00 AM | 01:15 PM | 4.2500 | REG | Christy Wilson |
| 04/13/2005 | 09:00 AM | 03:00 PM | 6.0000 | REG | Christy Wilson |
| 04/15/2005 | 09:00 AM | 03:00 PM | 6.0000 | REG | Christy Wilson |
| 04/18/2005 | 06:15 PM | 11:05 PM | 4.7500 | REG | Shelly Perrin |
| 04/18/2005 | 09:00 AM | 03:00 PM | 6.0000 | REG | Christy Wilson |
| 04/19/2005 | 09:00 AM | 02:00 PM | 5.0000 | REG | Christy Wilson |
| 04/20/2005 | 08:00 PM | 11:00 PM | 3.0000 | REG | Shelly Perrin |
| 04/20/2005 | 09:00 AM | 03:15 PM | 6.0000 | REG | Christy Wilson |
| 04/22/2005 | 09:00 AM | 03:00 PM | 6.0000 | REG | Christy Wilson |
| 04/24/2005 | 06:30 AM | 12:40 PM | 6.2500 | WKND | Shelly Perrin |
| 04/25/2005 | 09:00 AM | 02:30 PM | 5.5000 | REG | Christy Wilson |

| Date | Start | End | Hours | Type | Name |
|---|---|---|---|---|---|
| 04/25/2005 | 06:30 PM | 11:30 PM | 5.0000 | REG | Shelly Perrin |
| 04/26/2005 | 09:00 AM | 02:00 PM | 5.0000 | REG | Christy Wilson |
| 04/27/2005 | 9:00 AM | 03:00 PM | 6.0000 | REG | Christy Wilson |
| 04/27/2005 | 09:00 PM | 11:00 PM | 2.0000 | REG | Shelly Perrin |
| 04/29/2005 | 09:00 AM | 03:20 PM | 6.2500 | REG | Christy Wilson |
| 05/01/2005 | 06:00 PM | 09:00 PM | 3.0000 | WKND | Shelly Perrin |
| 05/02/2005 | 6:00 PM | 11:10 PM | 5.2500 | REG | Shelly Perrin |
| 05/02/2005 | 9:00 AM | 3:00 PM | 6.0000 | REG | Christy Wilson |
| 05/03/2005 | 9:00 AM | 3:00 PM | 6.0000 | REG | Christy Wilson |
| 05/04/2005 | 6:30 PM | 11:00 PM | 4.5000 | REG | Shelly Perrin |
| 05/04/2005 | 9:00 AM | 3:00 PM | 6.0000 | REG | Christy Wilson |
| 05/06/2005 | 9:00 AM | 3:00 PM | 6.0000 | REG | Christy Wilson |
| 05/09/2005 | 09:00 AM | 03:00 PM | 6.0000 | REG | Christy Wilson |
| 05/10/2005 | 09:00 AM | 03:00 PM | 6.0000 | REG | Christy Wilson |
| 05/11/2005 | 09:00 AM | 01:30 PM | 4.5000 | REG | Christy Wilson |
| 05/13/2005 | 10:00 AM | 03:00 PM | 5.0000 | REG | Christy Wilson |
| 05/16/2005 | 09:00 AM | 02:30 PM | 5.5000 | REG | Christy Wilson |
| 05/17/2005 | 09:00 AM | 01:30 PM | 4.5000 | REG | Christy Wilson |
| 05/18/2005 | 09:00 AM | 03:00 PM | 6.0000 | REG | Christy Wilson |
| 05/20/2005 | 09:00 AM | 03:00 PM | 6.0000 | REG | Christy Wilson |
| 05/23/2005 | 09:00 AM | 03:00 PM | 6.0000 | REG | Christy Wilson |
| 05/24/2005 | 10:00 AM | 03:00 PM | 5.0000 | REG | Christy Wilson |
| 05/25/2005 | 09:00 AM | 03:00 PM | 6.0000 | REG | Christy Wilson |
| 05/27/2005 | 09:00 AM | 03:00 PM | 6.0000 | SICK | Christy Wilson |
| 05/30/2005 | 09:00 AM | 03:00 PM | 6.0000 | HOL1 | Christy Wilson |
| 05/31/2005 | 09:00 AM | 02:30 PM | 5.5000 | REG | Christy Wilson |
| 06/01/2005 | 12:00 PM | 03:00 PM | 3.0000 | REG | Christy Wilson |
| 06/03/2005 | 09:20 AM | 03:00 PM | 5.7500 | REG | Christy Wilson |
| 06/05/2005 | 09:00 AM | 03:00 PM | 6.0000 | WKND | Christy Wilson |
| 06/06/2005 | 9:00 AM | 2:00 PM | 5.0000 | REG | Christy Wilson |
| 06/07/2005 | 9:00 AM | 2:30 PM | 5.5000 | REG | Christy Wilson |
| 06/07/2005 | 11:00 PM | 12:00 AM | 1.0000 | REG | Christy Wilson |
| 06/08/2005 | 12:00 AM | 9:00 AM | 9.0000 | REG | Christy Wilson |
| 06/08/2005 | 9:00 AM | 3:00 PM | 6.0000 | REG | Christy Wilson |
| 06/10/2005 | 9:00 AM | 3:00 PM | 6.0000 | REG | Christy Wilson |
| 06/13/2005 | 09:00 AM | 02:30 PM | 5.5000 | REG | Christy Wilson |
| 06/14/2005 | 09:00 AM | 02:00 PM | 5.0000 | REG | Christy Wilson |
| 06/14/2005 | 11:00 PM | 12:00 AM | 1.0000 | REG | Christy Wilson |
| 06/15/2005 | 12:00 AM | 09:00 AM | 9.0000 | REG | Christy Wilson |
| 06/15/2005 | 09:00 AM | 03:00 PM | 6.0000 | REG | Christy Wilson |
| 06/17/2005 | 09:00 AM | 02:00 PM | 5.0000 | REG | Christy Wilson |
| 06/18/2005 | 08:00 AM | 03:00 PM | 7.0000 | WKND | Christy Wilson |
| 06/20/2005 | 9:00 AM | 3:00 PM | 6.0000 | REG | Christy Wilson |
| 06/21/2005 | 9:00 AM | 2:40 PM | 5.7500 | REG | Christy Wilson |
| 06/21/2005 | 11:00 PM | 12:00 AM | 1.0000 | REG | Christy Wilson |
| 06/22/2005 | 12:00 AM | 9:00 AM | 9.0000 | REG | Christy Wilson |
| 06/22/2005 | 9:00 AM | 3:00 PM | 6.0000 | REG | Christy Wilson |
| 06/24/2005 | 9:30 AM | 3:00 PM | 5.5000 | REG | Christy Wilson |
| 06/25/2005 | 9:00 AM | 3:00 PM | 6.0000 | WKND | Christy Wilson |
| 06/27/2005 | 09:00 AM | 03:00 PM | 6.0000 | REG | Christy Wilson |
| 06/28/2005 | 09:00 AM | 02:30 PM | 5.5000 | REG | Christy Wilson |
| 06/28/2005 | 11:00 PM | 12:00 AM | 1.0000 | REG | Christy Wilson |
| 06/29/2005 | 12:00 AM | 09:00 AM | 9.0000 | REG | Christy Wilson |
| 06/29/2005 | 09:00 AM | 03:00 PM | 6.0000 | REG | Christy Wilson |

| Date | Start | End | Hours | Type | Name |
|---|---|---|---|---|---|
| 07/01/2005 | 09:00 AM | 10:00 PM | 1.2500 | REG | Christy Wilson |
| 07/01/2005 | 11:00 AM | 03:00 PM | 4.0000 | REG | Christy Wilson |
| 07/02/2005 | 08:00 AM | 03:00 PM | 7.0000 | VAC | Christy Wilson |
| 07/05/2005 | 09:00 AM | 03:00 PM | 6.0000 | REG | Christy Wilson |
| 07/05/2005 | 11:00 PM | 12:00 AM | 1.0000 | REG | Christy Wilson |
| 07/06/2005 | 12:00 AM | 09:00 AM | 9.0000 | REG | Christy Wilson |
| 07/06/2005 | 09:00 AM | 03:00 PM | 6.0000 | REG | Christy Wilson |
| 07/08/2005 | 09:00 AM | 03:00 PM | 6.0000 | REG | Christy Wilson |
| 07/09/2005 | 07:00 AM | 03:00 PM | 8.0000 | WKND | Christy Wilson |
| 07/25/2005 | 9:00 AM | 3:00 PM | 6.0000 | REG | Christy Wilson |
| 07/26/2005 | 9:00 AM | 3:00 PM | 6.0000 | REG | Christy Wilson |
| 07/26/2005 | 11:00 PM | 12:00 AM | 1.0000 | REG | Christy Wilson |
| 07/27/2005 | 12:00 AM | 9:00 AM | 9.0000 | REG | Christy Wilson |
| 07/27/2005 | 9:00 AM | 3:00 PM | 6.0000 | REG | Christy Wilson |
| 07/29/2005 | 9:00 AM | 3:00 PM | 6.0000 | REG | Christy Wilson |
| 07/30/2005 | 9:00 AM | 3:00 PM | 6.0000 | WKND | Christy Wilson |
| 08/01/2005 | 09:00 AM | 03:00 PM | 6.0000 | REG | Christy Wilson |
| 08/02/2005 | 10:00 AM | 02:00 PM | 4.0000 | REG | Christy Wilson |
| 08/02/2005 | 11:00 PM | 12:00 AM | 1.0000 | REG | Christy Wilson |
| 08/03/2005 | 12:00 AM | 09:00 AM | 9.0000 | REG | Christy Wilson |
| 08/03/2005 | 09:00 AM | 12:15 PM | 3.2500 | REG | Christy Wilson |
| 08/05/2005 | 09:30 AM | 03:00 PM | 5.5000 | REG | Christy Wilson |
| 08/06/2005 | 08:30 AM | 03:00 PM | 6.5000 | WKND | Christy Wilson |
| 08/08/2005 | 9:00 AM | 4:15 PM | 7.2500 | REG | Christy Wilson |
| 08/09/2005 | 9:00 AM | 3:00 PM | 6.0000 | REG | Christy Wilson |
| 08/09/2005 | 11:00 PM | 12:00 AM | 1.0000 | REG | Christy Wilson |
| 08/10/2005 | 12:00 AM | 9:00 AM | 9.0000 | REG | Christy Wilson |
| 08/10/2005 | 9:00 AM | 3:00 PM | 6.0000 | REG | Christy Wilson |
| 08/12/2005 | 9:00 AM | 3:00 PM | 6.0000 | REG | Christy Wilson |
| 08/15/2005 | 09:00 AM | 03:00 PM | 6.0000 | REG | Christy Wilson |
| 08/16/2005 | 09:00 AM | 03:00 PM | 6.0000 | REG | Christy Wilson |
| 08/19/2005 | 7:00 AM | 3:15 PM | 8.2500 | REG | Joe Bonomo |
| 08/31/2005 | 3:00 PM | 9:15 PM | 6.2500 | REG | Helen Burianek |
| 09/04/2005 | 3:00 PM | 11:15 PM | 8.2500 | WKND | Joe Bonomo |
| 09/05/2005 | 12:30 PM | 2:30 PM | 2.0000 | HOL1 | Helen Burianek |
| 09/07/2005 | 11:00 AM | 12:00 PM | 1.0000 | REG | Joe Bonomo |
| 09/08/2005 | 12:00 AM | 07:00 AM | 7.0000 | REG | Joe Bonomo |
| 09/14/2005 | 03:00 PM | 11:00 PM | 8.0000 | REG | Joe Bonomo |
| 09/18/2005 | 03:00 PM | 11:00 PM | 8.0000 | WKND | Joe Bonomo |
| 09/20/2005 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 09/21/2005 | 12:00 PM | 05:00 PM | 5.0000 | REG | Marjorie Walsh |
| 09/23/2005 | 12:30 PM | 07:30 PM | 7.0000 | REG | Marjorie Walsh |
| 09/26/2005 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 09/27/2005 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 09/28/2005 | 12:00 PM | 05:00 PM | 5.0000 | REG | Marjorie Walsh |
| 09/30/2005 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 10/02/2005 | 3:00 PM | 11:00 PM | 8.0000 | WKND | Joe Bonomo |
| 10/03/2005 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 10/04/2005 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 10/05/2005 | 12:00 PM | 05:00 PM | 5.0000 | REG | Marjorie Walsh |
| 10/07/2005 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 10/09/2005 | 03:00 PM | 11:00 PM | 8.0000 | WKND | Joe Bonomo |
| 10/10/2005 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 10/11/2005 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |

| Date | Start | End | Hours | Type | Name |
|------|-------|-----|-------|------|------|
| 10/12/2005 | 12:00 PM | 06:00 PM | 6.0000 | REG | Marjorie Walsh |
| 10/14/2005 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 10/16/2005 | 03:00 PM | 11:00 PM | 8.0000 | WKND | Joe Bonomo |
| 10/17/2005 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 10/18/2005 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 10/19/2005 | 12:00 PM | 05:00 PM | 5.0000 | REG | Marjorie Walsh |
| 10/21/2005 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 10/23/2005 | 03:00 PM | 11:00 PM | 8.0000 | WKND | Joe Bonomo |
| 10/24/2005 | 12:00 PM | 4:00 PM | 4.0000 | SICK | Marjorie Walsh |
| 10/24/2005 | 4:00 PM | 8:00 PM | 4.0000 | REG | Marjorie Walsh |
| 10/24/2005 | 08:15 AM | 11:15 AM | 3.0000 | REG | Joe Bonomo |
| 10/25/2005 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 10/26/2005 | 12:00 PM | 5:00 PM | 5.0000 | REG | Marjorie Walsh |
| 10/28/2005 | 12:00 PM | 08:00 PM | 8.0000 | VAC | Marjorie Walsh |
| 10/30/2005 | 03:00 PM | 11:00 PM | 8.0000 | WKND | Joe Bonomo |
| 10/31/2005 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 11/01/2005 | 11:00 PM | 12:00 AM | 1.0000 | REG | Joe Bonomo |
| 11/01/2005 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 11/02/2005 | 12:00 AM | 07:00 AM | 7.0000 | REG | Joe Bonomo |
| 11/02/2005 | 12:00 PM | 05:00 PM | 5.0000 | REG | Marjorie Walsh |
| 11/04/2005 | 12:30 PM | 08:30 PM | 8.0000 | REG | Marjorie Walsh |
| 11/07/2005 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 11/08/2005 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 11/09/2005 | 12:00 PM | 05:00 PM | 5.0000 | REG | Marjorie Walsh |
| 11/11/2005 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 11/13/2005 | 03:00 PM | 11:00 PM | 8.0000 | WKND | Joe Bonomo |
| 02/21/2005 | 6:30 AM | 11:30 AM | 5.0000 | REG | Shelly Perrin |
| 02/21/2005 | 9:00 AM | 3:30 PM | 6.5000 | REG | Christy Wilson |
| 02/22/2005 | 9:00 AM | 1:15 PM | 4.2500 | REG | Christy Wilson |
| 02/23/2005 | 6:00 AM | 10:40 AM | 4.7500 | REG | Shelly Perrin |
| 02/23/2005 | 9:00 AM | 3:00 PM | 6.0000 | REG | Christy Wilson |
| 02/25/2005 | 6:30 AM | 8:00 AM | 1.5000 | REG | Shelly Perrin |
| 02/25/2005 | 11:30 PM | 12:00 AM | 0.5000 | REG | Shelly Perrin |
| 02/25/2005 | 12:00 AM | 12:30 AM | 0.5000 | REG | Shelly Perrin |
| 02/25/2005 | 9:00 AM | 3:00 PM | 6.0000 | REG | Christy Wilson |
| 02/28/2005 | 9:30 AM | 3:00 PM | 5.5000 | REG | Christy Wilson |
| 03/01/2005 | 9:30 AM | 1:30 PM | 4.0000 | REG | Christy Wilson |
| 03/02/2005 | 9:00 AM | 3:00 PM | 6.0000 | REG | Christy Wilson |
| 03/02/2005 | 9:00 PM | 11:00 PM | 2.0000 | REG | Shelly Perrin |
| 03/04/2005 | 9:00 AM | 3:00 PM | 6.0000 | REG | Christy Wilson |
| 03/04/2005 | 9:30 AM | 11:30 AM | 2.0000 | REG | Shelly Perrin |
| 03/06/2005 | 1:00 PM | 5:00 PM | 4.0000 | WKND | Shelly Perrin |
| 03/06/2005 | 11:10 AM | 12:10 PM | 1.0000 | WKND | Shelly Perrin |
| 11/14/2005 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 11/15/2005 | 12:00 PM | 06:00 PM | 6.0000 | REG | Marjorie Walsh |
| 11/16/2005 | 12:00 PM | 05:00 PM | 5.0000 | REG | Marjorie Walsh |
| 11/18/2005 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 11/20/2005 | 03:00 PM | 11:00 PM | 8.0000 | WKND | Joe Bonomo |
| 11/21/2005 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 11/22/2005 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 11/23/2005 | 12:00 PM | 05:00 PM | 5.0000 | REG | Marjorie Walsh |
| 11/25/2005 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 11/27/2005 | 3:00 PM | 11:00 PM | 8.0000 | WKND | Joe Bonomo |
| 11/28/2005 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 11/29/2005 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 11/30/2005 | 12:00 PM | 1:30 PM | 2.5000 | REG | Marjorie Walsh |
| 12/02/2005 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |

| Date | Time In | Time Out | Hours | Type | Name |
|---|---|---|---|---|---|
| 12/04/2005 | 03:15 PM | 11:00 PM | 7.7500 | WKND | Joe Bonomo |
| 12/05/2005 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 12/06/2005 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 12/07/2005 | 12:00 PM | 5:00 PM | 5.0000 | REG | Marjorie Walsh |
| 12/09/2005 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 12/11/2005 | 3:00 PM | 11:00 PM | 8.0000 | WKND | Joe Bonomo |
| 07/11/2005 | 9:30 AM | 2:30 PM | 5.0000 | REG | Christy Wilson |
| 07/12/2005 | 9:00 AM | 3:00 PM | 6.0000 | REG | Christy Wilson |
| 07/12/2005 | 11:00 PM | 12:00 AM | 1.0000 | REG | Christy Wilson |
| 07/13/2005 | 12:00 AM | 9:00 AM | 9.0000 | REG | Christy Wilson |
| 07/13/2005 | 9:00 AM | 3:00 PM | 6.0000 | REG | Christy Wilson |
| 07/15/2005 | 9:50 AM | 3:00 PM | 5.2500 | REG | Christy Wilson |
| 07/16/2005 | 9:00 AM | 3:00 PM | 6.0000 | WKND | Christy Wilson |
| 07/18/2005 | 9:00 AM | 3:00 PM | 6.0000 | REG | Christy Wilson |
| 07/19/2005 | 9:00 AM | 3:00 PM | 6.0000 | REG | Christy Wilson |
| 07/19/2005 | 11:00 PM | 12:00 AM | 1.0000 | REG | Christy Wilson |
| 07/20/2005 | 12:00 AM | 9:00 AM | 9.0000 | REG | Christy Wilson |
| 07/20/2005 | 9:00 AM | 3:00 PM | 6.0000 | REG | Christy Wilson |
| 07/22/2005 | 9:00 AM | 3:00 PM | 6.0000 | VAC | Christy Wilson |
| 01/23/2006 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 01/24/2006 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 01/25/2006 | 12:00 PM | 05:00 PM | 5.0000 | REG | Marjorie Walsh |
| 01/27/2006 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 01/29/2006 | 03:00 PM | 11:15 PM | 8.2500 | WKND | Joe Bonomo |
| 01/30/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 01/31/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 02/01/2006 | 9:00 AM | 2:00 PM | 5.0000 | REG | Marjorie Walsh |
| 02/03/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 02/05/2006 | 3:00 PM | 11:00 PM | 8.0000 | VAC | Joe Bonomo |
| 02/06/2006 | 12:00 PM | 8:00 PM | 8.0000 | VAC | Marjorie Walsh |
| 02/07/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 02/08/2006 | 12:30 PM | 6:00 PM | 4.5000 | REG | Marjorie Walsh |
| 02/10/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 02/12/2006 | 3:00 PM | 11:00 PM | 8.0000 | WKND | Joe Bonomo |
| 02/13/2006 | 12:30 PM | 08:00 PM | 7.5000 | REG | Marjorie Walsh |
| 02/14/2006 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 02/15/2006 | 12:00 PM | 05:00 PM | 5.0000 | REG | Marjorie Walsh |
| 02/17/2006 | 1:30 PM | 08:00 PM | 6.5000 | REG | Marjorie Walsh |
| 02/20/2006 | 1:00 PM | 8:00 PM | 7.0000 | REG | Marjorie Walsh |
| 02/21/2006 | 1:00 PM | 8:00 PM | 7.0000 | REG | Marjorie Walsh |
| 02/22/2006 | 12:00 PM | 5:00 PM | 5.0000 | REG | Marjorie Walsh |
| 02/24/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 02/26/2006 | 3:00 PM | 11:00 PM | 8.0000 | WKND | Joe Bonomo |
| 02/27/2006 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 02/28/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 03/01/2006 | 12:00 PM | 5:00 PM | 5.0000 | REG | Marjorie Walsh |
| 03/03/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 03/05/2006 | 03:00 PM | 11:00 PM | 8.0000 | WKND | Joe Bonomo |
| 12/26/2005 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 12/27/2005 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 12/28/2005 | 12:00 PM | 5:00 PM | 5.0000 | REG | Marjorie Walsh |
| 12/30/2005 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 01/02/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 01/03/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 01/04/2006 | 12:00 PM | 5:00 PM | 5.0000 | REG | Marjorie Walsh |
| 01/06/2006 | 1:00 PM | 8:00 PM | 7.0000 | REG | Marjorie Walsh |
| 01/08/2006 | 3:00 PM | 8:00 PM | 5.0000 | WKND | Joe Bonomo |

| Date | Start | End | Hours | Type | Name |
|---|---|---|---|---|---|
| 01/09/2006 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 01/10/2006 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 01/11/2006 | 12:00 PM | 05:00 PM | 5.0000 | REG | Marjorie Walsh |
| 01/13/2006 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 01/15/2006 | 3:00 PM | 11:00 PM | 8.0000 | WKND | Joe Bonomo |
| 01/16/2006 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 01/17/2006 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 01/18/2006 | 12:00 PM | 05:00 PM | 5.0000 | REG | Marjorie Walsh |
| 01/20/2006 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 01/22/2006 | 3:00 PM | 9:00 PM | 6.0000 | WKND | Joe Bonomo |
| 01/22/2006 | 9:00 PM | 11:00 PM | 2.0000 | SICK | Joe Bonomo |
| 03/06/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 03/07/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 03/08/2006 | 12:00 PM | 5:00 PM | 5.0000 | REG | Marjorie Walsh |
| 03/10/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 03/12/2006 | 3:05 PM | 11:00 PM | 8.0000 | WKND | Joe Bonomo |
| 03/13/2006 | 12:00 PM | 8:00 PM | 8.0000 | SICK | Marjorie Walsh |
| 03/14/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 03/15/2006 | 12:00 PM | 5:00 PM | 5.0000 | REG | Marjorie Walsh |
| 03/17/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 03/19/2006 | 3:00 PM | 11:00 PM | 8.0000 | WKND | Joe Bonomo |
| 03/20/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 03/21/2006 | 1:00 PM | 8:00 PM | 7.0000 | REG | Marjorie Walsh |
| 03/22/2006 | 12:00 PM | 5:00 PM | 5.0000 | REG | Marjorie Walsh |
| 03/24/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 03/26/2006 | 3:00 PM | 11:00 PM | 8.0000 | VAC | Joe Bonomo |
| 03/27/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 03/28/2006 | 1:00 PM | 5:00 PM | 4.0000 | REG | Marjorie Walsh |
| 03/29/2006 | 12:00 PM | 10:00 PM | 10.0000 | REG | Marjorie Walsh |
| 03/31/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 04/02/2006 | 3:45 PM | 11:00 PM | 7.2500 | WKND | Joe Bonomo |
| 04/03/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 04/04/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 04/05/2006 | 2:00 PM | 5:00 PM | 3.0000 | REG | Marjorie Walsh |
| 04/07/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 04/09/2006 | 3:00 PM | 11:00 PM | 8.0000 | WKND | Joe Bonomo |
| 04/10/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 04/11/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 04/12/2006 | 12:00 PM | 5:00 PM | 5.0000 | REG | Marjorie Walsh |
| 04/16/2006 | 3:00 PM | 11:00 PM | 8.0000 | HOL2 | Joe Bonomo |
| 04/17/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 04/18/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 04/19/2006 | 12:00 PM | 5:00 PM | 5.0000 | REG | Marjorie Walsh |
| 04/21/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 04/23/2006 | 3:00 PM | 11:15 PM | 8.2500 | WKND | Joe Bonomo |
| 04/24/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 04/25/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 04/26/2006 | 12:00 PM | 8:00 PM | 5.0000 | REG | Marjorie Walsh |
| 04/28/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 04/30/2006 | 3:00 PM | 11:00 PM | 8.0000 | WKND | Joe Bonomo |
| 05/01/2006 | 12:00 PM | 3:00 PM | 3.0000 | REG | Marjorie Walsh |
| 05/01/2006 | 3:00 PM | 8:00 PM | 5.0000 | SICK | Marjorie Walsh |
| 05/02/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 05/03/2006 | 12:00 PM | 5:00 PM | 5.0000 | VAC | Marjorie Walsh |

| Date | Start | End | Hours | Type | Name |
|---|---|---|---|---|---|
| 05/05/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 05/08/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 05/09/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 05/10/2006 | 12:00 PM | 5:00 PM | 5.0000 | REG | Marjorie Walsh |
| 05/12/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 05/14/2006 | 3:00 PM | 11:00 PM | 8.0000 | WKND | Joe Bonomo |
| 12/12/2005 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 12/13/2005 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 12/14/2005 | 12:00 PM | 5:00 PM | 5.0000 | REG | Marjorie Walsh |

| Date | Start | End | Hours | Type | Name |
|---|---|---|---|---|---|
| 12/16/2005 | 12:00 PM | 08:00 PM | 8.0000 | VAC | Marjorie Walsh |
| 12/18/2005 | 3:00 PM | 11:00 PM | 8.0000 | WKND | Joe Bonomo |
| 12/19/2005 | 12:00 PM | 08:00 PM | 8.0000 | REG | Marjorie Walsh |
| 12/20/2005 | 11:30 AM | 08:00 PM | 8.5000 | REG | Marjorie Walsh |
| 12/21/2005 | 12:00 PM | 05:00 PM | 5.0000 | REG | Marjorie Walsh |
| 12/23/2005 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 12/25/2005 | 03:15 PM | 11:00 PM | 7.7500 | HOL2 | Joe Bonomo |
| 05/29/2006 | 12:00 PM | 8:00 PM | 8.0000 | VAC | Marjorie Walsh |
| 05/30/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 05/31/2006 | 12:00 PM | 5:00 PM | 5.0000 | VAC | Marjorie Walsh |
| 06/02/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 06/04/2006 | 3:00 PM | 11:00 PM | 8.0000 | WKND | Joe Bonomo |
| 06/05/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 06/06/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 06/07/2006 | 12:00 PM | 5:00 PM | 5.0000 | REG | Marjorie Walsh |
| 06/09/2006 | 1:30 PM | 8:00 PM | 6.5000 | REG | Marjorie Walsh |
| 06/12/2006 | 2:00 PM | 8:00 PM | 6.0000 | REG | Marjorie Walsh |
| 06/13/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 06/14/2006 | 12:00 PM | 5:00 PM | 5.0000 | REG | Marjorie Walsh |
| 06/16/2006 | 12:00 AM | 6:00 AM | 6.0000 | VAC | Marjorie Walsh |
| 06/16/2006 | 6:00 PM | 8:00 PM | 2.0000 | REG | Marjorie Walsh |
| 06/19/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 06/20/2006 | 5:00 PM | 8:00 PM | 3.0000 | REG | Marjorie Walsh |
| 06/20/2006 | 12:00 PM | 5:00 PM | 5.0000 | SICK | Marjorie Walsh |
| 06/21/2006 | 12:00 PM | 5:00 PM | 5.0000 | REG | Marjorie Walsh |
| 06/23/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 06/25/2006 | 6:00 PM | 11:00 PM | 5.0000 | WKND | Joe Bonomo |
| 05/15/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 05/16/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 05/17/2006 | 12:00 PM | 8:00 PM | 5.0000 | REG | Marjorie Walsh |
| 05/19/2006 | 12:00 PM | 8:00 PM | 8.0000 | VAC | Marjorie Walsh |
| 05/21/2006 | 3:15 PM | 11:00 PM | 7.7500 | WKND | Joe Bonomo |
| 05/22/2006 | 12:00 PM | 2:00 PM | 2.0000 | SICK | Marjorie Walsh |
| 05/22/2006 | 2:00 PM | 8:00 PM | 6.0000 | REG | Marjorie Walsh |
| 05/23/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 05/24/2006 | 12:00 PM | 5:00 PM | 5.0000 | REG | Marjorie Walsh |
| 05/26/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 05/28/2006 | 3:00 PM | 11:00 PM | 7.7500 | WKND | Joe Bonomo |
| 06/26/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 06/27/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 06/28/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 07/02/2006 | 3:30 PM | 11:00 PM | 7.5000 | WKND | Joe Bonomo |
| 07/03/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 07/04/2006 | 12:00 PM | 8:00 PM | 8.0000 | VAC | Marjorie Walsh |
| 07/05/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |

| Date | Start | End | Hours | Type | Name |
|------|-------|-----|-------|------|------|
| 07/07/2006 | 4:00 PM | 8:00 PM | 4.0000 | REG | Marjorie Walsh |
| 07/09/2006 | 3:00 PM | 11:00 PM | 8.0000 | WKND | Joe Bonomo |
| 07/24/2006 | 1:00 PM | 8:00 PM | 7.0000 | REG | Marjorie Walsh |
| 07/25/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 07/28/2006 | 12:00 PM | 8:00 PM | 8.0000 | VAC | Marjorie Walsh |
| 07/30/2006 | 3:00 PM | 11:00 PM | 8.0000 | WKND | Joe Bonomo |
| 07/30/2006 | 3:00 PM | 5:00 PM | 2.0000 | WKND | Marjorie Walsh |
| 07/31/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 08/01/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 08/02/2006 | 12:00 PM | 5:00 PM | 5.0000 | REG | Marjorie Walsh |
| 08/04/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 08/06/2006 | 3:00 PM | 11:00 PM | 8.0000 | WKND | Joe Bonomo |
| 08/14/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 08/15/2006 | 12:00 PM | 5:00 PM | 5.0000 | REG | Marjorie Walsh |
| 08/16/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |

| Date | Start | End | Hours | Type | Name |
|------|-------|-----|-------|------|------|
| 08/18/2006 | 4:00 PM | 8:00 PM | 4.0000 | REG | Marjorie Walsh |
| 08/20/2006 | 3:00 PM | 11:00 PM | 8.0000 | WKND | Joe Bonomo |
| 07/10/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 07/11/2006 | 12:00 PM | 3:00 PM | 3.0000 | SICK | Marjorie Walsh |
| 07/12/2006 | 3:00 PM | 8:00 PM | 5.0000 | REG | Marjorie Walsh |
| 07/14/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 07/16/2006 | 3:00 PM | 11:00 PM | 8.0000 | WKND | Joe Bonomo |
| 07/17/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 07/18/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 07/19/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 07/21/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 09/05/2006 | 3:00 PM | 8:00 PM | 5.0000 | REG | Marjorie Walsh |
| 09/08/2006 | 3:00 PM | 8:00 PM | 5.0000 | REG | Marjorie Walsh |
| 09/11/2006 | 5:00 PM | 8:00 PM | 3.0000 | REG | Marjorie Walsh |
| 09/12/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 09/13/2006 | 12:00 PM | 5:00 PM | 5.0000 | REG | Marjorie Walsh |
| 08/21/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 08/22/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 08/23/2006 | 12:00 PM | 5:00 PM | 5.0000 | REG | Marjorie Walsh |
| 08/25/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |
| 08/28/2006 | 5:30 PM | 8:30 PM | 3.0000 | REG | Marjorie Walsh |
| 08/29/2006 | 12:00 AM | 8:00 AM | 8.0000 | REG | Marjorie Walsh |
| 08/30/2006 | 12:00 PM | 5:00 PM | 5.0000 | REG | Marjorie Walsh |
| 09/01/2006 | 12:00 PM | 8:00 PM | 8.0000 | REG | Marjorie Walsh |

EXHIBIT D

872-1158 Home

234-8467

750-2053 cell

Center for Disability Rights
Notable Occurrence Supplement Form

9-27-04   Interview with Oliver Raymond Taylor 10:33 am
regarding Melissa General, attendant for
Verginia Kwentz.

① Melissa has worked for Verginia for approx
1 yr.

② Oliver has been self directing DAR for
2.5 years. Both interviewed but hired

③ Oliver was not attracted to Melissa at first.
Melissa approaching Oliver approx 2 months
into hire, said "I know you like me"
"I know you want to do me." Oliver said
"I never said that." She stated "I'm just
kissing." Melissa began getting friendly
poking Oliver in the side or on the chest
approx 3 months into hire

④ They played cards at night. Verginia
would be on the computer.

R T___                    9/27/04
Signature of Author        Date

___ L ___                 9-27-04  witness
Signature of Program Director/Designee    Date

* Oliver was at the same address as Verginia
113 Crosswood Dr., Rochester NY 14530.

Center for Disability Rights
Notable Occurrence Supplement Form

*(handwritten note in top right margin, illegible)*

(5) *(handwritten, largely illegible)* They would have drinks together (1-2) while playing cards. She would vodka, he drank Black Velvet. He offered to walk her and get her home safe, but he was never denied she was too drunk to drive. Started 3 months ago - ends 1 month ago. *(August 1 note)*

(6) *(handwritten, largely illegible)* Oliver thought she knew she was working for Virginia, but she also knew he was the SOO, and she tested him.

(7) *(handwritten, largely illegible)* Oliver began saying some insubordination, allowing ..., leaving early. (examples - ...) He did not he was falling in love with her in June, she said ... that she knew it was.

(8) *(handwritten, largely illegible)* Things started getting bad in July. Virginia might have ... getting ... at this point she stated she wouldn't ... going out with Oliver. No sex.

_____                    9-27-04
Signature of Author                          Date

_____                    9-27-04   Witness
Signature of Program Director/Designee       Date

Center for Disability Rights
Notable Occurrence Supplement Form

Oliver did not know how to respond.

(9) Six or seven months into the hire, leg and foot massages were offered. The massages occurred all the way up to the anti outside her leg. No point therein. Oliver asked her if she wanted a foot massage when she stated "my feet are hurting." The 10-12 massages given [X] (all that she massage over) she would lay on the couch and say "I need a massage." Virginia was in the room during all massages.

(10) This was a relationship that developed into something more.

(11) Kissing began about 6 months into the hire. Hugging was fine, then Oliver asked "why can't you kiss me on the lips."

Signature of Author _____    9-27-04
                                        Date

Signature of Program Director/Designee _____   9-27-04  witness
                                        Date

Center for Disability Rights
Notable Occurrence Supplement Form

THE NEXT TIME THEY HUGGED, SHE DID KISS
HIM ON THE LIPS.

(12) HUGGING, KISSING ON LIPS, LEG MASSAGES
GIFTS EXCHANGED. THEY WAS VERY CLOSE
MELISSA NEVER REFUSED ANY AFFECTIONS FROM
OLIVER, WAS RESPONSIVE TO ALL ABOVE LISTED
ACTIONS. WENT TO DINNER TOGETHER 3X'S
SHE WENT OUT TO YOUR COTTAGE 2X'S.

(13) OLIVER STARTED TALKING TO JUDY OR COPAS
[ ... ] AGO TO REPORT THE RELATIONSHIP
AND PROBLEMS HE WAS HAVING WITH MELISSA.

(14) OLIVER LET MELISSA SLACK ON OCCASION
BUT WOULD [ ] LET THE OTHER AIDS SEE THIS.

(15) MELISSA WOULD CALL OLIVER OFF HOURS,
HE FELT I WAS A CASUAL, FRIENDLY RELATIONSHIP.

(16) LAST NIGHT - (SUN 26TH) OLIVER GOT A PHONE CALL FROM
[ ], A FRIEND OF VIRGINIA'S WHO CONFIDED

_____     9-27-04
Signature of Author                 Date

_____     9-27-04  WITNESS
Signature of Program Director/Designee   Date



Center for Disability Rights
Notable Occurrence Supplement Form

some disturbing things (Melissa was manipulating her + her husband) about this Melissa was interfering between Melinda and Melissa. (Melissa was down issues, petty) He wanted it to stop.

(17) Oliver was having a hard time with Melissa's schedule, she made a lot of promises that were not being kept (Swimming) then Oliver was working a lot of double shifts. Melissa would not work overtime or volunteer for extra shifts.

(18) Oliver wanted to change Melissa's schedule to mon - sat.

He looked at the bottom line and figures out how comes she charge her for any MASO-7. He looking at the whole picture and realizes it wasn't worth it. Melissa wouldn't work

_____
Signature of Author                    9-23-09
                                       Date

_____
Signature of Program Director/Designee  9-23-09
                                       Date



(8)

Center for Disability Rights
Notable Occurrence Supplement Form

the scheduling he needed now to make.

(19) On Saturday 25th around 10 AM. Melissa called Oliver saying "I heard you want to fire me." Oliver said "I never said that." (Virginia had told Melissa about the firing when Oliver told her about the schedule change. Virginia denied it.)

(20) Melissa said she was going to the [illegible] board and CDR and "Just fire me, go ahead!"

Melissa gave the phone to Virginia. Oliver asked Virginia "what's this all about?" Oliver asked to speak to Melissa again, but she refused to talk at the time.

(21) On Sunday 26th Oliver called at around 6pm. Melissa and Oliver began arguing. Melissa is telling Oliver she's going to the

Signature of Author — 9-27-04
Date

Signature of Program Director/Designee — 9-27-04 [illegible]
Date

Center for Disability Rights
Notable Occurrence Supplement Form

HOSPITAL [illegible] ... [illegible handwritten text] ...

[illegible handwritten text] ... JUST GO HOME."

MELISSA CALLS [illegible], A FRIEND OF VIRGINIA'S
TO PROVIDE COVERAGE AND SHE LEFT BEFORE
9 PM.

OLIVER HAS NOT SPOKEN TO HER SINCE.
OLIVER THINKS THAT SINCE [illegible] SHE IS [illegible].
MELISSA CALLED THE POLICE ON SUN [illegible]
5 PM. [illegible] OLIVER HAS CALLED THE POLICE
DUE TO HIS [illegible] WITH [illegible], WHO WAS
[illegible] AT HIM, SAYING HE [illegible] TO
RETURN TO HIS RESIDENCE. AND [illegible] WHEN OLIVER
[illegible] SAW MANY POLICE [illegible] [illegible] AT
HIS RESIDENCE, DUE TO MELISSA CALLING. OLIVER
TALKED TO THE OFFICER, AND [illegible] AT VIRGINIA WAS

Signature of Author _____     9-22-04
                                                        Date

Signature of Program Director/Designee _____     9-22-04  [illegible]
                                                                    Date



Center for Disability Rights
Notable Occurrence Supplement Form

accusing Nina of *verbal abuse* "you're going to the nursing home if you quit your program" she wants Nina out of her house. Abuse protective referral was made out [illegible] does not know who.

_____          _____
Signature of Author                   9-27-04
                                      Date

_____          _____
Signature of Program Director/Designee  9-27-04  Witness
                                      Date

Interview with Oliver Raymond Taylor 10:33am regarding: Melissa General, attendant for Virginia Kuentz.

1.) Melissa has worked for Virginia for approx. 1 year.

2.) Oliver has been self directing other for 2.5 years. Both interview. Both hire.

3.) Oliver was not attracted to Melissa at first. Melissa approached Oliver approx. 2 months into hire, states, "I heard you like me." "I heard you wanted to date me." Oliver said, "I never said that." She stated, "I'm just kidding." Melissa began getting friendly, poking Oliver in the side or on the chest approx. 3 months into hire.

4.) They played cards at night. Virginia would be on the computer.

***Oliver lives at the same address as Virginia: 117 Cranbrooke Terrace, Webster, NY 14580.

5.) They would have drinks together (1-2) while playing cards. She drank vodka. He drank black velvet. He checked to make sure she got home safe but he was never afraid she was too drunk to drive. Started 3 months into job – ended 1 month ago (August).

6.) Oliver thought she knew she was working for Virginia but she also knew he was the SDO, and she tested him.

7.) Oliver began seeing some insubordination: arriving late, leaving early (excuses – gas, air in tires) He told her he was falling in love with her in June. She said, "Give it time, see where it goes."

8.) Things started getting bad in July. Virginia might have been getting jealous at this point. She stated she wouldn't mind going out with Oliver herself. Oliver did not know how to respond.

9.) Six or seven months into hire, leg and foot massages were offered. Leg massages occurred all the way up to the butt outside her leg. No inner thigh. Oliver asked her if she wanted a foot massage when she stated, "My feet are hurting." 10-12 massages given. (1 massage given with oil that she brought over). → Oliver gave her his shorts to change into, which she did, then laid on the couch. She would lay on the couch and say "I need a massage". Virginia was in the room during all massages.

10.) This was a friendship that developed into something more.

11.) Kissing began about 6 months into the hire. Hugging was first, then Oliver asked "why don't you kiss me on the lips." The next time they hugged, she did kiss him on the lips.

12.) Hugging, kissing on the lips, leg massages, gifts exchanged. They were very alike Melissa never refused any overture from Oliver, was responsive to all above listed actions. Went to dinner together 3 times, she went out to your cottage 2 times.

13.) Oliver started talking to Judy at CDPAS 6 months ago to report the relationship and problems he was having with Melissa.

14.) Oliver let Melissa slack on occasion, but would not let the other aides see this.

15.) Melissa would call Oliver off hours, he felt it was a friendly, casual relationship.

16.) Last night (Sun., 26th), Oliver got a phone call from Molly, a friend of Virginia's, who confided some disturbing things (Virginia was manipulating her and her husband). Oliver felt Virginia was interfering between himself and Melissa. (back and forth) (He said, she said, issues, petty). He wanted it to stop.

**17.)** Oliver was having a hard time with Melissa's schedule. She would make a lot of promises that were not being kept (swimming) other aides were working a lot of double shifts. Melissa would not work overtime or volunteer for extra shifts.

**18.)** Oliver wanted to change Melissa's schedule to Mon.-Sat. He looked at the handbook and figured out that he could discharge her for any reason; he looked at the whole picture and decided it wasn't worth it. Melissa wouldn't work the schedule he needed her to work.

**19.)** On Saturday, 25th, around 10 am Melissa called Oliver saying, "I heard you want to fire me" Oliver said, "I never said that". (Virginia had told Melissa about the firing when Oliver told her about the schedule change, Virginia twisted it).

**20.)** Melissa said she was going to the Labor Board and CDR and "just fire me, go ahead!"

Melissa gave the phone to Virginia, Oliver asked Virginia "what's this all about?" Oliver asked to speak to Melissa again, but she refused to talk at that time.

**21.)** On Sunday, 26th, Oliver called at about 6pm. Melissa and Oliver began arguing. Melissa is telling Oliver she is going to the hospital with a nervous breakdown. "are you firing me?" "You're going down" accused him of sexual harassment. Oliver stated, "if that's what you want." "Just go home".

Melissa calls David, a friend of Virginia's, to provide coverage and she left before 9 pm.

Oliver has not spoken to her since. Oliver thinks that she thinks she s fired: Melissa called the police on Sun. between 6pm and 8pm. Oliver had called the police due to his conversation with David, who was screaming at him, saying he could not return to his residence. That's when Oliver found out about police being already at his residence, due to Melissa calling. Oliver talked to the officer, and found out Virginia was accusing him of verbal abuse "You're going to a nursing home if you don't run your program" she wants him out of her house. Adult protective referral was made out but Oliver does not know who.

Signed by both Oliver Raymond Taylor and Melanie Menough (CDPAS Director)

EXHIBIT E

## Mary Willoughby

| | |
|---|---|
| **From:** | Melissa General [mgeneral@rochester.rr.com] |
| **Sent:** | Tuesday, September 28, 2004 12:39 PM |
| **To:** | Mary Willoughby |
| **Subject:** | melissa general |

To whom it may concern:

Raymond Taylor who is Virginia Kuentz's SDO has Fired Melissa General under no grounds called Virginia Kuentz at 6:30 pm Sunday and spoke with Virginia who repeated his statement who stated that this was my last night to work he broke the confidentiality between supervisor and SDO by his actions. I had become very mentally ill at that moment in time and asked to be relieved. He stated that I had to call other aides to be relieved I said Ok and I proceeded to call other attendants who could not come in I called David R Rufeisen who is a close friend of Virginias after she had requested I call him to come there and so I can be relieved I could not perform my duties I was a Nervous wreck. Police were called because Virginia did not want Raymond to be around her unfortunately he does live with her and unless any other act of violence besides the verbal abuse can he be removed Police were called to 117 Cranbrooke Terrace only in regards to Mrs.Kuentz who was very offended by his actions by the arguing back and forth between Raymond Taylor and David Raufeisen actual argument was Raymond dropped them off at the airport Virginia went on a little vacation to see her best friend Raymond Taylor being her SDO dropped them off at the airport and Raymond Taylor picking them up on their arrival did not know which airline there were coming home on so he says is the reason he called her friend Molly because intruded in her personal life and caused Molly not to talk to her because through all this mental abuse that has been going on he tells Virginia Molly does not want nothing to do with her just trying to make her feel terrible. He had called me and broke confidentiality and said Melissa did you know her brother has no feet and hands my response was what are you talking about and told me the conversation that had gone on which to me was inappropriate to be talking to me about it and response I got is that he was is trying to make himself look good because Virginia has been talking about how am I going to rid this control freak. Virginia also received a phone call from David since David and Raymond have never been friends it was strange that David called and said if you do not be good to Raymond you will end up in a nursing home she then called Raymond and asked him why did you call David and tell him to pass onto me the above said Raymond was feeling guilty because she had passed on to David that she wants to get rid of him. David on the night I was fired called Raymond to ask why he called Molly because Ginny was crying and they began to yell and Virginia said call the police she does not want him in her home so police were called and with full police report was written and investigators will follow up with special adult services. Raymond Taylor resides with Mrs. Kuentz who has not only sexually harassed Melissa General on more then several occasions did he threaten to fire her and hang her job over her head for several months because I had no response to him I have a tape of his sexual harassment actions a full witness of his sexual advances are David Raufeisen. Raymond Taylor spoke to him face to face and said I am going to get a piece of that meaning he is going to try and get sex from me. I had called CDR in June to take actions against Raymond Taylor if Melissa took her first actions to complain to CDR on which I did make contact and left a message with a woman named Judy to call me back. She did call me back and I never followed up because this would cause Virginia to go back to the nursing home I was told by Raymond this would happen and he forced Virginia to speak with me not take actions in which she is very afraid of Raymond Taylor he has threatened her for about 9 months you belong in a nursing home and if I leave that is where you will go because you can not have another SDO according to Raymond Taylor he stated he had talked to Judy Farusha and this is what she has told him. Virgina feels threatened into a nursing home. Raymond Taylor will go to every extreme to make up lies

9/28/2004

but I have the truth on tape not to mention that he used to be a state trooper and got fired because of something to do with sexual harassment I just found that information out he is the biggest manipulator I can not believe CDR would actually let someone as mental as he is to be a Self directed Other for a woman with a disability and I strongly believe they should have background checks especially if the male is going to reside in the home they will have the care and CDR who employees these attendants such as I to work. **If he has the authority to fire an employee CDR will take full responsibility for his actions** and I will not be subjected to a loss job and wages, as I will follow through with a lawyer and the media. Raymond Taylor has caused great stress on my job (an incident where a strange woman called my work and said that she was his girlfriend and asked me if I was dating him Virginia was my witness and I told that strange woman that absolutely not and not to call my work again he is PHYSCO) and caused great stress to Virginia all because I have not responded to him this is my job and I take it very serious I ask him to back up his reason to fire me I have never been written up for any reason I also have on tape that I do my job and I do a great job right from his mouth. And she has made the attempt to speak with someone at CDR to take care of her needs not his. I am there for Virginia to take care of her needs not his. And she has made the attempt to speak with someone at CDR to talk about having another SDO and to hear the rules and regulations of an SDO and her rights to change SDO. He has discriminated me by making me call when I leave and when I come so he can hear my voice he is obsessed and until I pushed this issue that all the aides will follow the same rules. I went on to do some self-investigating I had gone to work early to see them not call him as he makes me I then complained that the other aides will perform the same rules I have too. I literally had to abide rules he made up in fret of loosing my job then It came to the mental abuse of both Virginia and I did I say enough is enough. He thought I would act in the same manner the first time where he pushed my buttons so far and then requested me to not take actions as he forced Virginia to talk me out of it. I am reliable worker who performs her duties as CDR and my consumer requires I am very punctual and always give notice to my supervisor in any reason in regards to my job under no circumstances should I be fired and I ask what grounds. I am the victim who has not only been sexually harassed and terminated because I do not respond. I was told never to give notice to Viginia who is my supervisor but to solely call Raymond Taylor that he has all the power and say never did I go against those I have witnessed daily mental stress to her and threats. Along with other witnesses David Rufeisen I ask why were Police called because she does not want Raymond Taylor in her house it had nothing to do with my reasoning of Raymond Taylor that was her wish. I don't have to make this along letter because I have everything on tape. Witnesses of his wrongful behaviors and sexual harassment are Scott General my brother who has heard several conversations of him threaten my job calling my phone all hours of the night invading my personal time at home after I had left my work site I can bring up all the incoming calls and the times if requested by my Verizon carrier one absurd call to my house at 4 in the morning. Virginia Kuentz and David Rufeisen who can and are all-aware of this action to threaten my job. Today is September 27th @ 5:09 I returned Virginias call because she called me. She began crying and telling me how sorry she was and she called me to tell me that according to CDR Raymond Taylor had spoke with them and told her can not have any contact with me. Alina was working at that moment and had seen how unhealthy all of this has made her and she doesn't speak English well I just told her to take care of Virginia. I ask this why is she upset? Why is she crying? She is very unhealthy if she continues this mental abuse from Raymond Taylor. He is a very disturbed male and will go to any extreme to continue abusing her my concern is first myself and I feel really sorry Virginia is also solely apart of this because he mentally abuses her. She also has a meeting with Judy farusha on Wednesday and she continually told me that she didn't want Raymond Taylor there while she spoke to her. If you interview her she can answer all the questions in regards to the mental abuse. He has caused all of this mental abuse to Virginia sexual Harassment to me and mentally affected me, as I will see my Doctor on first set appointment which is 9/28/2004 @ 3:15 for symptoms of nervous breakdown and I will speak with a Lawyer. Why should I be with out work I will not accept waiting on a waiting list for work and especially will not let CDR and Raymond Taylor get away these actions? I have taped conversation of him holding my job over my head along with all the witnesses below to prove my case and why he did this.

9/28/2004

I highly spoke of Virginia Kuentz who needs to be away from that man as I am 100% accurate to prove my own case.

Sincerely,

Melissa M General
307 Avenue A Rochester NY, 14621
home 585-288-6272   507-8604 cel

Witnesses as follows:

Scott General        303-5704 lives with me 307 Avenue A 14621
David Raufeisen   621-2610 18 Spearmint Drive
                          Rochester NY,  14615
Virginia Kuents my consumer  872-1658  117 Cranbrooke Terrace
                                              Webster Ny,  14580


You can get that strange woman's number through questioning of Raymond she lives in Wolcott NY and her name was Sandy a cleaning lady and she can verify what I don't know but I know it not to be good especially what he has done to me.

9/28/2004

EXHIBIT F

## CDR Consumer Directed Personal Assistance Program
## Work Authorization-Hire Form

**Position:** **Personal Care Assistant/Aide**

**Supervisor:** Shelly Perrin
(Please Print)

**Employee:** Melissa General
(Please Print)

This letter serves as an offer of employment by the CDR Consumer Directed Personal Assistance Program. This letter outlines the in _____ of employment, but does not serve as a contract for employment. The terms of this offer are subject to verification of the employee's _____ for work. Hours of work may be subject to change.

**Rate of Pay:** _____       **Expected Start Date:** _____

**Date and Time of New Hire Appointment at CDR:** _____

**Initial Schedule:**

|  | Times | Number of Hours Scheduled |
|---|---|---|
| Sunday | 6PM – 10PM | 4 |
| Monday | 6PM – 10PM | 4 |
| Tuesday |  |  |
| Wednesday | 6PM – 10PM | 4 |
| Thursday |  |  |
| Friday |  |  |
| Saturday |  |  |
| **Total Hours Per Week** |  | 12 |

If the attendant is unable to work any of the specified shifts,

(Contact information on r_____)

[X] the attendant is responsible for arranging his/her own coverage from the contact list on the back of this form or must cover the shift him/herself. If the attendant does not show up for the shift or arrange alternative coverage, his/her employment may be terminated.

[ ] the supervisor will arrange coverage, but requires at least _____ (insert time) advance notice before the beginning of the scheduled shift. If the attendant does not show up for the shift or provide advance notice, his/her employment may be terminated.

X _____   10-6-04
Supervisor Signature – Verifies that this is the Schedule was Offered    Date

_____   10-6-04
Personal Assistant/Aide Signature – Verifies that the Schedule was Accepted    Date

EXHIBIT G

# Mary Willoughby

**From:** Susan Stahl
**Sent:** Monday, October 25, 2004 1:00 PM
**To:** Mary Willoughby
**Subject:** Melissa General

Hi Mary

I just got a call from Melissa General who said she is looking for any hours. I offered her a consumer who lives in a highrise near the lake/beach on Sunday mornings that is open for Nancy Culbertson now. I am going to call Nancy now and have her call Melissa to see if she can work the hours.

Susan

Susan Stahl
CDPAS Supervisor Support Specialist
Center for Disability Rights
412 State Street
Rochester, NY 14608
(585) 546-7510 V/TTY
(585) 546-5643 Fax

## Mary Willoughby

| | |
|---|---|
| **From:** | Melanie Menough |
| **Sent:** | Thursday, December 16, 2004 11:06 AM |
| **To:** | Mary Willoughby |
| **Subject:** | mg |

heres the recent scoop on melissa general.

I had Lisa Cyphers call her today, ~~her home phone has been disconnected~~, and her cel just rings, You cant leave a message on it.  Lisa needed her for the day shift tomorrow.

Francine Bunton called her monday, 12-13-04 to offer every monday and tuesday from 7a-3p.  She left a message on the cell phone, the home phone was disconnected.  Melissa has not called her back.

Aaron Watkins called to offer hours last week, i need to get the response for you.  mel

*I called   342-1831 ~~since~~ on 12/16/04 - 12 rings*
*507-8604      "          "     - No Answer*
*                          - Pick up No*
*                          speak-hang up*

**Mary Willoughby**

| | |
|---|---|
| **From:** | Elizabeth Avalos |
| **Sent:** | Monday, January 10, 2005 2:51 PM |
| **To:** | Mary Willoughby |
| **Subject:** | Melissa General |

Hi Mary,

Michele Weis (SDO for Gabriella Weis) called Melissa General and asked her to fill a time slot of 7-9 a.m. for Cathy Colon. Melissa told SDO that she couldn't because she was already working those hours. Michele then told her that maybe they could work something else out and scheduled a time to meet, which Melissa never kept. She called the SDO instead and cancelled due to weather and her son being ill. She said she would call on Sunday to reschedule and hasn't of as yet. I told the SDO to keep me informed of what happens. Thought you'd like to know.

Liz



Elizabeth
Avalos.vcf

# Mary Willoughby

**From:** Andrea Shulman
**Sent:** Wednesday, January 12, 2005 11:57 AM
**To:** Mary Willoughby; Melanie Menough
**Subject:** Melissa General

Mary/Melanie,

I spoke to Melissa about the HCSS position and she seemed very interested in it. I explained to her that it would be possibly working with a Male consumer, overnight hours, part time, and the hours can not be guaranteed, and yet she was still interested in the position. I explained to her that if she was interested that she would have to resign from CDPAS in order to work in the HCSS program. She said that since her sexual harrassment case is still pending that she will have to speak to her EOC counselor to see if it is the right thing for her to do at this time.

She is planning on calling me back tommorow and I will let you guys know how that goes.

thanks,

Andrea

**Meghan Stevenson**

| | |
|---|---|
| **From:** | Susan Stahl |
| **Sent:** | Tuesday, February 08, 2005 10:44 AM |
| **To:** | Meghan Stevenson |
| **Subject:** | RE: Nancy Culbertson/Melissa General |

Hi Meg

I was speaking to Nancy yesterday and she mentioned that ~~melissa is not working with her anymore~~ because of
transportation issues since Nancy just moved this past week to Ferncliff Gardens which is across town from Nancy's other
apartment. Melissa is on Nancy's baack up list for emergencies.

Susan Stahl
CDPAS Supervisor Support Specialist
Center for Disability Rights
412 State Street
Rochester, NY 14608
(585) 546-7510 V/TTY
(585) 546-5643 Fax

-----Original Message-----
**From:** Meghan Stevenson
**Sent:** Wednesday, February 02, 2005 4:59 PM
**To:** Susan Stahl
**Subject:** RE: Nancy Culbertson/Melissa General

don't worry about calling her if nothing else has been reported.
i just wanted to know b/c melissa is a special concern.
thanks -- meg

-----Original Message-----
**From:** Susan Stahl
**Sent:** Wednesday, February 02, 2005 4:48 PM
**To:** Meghan Stevenson
**Subject:** RE: Nancy Culbertson/Melissa General

Hi Meg

There are no more problems with Melissa I will call Nancy tomorrow to see what happened etc.

Susan

Susan Stahl
CDPAS Supervisor Support Specialist
Center for Disability Rights
412 State Street
Rochester, NY 14608
(585) 546-7510 V/TTY
(585) 546-5643 Fax

-----Original Message-----
**From:** Meghan Stevenson
**Sent:** Wednesday, February 02, 2005 3:28 PM
**To:** Susan Stahl
**Subject:** Nancy Culbertson/Melissa General

hi susan --
i just received the Disciplinary for Melissa from Nancy about how she did not show up for a shift.
please let me know if there are any more problems with melissa.
thank you --
meg

## Mary Willoughby

| | |
|---|---|
| **From:** | John C. Simaitis |
| **Sent:** | Wednesday, February 16, 2005 11:14 AM |
| **To:** | Mary Willoughby |
| **Subject:** | Melissa General |

mary,
  marjorie walsh called melissa general on Jan 17th. she  set
up an appointment for Jan 21th. Melissa was a no call and no
show for the meeting on the 21st.
john

**Mary Willoughby**

| | |
|---|---|
| **From:** | J Farruggia |
| **Sent:** | Thursday, February 17, 2005 1:47 PM |
| **To:** | Mary Willoughby |
| **Subject:** | Melissa General |
| | |
| **Importance:** | High |

Hi Mary,

I spoke with Melissa General last night while i was at Christy Willson's house.  Melissa is working with another consumer on Thursday and can not work at 7:00 because she has to get her son on the bus.

Judy

EXHIBIT H

*HHN. Teresa*

# SUPERVISOR AUTHORIZATION-HIRE FORM

**Position:**   **Personal Care Assistant/Attendant**

**Supervisor:**   *Cristh... will* **Christine Willson**

**Employee:**   *Melissa General*
(Please Print)

This letter serves as an offer of employment by the CDR Consumer Directed Personal Assistance Program. This letter outlines the initial terms of employment, but does not serve as a contract for employment. The terms of this offer are subject to verification of the employee's eligibility for work. This verification may include the Child Abuse Registry and appointment is conditional upon clearance. Hours of work may be subject to change.

**Rate of Pay:**   *$8/hr*          **Expected Start Date:**   *ASAP*

**Initial Schedule:**

| | Times | Number of Hours Scheduled |
|---|---|---|
| Sunday | | |
| Monday | 9 - 3 | 6 |
| Tuesday | 9 - 3 | 6 |
| Wednesday | 9 - 3 | 6 |
| Thursday | | |
| Friday | 9 - 3 | 6 |
| Saturday | | |
| *Back up As Needed* | Total Hours Per Week | 24 |

*(Contact information on reverse side.)*

If the attendant is unable to work any of the specified shifts,

☐  the attendant is responsible for arranging his/her own coverage from the supervisor's back up list or must cover the shift him/herself. If the attendant does not show up for the shift or arrange alternative coverage, his/her employment may be terminated.

☐  the supervisor will arrange coverage, but requires at least _____ (insert time) advance notice before the beginning of the scheduled shift. If the attendant does not show up for the shift or provide advance notice, his/her employment may be terminated.

Supe.   *Christine Willson*

Personal Assistant/Attendant Signature -- Verifies that the Schedule was Accepted          Date   *2/6 05*

file: CDPAS Hire Form rev 0604 .xls

EXHIBIT I

As of the week of Sept 25-06, Melissa General is no longer working for me.

The hours may have been difficult for her to work with a family, but I needed someone who could work, 12 pm - 8 pm, 4 days a week. We mutually agree to find new people.

Sincerely,
Morgane Walsh